## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| | **Civil Action File No.** |
| **v.** | |
| **TANNER S. ADAM, JONATHAN L. ADAM, TRITEN FINANCIAL GROUP, LLC, and GCZ GLOBAL LLC,** | **JURY DEMAND** |
| **Defendants.** | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR ASSET FREEZE AND OTHER EQUITABLE RELIEF

## I.   PRELIMINARY STATEMENT

From January 2023 until June 14, 2024, Tanner Adam and his brother Jonathan Adam, a recidivist with prior convictions for state securities law violations (collectively, the "Adam Brothers"), through their respective alter-ego companies, Triten Financial Group, LLC ("Triten") and GCZ Global, LLC ("GCZ"), raised at least $61.5 million in funds from more than 80 investors.  Defendants offered investors the opportunity to participate in a crypto asset lending pool the Adam Brothers purportedly operated in the decentralized finance ("DeFi") space.  Through investment contracts in the form of promissory notes and lending agreements, the Adam Brothers offered investors the opportunity to earn up to a 13.5 percent monthly

return.  The Adam Brothers told investors that these monthly returns were generated from the fees earned on the total amount of capital purportedly made available for such loans on the crypto asset trading platform operated by Gemini Trust Company.

The Adam Brothers did not use investors funds as represented and their representations were false and misleading.  While the Adam Brothers did send a portion of investor funds to two different crypto asset trading platforms, most investor funds were not deployed as represented by the Adam Brothers.  Instead, the Adam Brothers operated a Ponzi scheme.  Of the $61.5 million of investor funds raised by Defendants, at least $53.9 million was either misappropriated or used to pay interest, pay finders fees, and return principal to existing investors.

The Adam Brothers have used investor funds for a variety of personal expenses.  Tanner Adam has used investor funds to make the down and installment payments to build a $30 million condominium in Miami.  The Adam Brothers have used over $1.8 million in investor funds to build houses in Texas for Jonathan Adam and their brother, their parents, and Jonathan's in-laws.  Jonathan Adam has used at least $480,000 to purchase cars, trucks, and recreational vehicles.  The Adam Brothers' dissipation of assets has continued into June 2024 and less than $400,000 in investor funds remain in bank accounts controlled by the Adam Brothers.

The Securities and Exchange Commission ("Commission") files this emergency action to preserve assets that have been procured though Defendants'

fraudulent misappropriation of investor funds and are currently under the control of the Defendants.  In addition to an asset freeze, this motion seeks an order preventing the destruction of documents and an accounting.  The complaint ultimately seeks additional remedies of permanent injunctive relief, disgorgement plus prejudgment interest, and civil penalties.

The sworn declarations of Krysta Cannon [8/25/2024 Declaration of Krysta Cannon ("Cannon Dec."), attached hereto as Exhibit 1], Dan Byler [7/24/2024 Declaration of Dan Byler ("Byler Dec."), attached hereto as Exhibit 2], Scott Shickler [8/13/2024 Declaration of Scott Shickler ("Shickler Dec."), attached hereto as Exhibit 3], David Mireles [7/25/2024 Declaration of David Mireles ("Mireles Dec."), attached hereto as Exhibit 4], John Baughman [7/26/2024 Declaration of John F. Baughman ("Baughman Dec."), attached hereto as Exhibit 5], Elaine Richards [6/17/2024 Declaration of Elaine Y. Richards ("Richards Dec."), attached hereto as Exhibit 6], and Robin Chang [6/20/2024 Declaration of Robin Chang ("Chang Dec."), attached hereto as Exhibit 7] provide the basis for the facts set forth in this brief.

## II.   **FACTS**

### A.   **Background**

Though the Adam Brothers operated this Ponzi scheme together, soliciting investors jointly on calls and videoconferences and sending funds between the

bank accounts each controls, they held themselves out to investors as having defined roles in the scheme, and each controls their own entity.  Jonathan presented himself as a self-described "tech nerd" and "the brains" of the operation who invented the bot.  [Shickler Dec. Ex. D at 2-5, 14 & 28, Ex. M & Ex. F at 30-32.] Jonathan has a technology background and told investors that he had launched several successful technology businesses, including Thissl, Inc ("Thissl").  [*See, e.g., id*. Ex. M.]  Jonathan is the principal of GCZ, raises investor funds through GCZ, and controls all the funds flowing in and out of GCZ's bank accounts.  [*Id*. Ex. M; Cannon Dec. ¶ 9.]

Tanner presented himself as the more social, business-minded one of the duo.  [Shickler Dec. Ex. F at 30-32.]  Tanner controls the Triten entity, raises investor funds through Triten, and controls all the funds flowing in and out of Triten's bank accounts.  [Cannon Dec. ¶ 10.]  Apart from one investor, GCZ and Triten appear to have separate pools of investors.  [*Id*. ¶ 11.]

Mechanically, most investors entered into promissory notes or lending agreements with Triten or GCZ, agreeing to loan principal (in the form of either fiat or digital assets) to the entities for a period ranging from one to ten years. [*See, e.g*., Byler Dec. ¶¶ 23 & 39 & Exs. 6 & 10; Mirles Dec. ¶ 15 & Ex. 4; Shickler Dec. ¶¶ 8, 42, 46 & 49 & Exs. B, K, N & P; Cannon Dec. ¶¶ 28-30 & A.] Investors were motivated to enter into these agreements to earn the substantial

returns offered by the Adam Brothers.  [Byler Dec. ¶¶ 3-6.]  To date, the Adam

Brothers, both themselves and through several individuals operating as finders,

have successfully solicited more than 80 investors to invest in Triten and GCZ.

[Cannon Dec. ¶ 8.]  The Adam Brothers promised those investors monthly

investment returns of at least 8 percent, but in some cases of up to 13.5 percent.

[*See, e.g.*, Byler Dec. ¶ 5 & Exs. 1 & 2; Mirles Dec. ¶ 10 & Ex. 2; Cannon Dec. ¶

30 & Ex. A.]

## B.   <u>Misrepresentations Concerning the Lending Pool Investment</u>

The Adam Brothers consistently made numerous material misrepresentations

to investors regarding the lending pool opportunity and their own backgrounds.  The

Adam Brothers, in joint conversations and individually, told investors highly specific

information about the purported lending pool investment opportunity.

The Adam Brothers knew that Gemini Trust Company operated a crypto asset

trading platform.  The Defendants have no relationship with Gemini Trust Company.

 [*See generally,* Baughman Dec.]  The Adam Brothers knew that none of the

Defendants had any relationship with Gemini Trust Company.  [*See, e.g.*, Shickler

Dec. Ex. J.]  Nevertheless, the Adam Brothers led investors to believe that they were

working with Gemini Trust Company.  [*Id*. ¶¶ 33-37 & Ex. F at 2-3; Mireles Dec. ¶

8.]

The Adam Brothers told investors that Jonathan had invented a bot that entered into smart contracts to provide flash loans to arbitrage traders seeking to trade crypto assets.  [Shickler Dec. ¶ 27; Byler Dec. ¶¶ 5 & 11 & Exs. 1 & 2; Mireles Dec. ¶¶ 5-8 & Exs. 1 & 2.]  Jonathan told investors that he, through GCZ, began operating the bot on the Gemini platform, where it caught the attention of Gemini because the GCZ bot "outperformed" Gemini's own bot.  [Shicker Dec. ¶¶ 29-30.]  When Jonathan told investors about Gemini, he knew that investors believed that he was referring to Gemini Trust Company.  [*Id*. Ex. D at 33-34.]

In response to an investor's question about Jonathan's relationship with Gemini Trust Company, Jonathan did not tell the investor that he was not working with Gemini Trust Company.  Instead, he told the investor that Gemini was dozens of different companies and that he was working with Gemini's Panamanian platform.  [*Id*. ¶ 33.]  During a subsequent conversation with that same investor, Tanner referenced the prior discussion of Gemini Trust Company and explained that the Adam brothers were working with Gemini's Panamanian platform.  [*Id*. Ex. H at 13-15.]  The Adam Brothers never told investors that neither they nor their companies were associated with the crypto asset trading platform operated by Gemini Trust Company.  [*Id*. ¶ 37.]

According to the Adam Brothers, Gemini wanted to purchase Jonathan's bot, but Jonathan declined.  Instead, the Adam Brothers told investors that Jonathan had

entered an exclusive contract with Gemini whereby Gemini would pay the Adam Brothers a rate of one-percent interest per day on the total balance of the lending pool capital the Adam Brothers made available for flash loans. [*Id*. ¶ 30; Byler Dec. ¶ 9.] This rate would be paid regardless of whether the funds were actually deployed for the purpose of these flash loans. [Shickler Dec. Ex. F at 12-13; Byler Dec. ¶ 35.]

The purported arrangement created revenues of around 30 percent per month and served as the source for the returns paid to the investors. [Shickler Dec. ¶ 10; Byler Dec. ¶ 6.] The Adam Brothers told investors that the Adam Brothers were compensated by taking a share of the 30-percent return paid to them by Gemini. The Adam Brothers told investors that they were not entitled to any other fees or compensation paid by investors. [*Id*. ¶¶ 12-13.] The Adam Brothers failed to disclose to some investors that they were paying finders fees to individuals who introduced them to others who ultimately invested. [Byler Dec. ¶ 42.]

The Adam Brothers told investors that they were raising funds to service the demands of the lending pool. Tanner told one investor that they were trying to raise $250 million from investors. [*Id*. ¶ 9.] Tanner also told investors that the Gemini agreement had been entered into between the Adam Brothers and Gemini's offshore Panamanian lending pool because Gemini and other crypto asset trading platforms were moving their operations offshore to avoid SEC regulation. [Shickler Dec. ¶ 36 & Ex. H at 14-15.]

The Adam Brothers told investors that once the investors wired their funds in U.S. Dollars to GCZ's or Triten's bank account, the entities would purportedly wire the funds to Kraken, where the U.S. Dollars would be exchanged for the stablecoin Tether.  [Byler Dec. Ex. 1 at 5.]  The Adam Brothers told investors that the Monday following receipt of investor principal, the Tether deployed to an automated bot through a crypto wallet and then to the lending pool, to be loaned out to arbitrage traders in the DeFi space.  [Shickler Dec. ¶ 9.]  According to the Adam Brothers, when investor capital came into a Triten or GCZ controlled account or wallet, it was purportedly immediately deployed into the lending pool and "locked up" in a bot, such that nobody, the Adam Brothers included, could access the money until the agreed upon length of the investment contract had passed.  [*Id.* ¶¶ 9-10; Byler Dec. ¶ 14.]

The Adam Brothers told investors that the risk to the investors' principal was virtually non-existent, unless there was a complete global market meltdown. [Shickler Dec. ¶¶ 52-53; Byler Dec. ¶ 35.]  The Adam Brothers told investors that at the end of the lending period, investors could either receive their principal back, or roll it into a new investment contract.  [*See, e.g.*, Cannon Dec. ¶ 30 & Ex. A.]  The Adam Brothers told investors that the fees from the arrangement with Gemini were purportedly paid in Tether by Gemini to the Adam Brothers' crypto "profit wallet" and were then transferred to GCZ's or Triten's crypto "corporate wallet."  According

-8-

to the Adam Brothers, the fees were sent from the "corporate wallet" to the Adam Brothers' Kraken accounts where the Tether was converted back to U.S. Dollars, sent to GCZ's or Triten's bank accounts, and then wired back to investors. [Byler Dec. Ex. 1 at 5.] The Adam Brothers told investors that each brother had the pass keys to the other brother's wallet, and that each month they would get together to unlock their crypto wallets and process the returns to investors as described above. [Shickler Dec. ¶ 54.]

These representations that the Adam Brothers made to investors are false. Instead of deploying investor capital into smart contacts, the Adam Brothers misappropriated and misspent approximately $53.9 million of the $61.5 million raised from investors. [Cannon Dec. ¶ 12.] Though the Adam Brothers transferred $12.9 million of investor funds to Coinbase and Kraken, they withdrew $5.3 million from those platforms back to their bank accounts. [*Id*. ¶ 13.] To the extent that there is a net outflow of $7.6 million to Coinbase and Kraken, there is no evidence those funds have been deployed in any manner consistent with the representations made to investors. The $7.6 million transferred to Coinbase and Kraken has not generated a daily return of 1%. [*Id*. ¶ 14.]

### C.    Adam Brothers' Misappropriation of Assets

Bank records from February 1, 2023, through June 30, 2024, show that the

Adam Brothers misappropriated more than $19 million of the investor funds that they

raised.  The following table reflects the funds misappropriated by the Adam Brothers:

| | Triten | GCZ | Total |
|---|---|---|---|
| Investor funds raised in business and personal accounts | $    40,707,612 | $    20,852,322 | $    61,559,934 |
| Less: Investor payments and finder fees | (27,634,470) | (6,567,081) | (34,201,551) |
| Less: Net funds sent to crypto market | (5,495,976) | (2,077,917) | (7,573,893) |
| Less: Account balance at 06/30/24 | (173,760) | (162,461) | (336,221) |
| | | | |
| Net misappropriation for personal use | $      7,403,406 | $    12,044,863 | $    19,448,269 |

[*Id.* ¶ 12.]

In addition to paying former investors with new investor money, the Adam

Brothers used investor funds to finance their and their family's lifestyle and to invest

in other business ventures.  Tanner directed investor funds in the amount of $3.725

million towards the down payment and progress payments for an 11,861 square foot,

five-bedroom, nine-and-a-half-bathroom penthouse condominium he is building in

Miami, with a total purchase price of nearly $30 million.  [*Id.* ¶ 15.]  The Adam

Brothers directed a total of $1.46 million to a Texas home builder who built custom

homes for their brother, their parents, Jonathan, and Jonathan's in-laws.   [*Id.* ¶ 16.]

Jonathan, through GCZ, also provided a $3 million line of credit to the home

builder to finance working capital, of which $637,000 was drawn.  [*Id.* ¶ 17.]  In

addition to the construction cost of the new homes in Texas, Jonathan, both

individually and through GCZ, paid over $995,000 to escrow and title companies.

[*Id*. ¶ 18.]   Jonathan also spent over $360,000 on home and construction related expenses, including over $75,000 for the construction of a pool.  [*Id*. ¶ 19.]  Jonathan directed a total of over $480,000 for the purchase of cars, trucks, and recreational vehicles.  [*Id*. ¶ 20.]

The Adam Brothers used investor funds to pay living expenses for themselves and for their parents, including designer purchases at Louis Vuitton, Carolina Herrera, and Jimmy Choo, and credit card payments of over $220,000.  [*Id*. ¶ 21.] Tanner designated a Triten bank account for his parents from which his parents made credit card payments, tax payments, and payments for other living expenses exceeding $65,000 in a four-month period ending in June 2024.  [*Id*. ¶ 22.]  The Adam Brothers did not tell investors that their money would be used to pay other investors.  [Shickler Dec. ¶ 15; Byler Dec. ¶ 25; Mireles Dec. ¶ 17.]  The Adam Brother also did not tell investors that they would use investor funds to pay personal expenses.  [Shickler Dec. ¶ 14; Byler Dec. ¶ 26; Mireles Dec. ¶ 18.]

### D.  **Misrepresentations Concerning Jonathan Adam's Background**

Jonathan spent extensive time talking with and answering questions from potential investors about his background and Jonathan's other company, Thissl, on numerous video calls and at least one video presentation.  [*See, e.g*., Shickler Dec. Exs. C-F, I, J & L; Mireles Dec. Ex. 1.]  Jonathan also circulated a ten-minute video of himself making claims about his background and qualifications.  [Shickler Dec.

Exs. L & M; Byler Dec. Ex. 9.]  In those calls, presentation and videos, the Adam

Brothers made multiple misrepresentations about Jonathan Adam's background:

- Jonathan falsely told investors that he serves as the cyber ambassador to the State of Kansas.  [Shickler Dec. Ex. M at 2.]

- Tanner repeated the misrepresentation about Jonathan's involvement as cyber ambassador to the state of Kansas.  [*Id*. Ex. H at 52.]

- Jonathan falsely told investors that Thissl received $59 million pursuant to a Simple Agreement for Future Equity investment from Sequoia Capital Operations, Inc. ("Sequoia"), a venture capital firm that specializes in seed stage, early stage, and growth stage investments in private companies across technology sectors.  [*Id*. Ex. F at 34-35.]

- Tanner repeated the misrepresentations about Sequoia's investment in Thissl to investors.  [*Id*. Ex. H at 51.]

- Jonathan falsely told investors that Thissl powers the entire network for Basecamp, Inc. ("Basecamp"), a program management software company that previously used Amazon Web Services for its data storage needs and in October 2022 publicly announced that it would no longer be using Amazon Web Services.  [*Id*. Ex. F at 36.]

- Jonathan falsely told investors that Thissl has a large contract with Rackspace Technology, Inc. ("Rackspace"), a cloud computing services company.

- Tanner repeated the misrepresentation about Thissl's contract with Rackspace.  [*Id.* Ex. H at 50.]

- Jonathan falsely told investors that Thissl has successfully litigated over its patents after being sued by large corporations, including Comcast, Oracle and Cisco.  [*Id.* Ex. D at 26.]

Contrary to Jonathan's representations, Thissl has never provided any services to Basecamp.  [*See generally*, Richards Dec.]  Neither Thissl, nor any prior owner of patents developed by Jonathan, has ever been involved in litigation over the patents developed by Jonathan.  [Cannon Dec. ¶ 35.]  Contrary to Jonathan and Tanner's representations, Sequoia has never made an investment in Thissl and Thissl has never had any contracts with Rackspace.  [*See generally*, Chang Dec.; Cannon Dec. ¶¶ 33-35.]  These misrepresentations regarding Jonathan's technical abilities and successes were important to investors in making their decision to invest.  [Shickler Dec. ¶¶ 28 & 38-41.]  In discussing his background, Jonathan failed to disclose that he had previously been convicted of three counts of securities fraud and sentenced to 50 months in prison.  Tanner also failed to disclose to investors Jonathan's criminal history.  [Byler Dec. ¶ 28; Mireles Dec. ¶ 19.]  Had the Adam Brothers disclosed

-13-

Jonathan's criminal history, several individuals would not have invested in Triten. [*See, e.g.*, Byler Dec. ¶ 29.]

### E.   Defendants' Dissipation of Assets

The Adam Brothers continued to raise, and misappropriate, investor funds through at least June 2024, when they agreed to stop soliciting investments at the request of the Commission.  [Cannon Dec. ¶ 23.]  In May and June 2024, the Adam Brothers raised $10.96 million and paid $8.8 million to investors with those funds. [*Id*. ¶ 24.]  Furthermore, Jonathan made credit card payments of over $50,000, paid at least $180,000 in attorney fees, sent $974,000 to other businesses he is affiliated with, and transferred $100,000 to his personal bank accounts.  [*Id*. ¶ 25.]  As of June 30, 2024, $336,000 of investor funds remain in the bank accounts of Triten and GCZ. [*Id*. ¶ 26.]  As of June 30, 2024, the net outflow of funds to Coinbase and Kraken is $7.6 million which represents investor funds transferred to and still within crypto wallets.  [*Id*. ¶ 27.]

## III.   ARGUMENT

### A.   The Investments Are Securities

The promissory notes between Triten and investors and the lending agreements between GCZ and investors are investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and also are securities under the "family resemblance" test adopted in *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, an "investment contract."  In *Howey*, the Supreme Court defined an investment contract to mean a contract, transaction, or scheme whereby a person makes (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits to be derived solely from the efforts of others.  328 U.S. at 298-99.  Here, the first and third *Howey* factors are satisfied because at least 80 investors have provided principal investments totaling at least $60 million to GCZ and Triten, had no involvement in the development and deployment of the purported bot or the flash loans, and expected profits to be derived solely from the efforts of Defendants.

In the Eleventh Circuit, the second element, a "common enterprise," can be satisfied by a showing of "broad vertical commonality."  *See SEC v. Koscot Interplanetary, Inc*., 497 F.2d 473, 478-79 (5th Cir. 1974); *SEC v. Cont'l Commodities Corp*., 497 F.2d 516, 520-523 (5th Cir. 1974).  Broad vertical commonality requires only a finding that the fortunes of investors are linked to the efforts of the promoter or third parties.  S*EC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199-1200 (11th Cir. 1999); *Koscot*, 497 F.2d at 479.  Vertical commonality exists here because investors' returns, on both the promissory notes and the lending agreements are dependent upon the success of the Adam Brothers' companies, vertical commonality is fulfilled, and the second requirement of *Howey* is met.

-15-

The promissory notes and lending agreements also qualify as securities under the Supreme Court's "family resemblance" test established in *Reves*.  Under that test, a note is presumed to be a security unless it bears a strong resemblance to a judicially created list of non-security notes or the note is of a type that should be added to the list.  *Reves*, 494 U.S. at 65-67.  To determine whether a note is a security, the Supreme Court identified the following factors: (1) the motivation of the parties for entering the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of investors; and (4) whether some factor, such as the existence of another regulatory scheme, reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary.  *Id.* at 66-67.

Applying the *Reves* factors, both the Triten promissory notes and the GCZ lending agreements are securities.  The Adam Brothers sold the notes for investment purposes, and the purchasers of the notes were motivated to earn profits.  The promissory notes and lending agreements entered into by the Triten and GCZ investors do not fall within any of the types of instruments that *Reves* stated are not securities, they do not bear a family resemblance to the notes on the list, and they should not be added to the list due to factor four—there are no risk-reducing factors present here.

**B.     The Defendants Violated the Antifraud Provisions
        of the Securities Act and the Exchange Act**

Section 17(a) of the Securities Act of 1933 ("Securities Act") proscribes

fraudulent conduct in the offer or sale of securities and Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder

proscribe fraudulent conduct in connection with the purchase or sale of securities.

*U.S. v. Naftalin*, 441 U.S. 768 (1979).  Among other things, those statutes and the

corresponding rule make it unlawful to make any untrue statement of material fact,

or to omit any material fact necessary to make a statement not misleading, in the

offer or sale of securities or in connection with the purchase or sale of securities.

These provisions also reach beyond misrepresentations or omissions and

encompass any wrongdoing by any person that rises to the level of a deceptive

practice.  *See Superintendent of Ins. v. Bankers Life and Cas. Co.*, 404 U.S. 6, 10

(1971).

Specifically, Section 17(a)(2) of the Securities Act makes it unlawful "in the

offer or sale of any securities … to obtain money or property by means of any

untrue statement of a material fact or any omission to state a material fact

necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading."  Rule 10b-5(b) prohibits the making

of material misstatements and omissions to investors in connection with the

purchase or sale of securities.

-17-

Defendants violated Section 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5(b) thereunder by making material misrepresentations to investors concerning how the funds they invested in Triten and GCZ would be used, and obtained money as a result of these material misrepresentations. They led investors to believe the principal they invested was safe and the monthly return virtually guaranteed. For instance, the Adam Brothers falsely represented to investors that their money would be deployed in smart contracts and could not be touched by anyone until the end of the investment contract. [Shickler Dec. ¶¶ 9-10; Byler Dec. ¶ 14.] In reality, most investor funds were transferred to other investors shortly after they were deposited or were used to fund the Adam Brothers' lifestyles. [Cannon Dec. ¶ 12.] Investors were never told their funds could be used to pay other investors or for the Adam Brothers' personal use, and they would not have invested with the brothers if they had known this. [Shickler Dec. ¶¶ 14-16; Byler Dec. ¶¶ 25-27; Mireles Dec. ¶¶ 17-18.]

In addition, Rule 10b-5(a) prohibits "employ[ing] any device, scheme or artifice to defraud," and Rule 10b-5(c) bars "engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person," in connection with the purchase or sale of securities. Section 17(a)(1) similarly prohibits "employ[ing] any device, scheme or artifice to defraud," and Section 17(a)(3) bars "engag[ing] in any transaction, practice or course of business which

operates or would operate as a fraud or deceit upon the purchaser," in the offer or sale of securities.

Here, the Adam Brothers, Triten, and GCZ engaged in a course of conduct designed to deceive investors and use the investment proceeds in a manner contrary to what they told investors, including by misappropriating investor funds.  As discussed above, Jonathan, individually and through GCZ, and in connection with and in the offer or sale of securities, knowingly made and disseminated repeated material misrepresentations and materially misleading statements via written materials, recorded videos, and calls with investors, concerning his background and the use of investor money, and secretly used investor proceeds to make principal and interest payments to earlier GCZ investors.

Tanner, individually and through Triten, and in connection with and in the offer or sale of securities, also knowingly made and disseminated material misrepresentations and materially misleading statements via the same methods regarding his brother's background, the use of investor money, and secretly used investor proceeds to make principal and interest payments to earlier Triten investors. Therefore, the Adam Brothers, through Triten and GCZ, employed a "device, scheme, or artifice to defraud," in violation of Rule 10b-5(a) and Section 17(a)(1) and engaged in an "act" or "transaction, practice, or course of business" that "operated as a fraud or deceit" on investors under Rule 10b-5(c) and Section 17(a)(3).  *See*

*Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019) (knowing dissemination of misrepresentations with an intent to deceive violates Rules 10b-5(a) and (c) and Section 17(a)(1)); *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (applying *Lorenzo* to Section 17(a)(3) because it "is virtually identical to Rule 10b-5(c)").

Scienter is required for Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a)(1) of the Securities Act, while a showing of negligence is required for Sections 17(a)(2) and (3) of the Securities Act. In this case, there is ample evidence to support, not just negligence or recklessness, but an actual specific intent to defraud by the Adam Brothers. The evidence to support this conclusion includes their misappropriation of funds and use of newly invested funds to make interest and principal payments to existing investors.

Because Jonathan controls GCZ and Tanner controls Triten, their scienter is imputed to the entities. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1096, n.16 (2d Cir. 1972). For these reasons, the Defendants have violated the anti-fraud provisions of the securities laws.

## IV.   <u>RELIEF REQUESTED</u>

### A.   <u>Asset Freeze</u>

"A district court may exercise its full range of equitable powers, including an asset freeze, to preserve sufficient funds for the payment of a disgorgement

award."  *SEC v. Torchia*, 183 F. Supp. 3d 1291, 1324 (N.D. Ga. 2016); *SEC v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (holding that "[t]he district court may freeze assets in order to preserve funds while a party seeks an equitable remedy such as disgorgement").  The purpose of an asset freeze is to "preserve the status quo" and ensure that a defendant does not dissipate assets.  *SEC v. ETS Payphones*, 408 F.3d 727, 734 (11th Cir. 2005); *Torchia*, 183 F. Supp. 3d at 1324. Asset freezes are intended to protect the Commission's ability to collect disgorgement and, because disgorgement is not limited to the specific assets illegally obtained, asset freezes are not limited to those assets traceable to the fraud.  *See, e.g.*, *SEC v. MCC Int'l. Corp.*, 2024 WL 1508281, at *3 (11th Cir. Apr. 8, 2024) (*citing SEC v. Banner Fund Int'l, et al.,* 211 F.3d 602, 617 (D.C. Cir. 2000) and *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011)).

Defendants' decision to halt temporarily their efforts to solicit investors after learning of the Commission's investigation does not obviate the need for emergency relief.  *ETS Payphones*, 408 F.3d at 733 (affirming preliminary injunction even though the defendant "has complied with the SEC since the inception of the SEC suit [because the court] . . . must weigh this compliance against the magnitude of the alleged fraud and examples of potential malfeasance, including a finding of scienter"); *Manor Nursing,* 458 F.2d at 1101 (noting that the "cessation of illegal activities in contemplation of an SEC suit does not preclude the issuance of an

injunction enjoining violations"). "The reason is obvious: violators generally stop their illegal activities when under judicial scrutiny. But just because defendants may refrain from illegal activity during litigation does not mean they are unlikely to violate the securities laws again." *SEC v. Murphy*, 50 F.4th 832, 851 (9th Cir. 2022).

In *Starbucks Corp. v. McKinney*, 2024 WL 2964141, at *1 (2024), the Supreme Court established a four-part test to determine whether a party is entitled to emergency relief. Under that test, the Commission must show that: (1) it is likely to succeed on the merits of its claim; (2) irreparable harm will result in the absence of the emergency or preliminary relief; (3) the balance of equities tips in the Commission's favor; and (4) that the emergency relief is in the public interest. "The evidence presented for each of those criteria is balanced by the court on a sliding scale analysis: a much stronger showing on one or more of the necessary factors lessens the amount of proof required for the remaining factors." *Collins & Co., Gen. Contractors v. Claytor*, 476 F. Supp. 407, 409 (N.D. Ga. 1979). The Commission can satisfy this standard.

First, the evidence shows that the Commission is likely to succeed on the merits of its claim. The bank records confirm that the Adam Brothers are operating a Ponzi scheme—of the $61.5 million raised, at least $53.9 million was either misappropriated or used to pay interest, pay finders fees, and return principal to existing investors. [Cannon Dec. ¶ 12.]

Second, irreparable harm will result in the absence of an asset freeze.  Since the very start of their scheme and continuing even after they learned of the Commission's investigation, the Adam Brothers have been misappropriating a substantial portion of funds raised from investors.  Although Defendants raised over $60 million from investors, and the Commission disgorgement claim likely exceeds $19 million (the amount of investor funds diverted for personal use), the Commission has only been able to identify $9 million of investor funds remaining in bank accounts and in crypto wallets associated with Defendants.  [*Id*. ¶¶ 12 & 26-27.]  Of that $9 million, more than $7.6 million is held in digital assets that remain under the Adam Brothers' control.  [*Id*. ¶ 27.]  An asset freeze is necessary to ensure that Defendants do not further misappropriate or dissipate investor funds.

Third, the balance of equities also favors the Commission in this case, as the Adam Brothers have defrauded more than 80 investors, and there is a pressing need to restrain the brothers from further misappropriating those investors' funds.  *See, e.g., SEC v. Mizrahi*, CV-19-2284 PA, 2019 WL 3241185, at *4 (C.D. Cal. Apr. 10, 2019) ("The balance of the equities favor the SEC, which is safeguarding the public and client funds from further diversion.").  Finally, an asset freeze is in the public interest, as it furthers the Commission's role to enforce the federal securities laws and safeguard the investing public.  *See, e.g., Mizrahi* at *6.

-23-

**B.     An Accounting and an Order Prohibiting
        Destruction or Concealment of Documents**

The Commission requests that Defendants be ordered to provide an accounting

of the use of investor funds in order to determine whether there are other entities or

individuals who are in possession of investor funds or assets purchased using investor

funds. *Manor Nursing*, 458 F.2d at 1105; *SEC v. Lybrand*, 2000 WL 913894, at *12

(S.D.N.Y. July 6, 2000).  In addition, to preserve the Commission's ability to take

effective discovery of the scope and magnitude of Defendants' fraud, the

Commission requests an order prohibiting the Defendants from altering, concealing,

or destroying relevant documents.  This is particularly important in this case because

the Adam Brothers have sole control over GCZ and Triten and, to date, have declined

to provide any evidence in response to investigative subpoenas or otherwise.

**V.     CONCLUSION**

Based on the foregoing, the Commission respectfully requests that the Court

issue an order imposing an asset freeze against Defendants and granting other relief

as described above.

Respectfully submitted this 26th day of August, 2024,

*/s/ Kristin W. Murnahan*
M. Graham Loomis
Regional Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7622

Georgia Bar No. 457868
loomism@sec.gov

Kristin W. Murnahan
Senior Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
404-842-7655
Atlanta, GA 30326
Georgia Bar No. 759054
murnahank@sec.gov

COUNSEL FOR PLAINTIFF

## <u>CERTIFICATION OF COMPLIANCE</u>

This is to certify that the foregoing was prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 (B).

_/s/ Kristin W. Murnahan_
Kristin W. Murnahan