# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Civil Action File No.** |
| **v.** | |
| **TANNER S. ADAM, JONATHAN L. ADAM, TRITEN FINANCIAL GROUP, LLC, and GCZ GLOBAL LLC,** | **JURY DEMAND** |
| **Defendants.** | |

## DECLARATION OF KRYSTA M. CANNON

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.      I am a Senior Accountant in the Enforcement Division of the United States Securities and Exchange Commission (the "Commission").  I have been licensed by the State of Georgia as a CPA since November 2000.  I am over eighteen years of age and am competent to make this declaration.

2.      I am the staff accountant who was part of the team assigned to the investigation of possible violations of the securities laws by the Defendants in the above-entitled cause of action, and I submit this declaration in support of the Commission's Motion for Asset Freeze and Other Equitable Relief.

3.     This Declaration is based upon my personal review of the following financial records, including monthly account statements, cancelled checks, deposit records, and wire details for the accounts listed below:

| Account Name | Financial Institution | Account Number | Start Date | End Date |
|---|---|---|---|---|
| GCZ Global LLC | Wells Fargo | XXXXXX5573 | June 6, 2023 | June 30, 2024 |
| GCZ Global LLC | Wells Fargo | XXXXXX3372 | February 12, 2024 | June 30, 2024 |
| Jonathan Adam Ava Adam | Wells Fargo | XXXXXX4153 | January 31, 2022 | May 31, 2024 |
| Jonathan Adam Ava Adam | Wells Fargo | XXXXXX1972 | January 3, 2022 | June 12, 2024 |
| Shorestream Limited | Wells Fargo | XXXXXX1925 | April 1, 2024 | June 30, 2024 |
| Tanner Adam | First Carolina | XXXXXX2767 | May 10, 2023 | March 8, 2024 |
| Tanner Adam | JPMC | XXXXX3016 | December 23, 2021 | June 25, 2024 |
| Tanner Adam | JPMC | XXXXX7478 | March 18, 2024 | June 28, 2024 |
| Tanner Adam | JPMC | XXXXX7486 | March 18, 2024 | June 28, 2024 |
| Tetragon FLP, LLC | JPMC | XXXXX6082 | February 23, 2024 | June 28, 2024 |
| Triten Financial Group, LLC | Comerica Bank | XXXXXX8368 | January 20, 2023 | March 31, 2023 |
| Triten Financial Group, LLC | Comerica Bank | XXXXXX9126 | January 1, 2023 | March 31, 2023 |
| Triten Financial Group, LLC | First Carolina Bank | XXXXXX2773 | May 1, 2023 | February 29, 2024 |
| Triten Financial Group, LLC | First Carolina Bank | XXXXXX2906 | March 20, 2023 | February 29, 2024 |
| Triten Financial Group, LLC | First Carolina Bank | XXXXXX2964 | July 3, 2023 | February 29, 2024 |
| Triten Financial Group, LLC | JPMC | XXXXX7767 | March 4, 2024 | June 28, 2024 |
| Triten Financial Group, LLC | JPMC | XXXXXX7451 | March 4, 2024 | June 28, 2024 |
| Triten Financial Group, LLC | JPMC | XXXXX8689 | February 26, 2024 | June 28, 2024 |
| Triten Financial Group, LLC | JPMC | XXXXX0919 | February 26, 2024 | June 28, 2024 |
| Triten Financial Group, LLC | JPMC | XXXXX8912 | March 23, 2024 | June 28, 2024 |
| Triten Financial Group, LLC | JPMC | XXXXX7002 | June 1, 2024 | June 28, 2024 |

4.     The Commission obtained the financial account information detailed in paragraph 3 above from the listed financial institutions.

5.     This Declaration is also based upon my personal review of records produced by Coinbase, Inc. ("Coinbase") and Payward Ventures, Inc. d/b/a Kraken ("Kraken") in response to a subpoena request for all documents and communications for accounts held or controlled by Jonathan Lee Adam, Tanner Scott Adam, GCZ Global LLC, or Triten Financial Group, LLC.

6.     Based on my review of the accounts identified in paragraph 3, I have concluded that Defendants used funds they received from investors to pay interest

and principal to other investors and to pay for personal expenses for Jonathan Adam and Tanner Adam, (collectively, the "Adam Brothers") and their family.

7.      I see no evidence that any of the funds Defendants received from investors were deployed into lending bots.

8.      Based on my review of the financial records, I have determined that the Adam Brothers, both themselves and through several individuals operating as finders, have successfully solicited more than 80 investors to invest in Triten Financial Group, LLC ("Triten") and GCZ Global LLC ("GCZ").

9.      The financial records show that Jonathan Adam has raised investor funds through GCZ, and controls all the funds flowing in and out of GCZ's bank accounts.

10.      The financial records show that Tanner Adam has raised investor funds through Triten, and controls all the funds flowing in and out of Triten's bank accounts.

11.      Based on my review of the financial records, with the exception of one investor, GCZ and Triten have separate pools of investors.

12.      Bank records from February 1, 2023, through June 30, 2024, show that the Adam Brothers misappropriated more than $19 million of the investor funds that they raised.  The following table reflects the funds misappropriated by the Adam Brothers:

|  | Triten | GCZ | Total |
|---|---|---|---|
| Investor funds raised in business and personal accounts | $ 40,707,612 | $ 20,852,322 | $ 61,559,934 |
| Less: Investor payments and finder fees | (27,634,470) | (6,567,081) | (34,201,551) |
| Less: Net funds sent to crypto market | (5,495,976) | (2,077,917) | (7,573,893) |
| Less: Account balance at 06/30/24 | (173,760) | (162,461) | (336,221) |
| Net misappropriation for personal use | $ 7,403,406 | $ 12,044,863 | $ 19,448,269 |

13.     Bank records show that the Adam Brothers sent a total of $12.9 million to crypto exchanges Coinbase and Kraken and that they withdrew $5.3 million from those platforms back to their bank accounts.

14.     Based on my review of documents received from Coinbase and Kraken, which corroborate the $7.6 million net outflow of funds shown in the bank statements, there is no evidence of daily earnings and no earnings consistent with the 1% daily rate that the Adam Brothers represented to investors.

15.     Tanner Adam directed investor funds in the amount of $3.725 million towards the down payment and progress payments for an 11,861 square foot, five-bedroom, nine-and-a-half-bathroom penthouse condominium he is building in Miami, with a total purchase price of nearly $30 million.

16.     The Adam Brothers directed a total of $1.46 million to a Texas home builder who built custom homes for their brother, their parents, Jonathan, and Jonathan's in-laws.

17.     Jonathan, through GCZ, also provided a $3 million line of credit to the home builder to finance working capital, of which $637,000 was drawn.

18.     In addition to the construction cost of the new homes in Texas, Jonathan, both individually and through GCZ, paid over $995,000 to escrow and title companies.

19.     Jonathan also spent over $360,000 on home and construction related expenses, including over $75,000 for the construction of a pool.

20.     Jonathan directed a total of over $480,000 for the purchase of cars, trucks, and recreational vehicles.

21.     The Adam Brothers used investor funds to pay living expenses for themselves and for their parents, including designer purchases at Louis Vuitton, Carolina Herrera, and Jimmy Choo, and credit card payments of over $220,000.

22.     Tanner designated a Triten bank account for his parents from which his parents made credit card payments, tax payments, and payments for other living expenses exceeding $65,000 in a four-month period ending in June 2024.

23.     The Adam Brothers continued to raise, and misappropriate, investor funds through at least June 2024, when they agreed to stop soliciting investments at the request of the Commission.

24.     In May and June 2024, the Adam Brothers raised $10.96 million and paid $8.8 million to investors with those funds.

25.     Furthermore, in May and June 2024, Jonathan made credit card payments of over $50,000, paid at least $180,000 in attorney fees, sent $974,000 to

other businesses he is affiliated with, and transferred $100,000 to his personal bank accounts.

26.     As of June 30, 2024, $336,000 of investor funds remain in the bank accounts of Triten and GCZ.

27.     As of June 30, 2024, the net outflow of funds to Coinbase and Kraken is $7.6 million which represents investor funds transferred to and still within crypto wallets.

28.     During our investigation, we spoke with various individuals who invested in Triten or GCZ.  Additionally, we received documents from various third parties, including individuals and entities who entered into promissory notes and lending agreements with Triten or GCZ.

29.     One individual who invested with GCZ told us that his agreement with GCZ was entitled a "Lending Agreement."

30.     Counsel for one entity provided us with a copy of a document entitled "Technology Services Agreement" that purports to represent the agreement between that entity and GCZ.  A true and correct copy of that document is attached hereto as Exhibit A.

31.     That same entity also provided us with a document that purports to reflect the terms of the lending opportunity that GCZ offered to the entity.  A true and correct copy of that document is attached hereto as Exhibit B.

- 6 -

32.     During our investigation, we contacted the Deputy City Attorney for the City of Wichita, Kansas to determine if Jonathan Adam served as the cybersecurity ambassador to the state of Kansas.  He confirmed that the state of Kansas did not employ anyone in the position of cybersecurity ambassador and that the Chief Information Officer for the City of Wichita had never heard of Jonathan Adam or the position of cybersecurity ambassador to the state of Kansas.

33.     During our investigation, we reached out to Corporate Counsel for Rackspace Technology, Inc., ("Rackspace") to inquire whether Thissl, Inc. ("Thissl") had a contract to provide services to Rackspace.  Corporate Counsel confirmed that Rackspace had no active agreements with Thissl as of July 2024.

34.     Additionally, we spoke with the General Counsel for Thissl and she confirmed that Thissl was a start-up company and had had only one client during its existence.  That client was not Rackspace.

35.     The General Counsel for Thissl also confirmed that Thissl had not been a party to any SAFE investment and that it had never received any funding from Sequoia Capital Operations LLC.  She also said that the patents owned by Thissl and had never been challenged by a third-party in court or at the United States patent office.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  August 25, 2024

_Krysta M. Cannon_
Krysta M. Cannon

# EXHIBIT A

# Technology Services Agreement

This Technology Services Agreement (the "**Agreement**"), effective as of the date of the last signature of the undersigned below (the "**Effective Date**"), is by and between GCz Global LLC, a Wyoming limited liability company with offices located at 5830 E 2nd St, STE 7000 #9453, Casper, WY 82609 ("**Provider**") and Bliss Creek Fund 1, LLC, a Wyoming limited liability company with offices located at 5309 NW 158th St., Edmond, Oklahoma 73013 ("**Requesting Party**"). Provider and Requesting Party may be referred to herein collectively as the "**Parties**" or individually as a "**Party**."

**WHEREAS**, Provider desires to use the funds contributed by the Requesting Party to effectuate certain transactions utilizing the Technology; and

**WHEREAS**, Requesting Party desires Provider to use Requesting Party's contributed funds with the Technology for cryptocurrency trading purposes, subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. <u>Definitions</u>.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory, or other, whether at law, in equity, or otherwise.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the direct or indirect power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks in the State of Wyoming are authorized or required by Law to be closed for business.

"**Confidential Information**" has the meaning set forth in Section 3.1.

"**Disclosing Party**" has the meaning set forth in Section 3.1.

"**Documentation**" means Provider's end user documentation relating to the Technology that Provider provides or makes available to Requesting Party which describe the

functionality, components, features, or requirements of the Technology, including any aspect of the installation, configuration, integration, operation, or use of the Technology.

"**Effective Date**" has the meaning set forth in the preamble.

"**Force Majeure Event**" has the meaning set forth in Section 10.10(a).

"**Indemnitee**" has the meaning set forth in Section 7.3.

"**Indemnitor**" has the meaning set forth in Section 7.3.

"**Intellectual Property Rights**" means any and all registered and unregistered rights granted, applied for, or otherwise now or hereafter in existence under or related to any patent, copyright, trademark, trade secret, database protection, or other intellectual property rights Laws, and all similar or equivalent rights or forms of protection, in any part of the world.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, or other requirement of any federal, state, local, or foreign government or political subdivision thereof, or any arbitrator, court, or tribunal of competent jurisdiction.

"**Requesting Party Indemnitee**" has the meaning set forth in Section 7.1.

"**Provider Indemnitee**" has the meaning set forth in Section 7.2.

"**Losses**" means all losses, damages, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the costs of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

"**Maintenance Release**" means any update, upgrade, release, or other adaptation or modification of the Technology by Provider.

"**Payment Failure**" has the meaning set forth in Section 9.2(a).

"**Person**" means an individual, corporation, partnership, joint venture, limited liability entity, governmental authority, unincorporated organization, trust, association, or other entity.

"**Receiving Party**" has the meaning set forth in Section 3.1.

"**Representatives**" means, with respect to a Party, that Party's and its Affiliates' employees, officers, directors, consultants, agents, independent contractors, service providers, sublicensees, subcontractors, and legal advisors.

"**Technology**" means the proprietary intellectual property used to facilitate blockchain and cryptocurrency transactions created and owned by the Provider, and any Maintenance Releases.

"**Term**" has the meaning set forth in Section 9.1.

"**Third-Party Materials**" means materials and information, in any form or medium, that are not proprietary to Provider, including any third-party: (a) documents, data, content or specifications; (b) software, hardware or other products, facilities, equipment or devices; and (c) accessories, components, parts or features of any of the foregoing.

2. Fees and Payment.

    2.1.   Service Fees. Requesting Party shall pay Provider the service fees set forth in **Exhibit A** in accordance with that exhibit and the terms of this Section 2.

    2.2.   Taxes. All fees and other amounts payable by Requesting Party under this Agreement are exclusive of taxes and similar assessments. Without limiting the foregoing, Requesting Party is responsible for all sales, use, and excise taxes, and any other similar taxes, duties, and charges of any kind imposed by any federal, state, or local governmental or regulatory authority on any amounts payable by Requesting Party hereunder, other than any taxes imposed on Provider's income.

    2.3.   Payment. Requesting Party shall pay all amounts due and owing under this Agreement within fifteen (15) days after the date of Provider's invoice therefor. Requesting Party shall make all payments hereunder in US dollars by Wire/ACH to the address or account specified in **Exhibit A** or such other address or account as Provider may specify in writing from time to time.

    2.4.   No Deductions or Setoffs. All amounts payable to Provider under this Agreement shall be paid by Requesting Party to Provider in full without any setoff, recoupment, counterclaim, deduction, debit or withholding for any reason (other than any deduction or withholding of tax as may be required by applicable Law).

3. Confidentiality.

    3.1.   Confidential Information. In connection with this Agreement, each Party (the "**Disclosing Party**") may disclose or make available Confidential Information to the other Party (the "**Receiving Party**"). Subject to Section 3.2, "**Confidential Information**" means information in any form or medium (whether oral, written, electronic, or other) that the Disclosing Party considers confidential or proprietary, including information consisting of or relating to the Disclosing Party's technology, trade secrets, know-how, business operations, plans, strategies, customers, and pricing, and information with respect to which the Disclosing Party has contractual or other confidentiality obligations, whether or not marked, designated, or otherwise identified as "confidential." Without limiting the foregoing: (a) the Technology and Documentation are the Confidential Information of Provider; and (b) the terms and existence of this Agreement are the Confidential Information of Provider.

    3.2.   Exclusions. Confidential Information does not include information that the Receiving Party can demonstrate by written or other documentary records: (a) was rightfully known to the Receiving Party without restriction on use or disclosure prior to

such information being disclosed or made available to the Receiving Party in connection with this Agreement; (b) was or becomes generally known by the public other than by the Receiving Party's or any of its Representatives' noncompliance with this Agreement; (c) was or is received by the Receiving Party on a non-confidential basis from a third party that, to the Receiving Party's knowledge, was not or is not, at the time of such receipt, under any obligation to maintain its confidentiality; or (d) the Receiving Party can demonstrate by written or other documentary records was or is independently developed by the Receiving Party without reference to or use of any Confidential Information.

    3.3.    <u>Protection of Confidential Information</u>. As a condition to being provided with any disclosure of or access to Confidential Information, the Receiving Party shall for the length of the Term of this Agreement and for two (2) years following:

    (a)    not access or use Confidential Information other than as necessary to exercise its rights or perform its obligations under and in accordance with this Agreement;

    (b)    except as may be permitted under the terms and conditions of Section 3.4, not disclose or permit access to Confidential Information other than to its Representatives who: (i) need to know such Confidential Information for purposes of the Receiving Party's exercise of its rights or performance of its obligations under and in accordance with this Agreement; (ii) have been informed of the confidential nature of the Confidential Information and the Receiving Party's obligations under this Section 3; and (iii) are bound by confidentiality and restricted use obligations at least as protective of the Confidential Information as the terms set forth in this Section 3;

    (c)    safeguard the Confidential Information from unauthorized use, access or disclosure using at least the degree of care it uses to protect its similarly sensitive information and in no event less than a reasonable degree of care; and

    (d)    promptly notify the Disclosing Party of any unauthorized use or disclosure of Confidential Information and take all reasonable steps to prevent further unauthorized use or disclosure; and

    (e)    ensure its Representatives' compliance with, and be responsible and liable for any of its Representatives' non-compliance with, the terms of this Section 3.

Notwithstanding any other provisions of this Agreement, the Receiving Party's obligations under this Section 3 with respect to any Confidential Information that constitutes a trade secret under any applicable Law will continue until such time, if ever, as such Confidential Information ceases to qualify for trade secret protection under one or more such applicable Laws other than as a result of any act or omission of the Receiving Party or any of its Representatives.

    3.4.    <u>Compelled Disclosures</u>. If the Receiving Party or any of its Representatives is compelled by applicable Law to disclose any Confidential Information then, to the extent permitted by applicable Law, the Receiving Party will: (a) promptly, and prior to such disclosure, notify the Disclosing Party in writing of such requirement so that the Disclosing Party can seek a protective order or other remedy or waive its rights under Section 3.3; and

(b) provide reasonable assistance to the Disclosing Party in opposing such disclosure or seeking a protective order or other limitations on disclosure. If the Disclosing Party waives compliance or, after providing the notice and assistance required under this Section 3.4, the Receiving Party remains required by Law to disclose any Confidential Information, the Receiving Party will disclose only that portion of the Confidential Information that the Receiving Party is legally required to disclose.

4. <u>Intellectual Property Rights</u>.

4.1.   <u>Intellectual Property Ownership</u>. Requesting Party acknowledges and agrees that:

(a)   the Technology and Documentation are to be used on behalf of, but are not licensed, transferred, or sold to, the  Requesting Party by Provider and Requesting Party does not have under or in connection with this Agreement any ownership interest in the Technology or Documentation, or in any related Intellectual Property Rights;

(b)   Provider is the sole and exclusive owner of all right, title, and interest in and to the Technology and Documentation, including all Intellectual Property Rights relating thereto; and

(c)   Requesting Party hereby unconditionally and irrevocably assigns to Provider, its entire right, title, and interest in and to any Intellectual Property Rights that Requesting Party may now or hereafter have in or relating to the Technology or Documentation (including any rights in derivative works or patent improvements relating to either of them), whether held or acquired by operation of law, contract, assignment or otherwise.

4.2.   <u>Requesting Party Cooperation and Notice of Infringement</u>. Requesting Party shall, during the Term:

(a)   take all measures to safeguard the Technology and Documentation from infringement, misappropriation, theft, misuse, or unauthorized access;

(b)   at Provider's expense, take all such steps as Provider may reasonably require to assist Provider in maintaining the validity, enforceability and Provider's ownership of the Intellectual Property Rights in the Technology and Documentation;

(c)   promptly notify Provider in writing if Requesting Party becomes aware of: (i) any actual or suspected infringement, misappropriation or other violation of Provider's Intellectual Property Rights in or relating to the Technology or Documentation; or (ii) any claim that the Technology or Documentation, including any production, use, marketing, sale or other disposition of the Technology or Documentation, in whole or in part, infringes, misappropriates or otherwise violates the Intellectual Property Rights or other rights of any Person; and

(d)   fully cooperate with and assist Provider in all reasonable ways in the conduct of any Action by Provider to prevent or abate any actual or threatened

infringement, misappropriation or violation of Provider's rights in, and to attempt to resolve any Actions relating to, the Technology or Documentation.

4.3.  No Implied Rights. Except for the limited rights and licenses expressly granted under this Agreement, nothing in this Agreement grants, by implication, waiver, estoppel or otherwise, to Requesting Party or any third party any Intellectual Property Rights or other right, title, or interest in or to any of the Technology or Documentation.

5. Representations and Warranties.

5.1.  Mutual Representations and Warranties. Each Party represents, warrants, and covenants to the other Party that:

(a)  it is duly organized, validly existing and in good standing as a corporation or other entity under the Laws of the jurisdiction of its incorporation or other organization;

(b)  it has the full right, power, and authority to enter into and perform its obligations and grant the rights, licenses, and authorizations it grants and is required to grant under this Agreement;

(c)  the execution of this Agreement by its representative whose signature is set forth at the end of this Agreement has been duly authorized by all necessary corporate or organizational action of such Party; and

(d)  when executed and delivered by both Parties, this Agreement will constitute the legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms.

5.2.  Requesting Party Representations and Warranties. The Requesting Party represents, warrants, and acknowledges, as the case may be, that:

(a)  It may be unlawful to access, directly or indirectly, or use the Technology in certain jurisdictions ("**Restricted Area Laws**"), including but not limited to Afghanistan, Cuba, Iran, North Korea, and Syria, and Provider will not violate the Restricted Area Laws.  By proceeding, Requesting Party is representing and warranting that the applicable Laws and regulations of its jurisdiction allow it to contract with Provider for use of the Technology, and it will not violate the Restricted Area Laws.

(b)  No digital asset bought and sold by use of the Technology has been registered under the Securities Act of 1933 or Securities Exchange Act of 1934, and may not be offered or sold in the United States or to US persons except pursuant to an applicable exemption from the registration requirements of the Securities Act or otherwise pursuant to any determination of such digital assets by the Securities and Exchange Commission of the United States.

(c)  Information used by the Technology contains material that may be interpreted by the relevant authorities in the United States as an offer, or solicitation of

an offer, to purchase or sell digital assets. Accordingly, the information used by the Technology is only intended to be viewed by persons who fall outside the scope of any law of the United States that seeks to regulate offer, sale, or other transactions in digital assets.  Requesting Party understands that it should seek advice from counsel before accessing, directly or indirectly, the Technology.

5.3.    Provider Representations and Warranties. The Provider represents, warrants, and acknowledges, as the case may be, that:

(a)    Provider has good title to the Technology and has the right to grant the licenses provided for hereunder in accordance with the terms and conditions hereof.

(b)    There is no claim, action, proceeding or other litigation pending or, to the knowledge of Provider, threatened with respect to Provider's ownership of the Technology or which, if adversely determined, would restrict or otherwise interfere in any material respect with the exercise by Requesting Party of the rights purported to be granted to Requesting Party hereunder.

(c)    The Technology and services delivered or performed shall be in accordance with the highest generally accepted standards of the profession existent at the time the Technology and services are delivered or performed.

5.4.    NO WARRANTIES. THE TECHNOLOGY, DOCUMENTATION AND OTHER PRODUCTS, INFORMATION, MATERIALS, AND SERVICES PROVIDED BY PROVIDER ARE PROVIDED "AS IS." PROVIDER SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE PRACTICE. WITHOUT LIMITING THE FOREGOING, PROVIDER MAKES NO WARRANTY OF ANY KIND THAT THE TECHNOLOGY OR DOCUMENTATION, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET REQUESTING PARTY'S OR OTHER PERSONS' REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEMS, OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE OR ERROR FREE.

6.  Investments.

6.1.    No Advice.

(a)    Provider is not registered or licensed in any jurisdiction as a broker, financial advisor, investment advisor, portfolio manager or tax advisor. Nothing contained in this Agreement constitutes investment, legal, tax or other advice.  By executing this Agreement, Requesting Party has considered the risks of transferring funds to Provider to utilize the Technology to generate investment returns. Requesting Party should obtain professional advice specific to its circumstances, and obtain and read the terms and conditions and other information relevant to any trade or investment, including risk disclosures pertaining to such trade or investment.  Provider does not

make any determination as to the suitability of any trade or investment conducted by the Technology and makes no representation or warranty that any such trade or investment is suitable for Requesting Party. Any statement of risks of any trade or investment referenced in this Agreement should not be regarded as a full disclosure of all risks.

(b)     Requesting Party acknowledges and agrees that Provider is not responsible for Requesting Party's use of any information that Requesting Party obtains from the Technology, that Requesting Party's trading or investment decisions are made on its own for which it bears sole responsibility, and that Requesting Party desires Provider to use the Technology at Requesting Party's sole risk.

6.2.   <u>Risks of Investments</u>. Requesting Party should be aware of the following:

(a)     Provider may not hold a license to offer Requesting Party services through the Technology in Requesting Party's jurisdiction.

(b)     Requesting Party should not transact or invest directly or indirectly in a digital asset if Requesting Party is not familiar with digital assets. Transacting in digital assets may not be suitable for Requesting Party. Once Requesting Party executes this Agreement, Requesting Party shall be deemed to be fully familiar with digital assets and fiat currency (if involved in the transaction).

(c)     Requesting Party should be aware that the value of digital assets may fluctuate greatly. Requesting Party should contract with Provider only if Requesting Party is willing and prepared to accept risks of loss with respect to the transactions described herein.

(d)     Past performance is not indicative of likely future performance and the value of any digital asset traded by the Technology may go down as well as up. Provider does not guarantee the performance of any trade or investment, the return of any investment or the achievement of any rate of return.

(e)     Investment in any of the digital assets available on the Technology carries substantial risk, including the possible loss of investment. Performance and returns may vary significantly over time.

(f)     Provider may, in its sole discretion, open and/or maintain external wallets/accounts with third party digital asset wallet solution providers and/or external digital assets counterparty exchanges (each, an "External Provider") to take custody and safekeep all or part of Requesting Party's digital assets, and/or to facilitate Requesting Party's trading and investment in digital assets through Provider. While we will undertake measures to carefully select and engage an External Provider, Provider does not guarantee the security or functionality of an External Provider's software or technology and is not responsible for any loss of digital asset due to the failure of the External Provider's software or technology. As a result, Requesting Party may risk losing digital assets that have been placed with an External Provider, and Provider will

8

not be liable Requesting Party for such loss. Furthermore, no compensation shall be expected from Provider under such circumstance.

(g)    The Technology uses various blockchains and/or blockchain technology to process Requesting Party's digital asset transactions.  All blockchains and/or blockchain technology may experience unintended events or consequences, including but not limited to backlogs, higher than normal transaction fees, changes to the network, failure, or forks in protocols. Provider does not own or control any blockchain or blockchain technology apart from the Technology, is not responsible for the operation of the blockchain network, and makes no guarantee regarding the blockchain network's security, functionality, or availability.  Requesting Party may suffer loss as a result of any such events or consequences, and Provider will not compensate Requesting Party for such loss. Requesting Party acknowledges and accepts that Provider has sole discretion to determine its response to any operating change to any digital asset protocol and that Provider has no responsibility to assist Requesting Party with unsupported currencies or protocols.

7.Indemnification.

7.1.   Provider Indemnification. Provider shall indemnify, defend, and hold harmless Requesting Party ("**Requesting Party Indemnitee**") from and against any and all Losses incurred by the Requesting Party Indemnitee resulting from:

(a)    any Action by a third party that the Technology or Documentation, or any use of the Technology or Documentation in accordance with this Agreement, infringes or misappropriates such third party's Intellectual Property Rights.

(b)    a breach by Provider of any representation, warranty, covenant, or obligation under this Agreement; or

(c)    relating to negligence, abuse, misapplication, misuse or more culpable act or omission (including recklessness or willful misconduct) by or on behalf of Provider or any of its Representatives with respect to the Technology or Documentation or otherwise in connection with this Agreement.

7.2.   Requesting Party Indemnification. Requesting Party shall indemnify, defend, and hold harmless Provider and its Affiliates, and each of its and their respective officers, directors, employees, agents, subcontractors, successors and permitted assigns (each, a "**Provider Indemnitee**") from and against any and all Losses incurred by the Provider Indemnitee resulting from any Action by a third party:

(a)    that any Intellectual Property Rights or other right of any Person, or any Law, is or will be infringed, misappropriated, or otherwise violated by any:

(i)    use or combination of the Technology by or on behalf of Requesting Party or any of its Representatives with any hardware, software, system, network, service, or other matter whatsoever that is neither provided by

9

Provider nor authorized by Provider in this Agreement and the Documentation; and

(ii)     information, materials, or technology directly or indirectly provided by Requesting Party or directed by Requesting Party to be installed, combined, integrated, or used with, as part of, or in connection with the Technology or Documentation;

(b)     a breach by Requesting Party of any representation, warranty, covenant, or obligation under this Agreement;

(c)     relating to negligence, abuse, misapplication, misuse or more culpable act or omission (including recklessness or willful misconduct) by or on behalf of Requesting Party or any of its Representatives with respect to the Technology or Documentation or otherwise in connection with this Agreement; or

(d)     relating to use of the Technology or Documentation by or on behalf of Requesting Party or any of its Representatives that is outside the purpose, scope or manner of use authorized by this Agreement or the Documentation, or in any manner contrary to Provider's instructions.

7.3.   <u>Indemnification Procedure</u>. Each Party shall promptly notify the other Party in writing of any Action for which such Party believes it is entitled to be indemnified pursuant to Section 7.2. The Party seeking indemnification (the "**Indemnitee**") shall cooperate with the other Party (the "**Indemnitor**") at the Indemnitor's sole cost and expense. The Indemnitor shall promptly assume control of the defense and investigation of such Action and shall employ counsel reasonably acceptable to the Indemnitee to handle and defend the same, at the Indemnitor's sole cost and expense. The Indemnitee may participate in and observe the proceedings at its own cost and expense with counsel of its own choosing. The Indemnitor shall not settle any Action without the Indemnitee's prior written consent. If the Indemnitor fails or refuses to assume control of the defense of such Action, the Indemnitee shall have the right, but no obligation, to defend against such Action, including settling such Action after giving notice to the Indemnitor, in each case in such manner and on such terms as the Indemnitee may deem appropriate. The Indemnitee's failure to perform any obligations under this Section will not relieve the Indemnitor of its obligations under this Section, except to the extent that the Indemnitor can demonstrate that it has been prejudiced as a result of such failure.

7.4.   <u>Mitigation</u>. If the Technology, or any part of the Technology is claimed in writing to infringe, misappropriate, or otherwise violate any third-party Intellectual Property Right, or if Requesting Party's indirect use, of the Technology is enjoined or threatened to be enjoined, Provider may, at its option and sole cost and expense:

(a)     obtain the right for Requesting Party to continue to indirectly use the Technology materially as contemplated by this Agreement;

(b)     modify or replace the Technology, in whole or in part, to seek to make the Technology non-infringing, while providing materially equivalent features and

functionality, and such modified or replacement software will constitute Technology under this Agreement; or

(c)     terminate this Agreement, in its entirety or with respect to the affected part or feature of the Technology, effective immediately on written notice to Requesting Party, in which event, provided that Requesting Party fully complies with its post-termination obligations set forth in Section 9.3, Provider shall promptly refund to Requesting Party, on a pro rata basis, the share of any service fees prepaid by Requesting Party for the future portion of the Term that would have remained but for such termination.

7.5.    Sole Remedy. THIS SECTION 7 SETS FORTH REQUESTING PARTY'S SOLE REMEDIES AND PROVIDER'S SOLE LIABILITY AND OBLIGATION FOR ANY ACTUAL, THREATENED, OR ALLEGED CLAIMS THAT THE TECHNOLOGY OR DOCUMENTATION OR ANY SUBJECT MATTER OF THIS AGREEMENT INFRINGES, MISAPPROPRIATES, OR OTHERWISE VIOLATES ANY INTELLECTUAL PROPERTY RIGHTS OF ANY THIRD PARTY.

8. Limitations of Liability.

8.1.    EXCLUSION OF DAMAGES. IN NO EVENT WILL PROVIDER, OR ANY OF ITS PROVIDERS, SERVICE PROVIDERS, OR SUPPLIERS BE LIABLE UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ITS SUBJECT MATTER UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE, FOR ANY (a) INCREASED COSTS, DIMINUTION IN VALUE OR LOST BUSINESS, PRODUCTION, REVENUES OR PROFITS, (b) LOSS OF GOODWILL OR REPUTATION, (c) USE, INABILITY TO USE, LOSS, INTERRUPTION, DELAY OR RECOVERY OF THE TECHNOLOGY, (d) LOSS, DAMAGE, CORRUPTION, OR RECOVERY OF DATA, OR BREACH OF DATA OR SYSTEM SECURITY, (e) COST OF REPLACEMENT GOODS OR SERVICES, OR (f) CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, ENHANCED, OR PUNITIVE DAMAGES, IN EACH CASE REGARDLESS OF WHETHER SUCH PERSONS WERE ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

8.2.    CAP ON MONETARY LIABILITY. IN NO EVENT WILL THE AGGREGATE LIABILITY OF PROVIDER ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING UNDER OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR ANY OTHER LEGAL OR EQUITABLE THEORY, EXCEED THE TOTAL AMOUNTS PAID TO PROVIDER UNDER THIS AGREEMENT IN THE TWELVE MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM. THE FOREGOING LIMITATIONS APPLY EVEN IF ANY REMEDY FAILS OF ITS ESSENTIAL PURPOSE.

9. Term and Termination.

    9.1.    Initial Term; Requesting Party Option to Renew.

        (a)    Initial Term. The term of this Agreement commences as of the Effective Date and continues in effect until three (3) years from such date unless terminated earlier pursuant to any of the Agreement's express provisions (the **"Initial Term").**

        (b)    Requesting Party Option to Renew. As long as no breach of this Agreement by Requesting Party has occurred and is continuing hereunder, Provider shall grant to Requesting Party the option to renew (the "**Renewal Option**") the Initial Term of this Agreement for one (1) additional period of two (2) years (the "**Renewal Term**," together with the Initial Term, the "**Term**"). Requesting Party shall exercise such Renewal Option by delivering written notice of such election to Provider at least thirty (30) days prior to the expiration of the Initial Term. The renewal of this Agreement shall be upon the same terms and conditions of this Agreement.

    9.2.    Termination. This Agreement may be terminated at any time:

        (a)    by Provider, effective on written notice to Requesting Party, if Requesting Party fails to pay any amount when due under this Agreement, where such failure continues more than thirty (30) days after Provider's delivery of written notice thereof ("**Payment Failure**");

        (b)    by Provider, immediately on written notice to Requesting Party if any two or more Payment Failures occur in any one month period;

        (c)    by either Party, effective on written notice to the other Party, if the other Party materially breaches this Agreement and such breach: (i) is incapable of cure; or (ii) being capable of cure, remains uncured 30 days after the non-breaching Party provides the breaching Party with written notice of such breach;

        (d)    by Provider, effective immediately, if the Requesting Party: (i) is dissolved or liquidated or takes any corporate action for such purpose; (ii) becomes insolvent or is generally unable to pay its debts as they become due; (iii) becomes the subject of any voluntary or involuntary bankruptcy proceeding under any domestic or foreign bankruptcy or insolvency Law; (iv) makes or seeks to make a general assignment for the benefit of its creditors; or (v) applies for, or consents to, the appointment of a trustee, receiver or custodian for a substantial part of its property.

    9.3.    Effect of Termination or Expiration.

        (a)    On the expiration or earlier termination of this Agreement:

        (i)    all rights, licenses and authorizations granted to Requesting Party hereunder will immediately terminate and Requesting Party will immediately cease all use of and other activities with respect to the Technology and Documentation; and

(b)      all amounts payable by Requesting Party to Provider of any kind under this Agreement are immediately payable and due no later than five (5) days after the effective date of the expiration or five (5) days after Provider's termination of this Agreement.

9.4.    Surviving Terms. The provisions set forth in the following sections, and any other right, obligation or provision under this Agreement that, by its nature, should survive termination or expiration of this Agreement, will survive any expiration or termination of this Agreement: this Section 9.4, Section 1, Section 2, Section 4, Section 6, Section 7, Section 8, and Section 10.

10. Miscellaneous.

10.1.    Further Assurances. On a Party's reasonable request, the other Party shall, at the requesting Party's sole cost and expense, execute and deliver all such documents and instruments, and take all such further actions, as may be necessary to give full effect to this Agreement.

10.2.    Relationship of the Parties. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement will be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

10.3.    Public Announcements. Neither Party shall issue or release any announcement, statement, press release, or other publicity or marketing materials relating to this Agreement or, unless expressly permitted under this Agreement, otherwise use the other Party's trademarks, service marks, trade names, logos, domain names, or other indicia of source, association or sponsorship, in each case, without the prior written consent of the other Party, which shall not be unreasonably delayed or withheld, provided, however, that Provider may, without Requesting Party's consent, include Requesting Party's name and other indicia in its lists of Provider's current or former customers of Provider in promotional and marketing materials.

10.4.    Notices. Any notice, request, consent, claim, demand, waiver, or other communication under this Agreement have legal effect only if in writing and addressed to a Party as follows (or to such other address or such other person that such addressee Party may designate from time to time in accordance with this Section 10.4):

If to Provider:                5830 E 2n$^d$ St,
                               STE 7000 #9453
                               Casper, WY 82609
                               Email: Jonathan@GCZ.global
                               Attention: Jonathan Adam, Principal

If to Requesting Party:        5909 NW 158th St.
                               Edmond, OK 73013
                               Email: btowler@towlergroup.com

Attention: Bill Towler

Notices sent in accordance with this Section 10.4 will be deemed effectively given: (a) when received, if delivered by hand, with signed confirmation of receipt; (b) when received, if sent by a nationally recognized overnight courier, signature required; (c) when sent, if by facsimile or email, (with confirmation of transmission), if sent during the addressee's normal business hours, and on the next Business Day, if sent after the addressee's normal business hours; and (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid.

10.5.    [Intentionally Omitted]

10.6.    <u>Interpretation</u>. For purposes of this Agreement: (a) the words "include," "includes" and "including" are deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole; (d) words denoting the singular have a comparable meaning when used in the plural, and vice versa; and (e) words denoting any gender include all genders. Unless the context otherwise requires, references in this Agreement: (x) to sections, exhibits, schedules, attachments, and appendices mean the sections of, and exhibits, schedules, attachments, and appendices to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The Parties intend this Agreement to be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted. The exhibits, schedules, attachments, and appendices referred to herein are an integral part of this Agreement to the same extent as if they were set forth verbatim herein.

10.7.    <u>Headings</u>. The headings in this Agreement are for reference only and do not affect the interpretation of this Agreement.

10.8.    <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

10.9.    <u>Assignment</u>. Requesting Party shall not assign or otherwise transfer any of its rights, or delegate or otherwise transfer any of its obligations or performance under this Agreement, in each case whether voluntarily, involuntarily, by operation of law, or otherwise, without Provider's prior written consent. No assignment, delegation, or transfer will relieve Customer of any of its obligations or performance under this Agreement. Any purported assignment, delegation, or transfer in violation of this Section 10.8 is void. This Agreement is binding on and inures to the benefit of the Parties hereto and their respective successors and permitted assigns.

10.10. <u>Export Regulation</u>. The Technology may be subject to US export control laws, including the US Export Control Reform Act and its associated regulations. Requesting Party will not directly or indirectly, export, re-export, or release the Technology to, or make the Technology accessible from, any country, jurisdiction or Person to which export, re-export, or release is prohibited by applicable Law. Requesting Party will comply with all applicable Laws and complete all required undertakings (including obtaining any necessary export service or other governmental approval) prior to exporting, re-exporting, releasing, or otherwise making the Technology available outside the US.

10.11. <u>Force Majeure</u>.

(a)     <u>No Breach or Default</u>. In no event will Provider be liable or responsible to Requesting Party, or be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, when and to the extent such failure or delay is caused by any circumstances beyond Provider's reasonable control (a "**Force Majeure Event**"), including (i) acts of God; (ii) flood, fire, earthquake, epidemics, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest; (iv) government order, law, or actions; (v) embargoes or blockades in effect on or after the date of this Agreement; (vi) national or regional emergency; and (vii) strikes, labor stoppages or slowdowns, or other industrial disturbances. Either Party may terminate this Agreement if a Force Majeure Event continues substantially uninterrupted for a period of 30 days or more.

(b)     <u>Affected Party Obligations</u>. In the event of any failure or delay caused by a Force Majeure Event, Provider will give prompt written notice to Requesting Party stating the period of time the occurrence is expected to continue and use reasonable efforts to end the failure or delay and minimize the effects of such Force Majeure Event.

10.12. <u>Anti-Money Laundering</u>. Provider is committed to complying with all applicable Laws, regulations and regulatory standards and guidance related to AML/CTF, including but not limited to, the International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation issued by the Financial Action Task Force; the Bank Secrecy Act and the USA PATRIOT Act of the United States; the Sixth Anti-Money Laundering Directive (effective 3 June 2021) of the European Union; the Money Laundering Regulations administered by the Financial Conduct Authority of the United Kingdom; the Proceeds of Crime (Money Laundering) and Terrorist Financing Act of Canada; and the Anti-Money Laundering and Counter-Terrorist Financing Ordinance (Cap. 615 of the Laws of Hong Kong) and the Guideline on Anti-Money Laundering and Counter-Financing of Terrorism of Hong Kong.

10.13. <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or will confer on any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

10.14.  <u>Amendment and Modification; Waiver</u>. No amendment to or modification of this Agreement is effective unless it is in writing and signed by each Party. No waiver by any Party of any of the provisions hereof is effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

10.15.  <u>Severability</u>. If any provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. On such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

10.16.  <u>Governing Law; Submission to Jurisdiction</u>. This Agreement is governed by and construed in accordance with the internal laws of the State of Wyoming without giving effect to any choice or conflict of law provision or rule that would require or permit the application of the laws of any jurisdiction other than those of the State of Wyoming. Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder will be instituted in the federal courts of the United States or the courts of the State of Wyoming in each case located in the city of Casper and County of Natrona, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such Party's address set forth herein will be effective service of process for any suit, action, or other proceeding brought in any such court.

10.17.  <u>Waiver of Jury Trial</u>. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

10.18.  <u>Equitable Relief</u>. Each Party acknowledges and agrees that a breach or threatened breach by such Party of any of its obligations under Section 2, Section 4, or Section 6 of this Agreement would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy and that, in the event of such breach or threatened breach, the other Party will be entitled to equitable relief, including in a restraining order, an injunction, specific performance, and any other relief that may be available from any court of competent jurisdiction, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity, or otherwise.

10.19.  <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

GCz Global LLC                          Bliss Creek Fund 1, LLC


By:_____              By:_____

Name: _____               Name: _____

Title: _____             Title: _____

## EXHIBIT A

## PAYMENTS AND FEES

Payment for services provided will be an amount equal to thirty-three and 43/100 percent (33.43%) per month of the Payment. Payment will be made in the amount of $00000.00 to the following account.

Bank name:

Bank account number:

Bank routing number:

Account owner name:

Account owner address:

# EXHIBIT B



## CONFIDENTIALITY NOTICE

This presentation, including all attachments and enclosures, is the exclusive property of GCZ Global, LLC and contains confidential, proprietary, and trade secret information that is privileged and intended solely for the viewing and use of the designated recipient(s). Unauthorized use, dissemination, distribution, reproduction, or copying of this presentation, in whole or in part, is strictly prohibited.

If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, distribution, retention, or any action taken or omitted to be taken in reliance on it is prohibited and may be unlawful. If you have received this presentation in error, please immediately notify the sender by return email, delete this presentation from your system, and destroy any printed copies.

By accepting and opening this presentation, you agree to treat all information contained within as confidential and to maintain its confidentiality in accordance with the terms set forth above.



**GCZ** ▲

# Discover Smart, Simple Returns

Join GCZ Global, LLC in redefining wealth-building with tech-powered opportunities.



STRICTLY CONFIDENTIAL

The GCZ Opportunity

# Unveiling the GCZ Automated System.

Leveraging always-liquid capital to empower flash loans for arbitrage traders, operations, and institutions.

GCZ Global, LLC (GCZ) developed an automated software system (bot) that deploys always liquid capital via qualified lending pools to provide flash loans to arbitrage traders, operations, and institutions. GCZ provides liquid capital to the top flash liquidity providers that meet GCZ's strict criteria for deployments.





GCZ Invest - Partnership Proposal

KEY:   GCZ BOT   LP   LENDING POOL   AT   ARBITRAGE TRADERS   OP   OPERATIONS   INS   INSTITUTIONS   QUALIFIED LP   FLASH LOAN

2023

GCZ



Setting the Bar High

# Our Criteria for Flash Liquidity Providers.



**$50 M**

EVERY 24 HOURS

Minimum of $50M loan volume every 24 hours.



PROPRIETARY ORACLES

Deployment of proprietary oracles for seamless communication.

**99.9%**

REPAYMENT RATE

At least 99.9% repayment rate.



EVALUATION VIA ORACLE

Robust loan and trade evaluation through oracles for guaranteed repayment.

**DETAILS:**

- Liquidity pool operators must have a minimum of $50,000,000 (fifty-million dollars) in loan volume per each 24-hour period.
- They must deploy their own oracles within their chain to communicate with our system (bot).
- They must have a minimum of 99.9% repayment of transaction rates.
- They must evaluate all trades and loan requests through their oracle system for validity and profitability of each trade, to ensure the loan can be repaid within the same transaction on the chain. If not, the loan is deemed invalid.

**STRICTLY CONFIDENTIAL**



## Dive into Our Process - How GCZ's Automated System Operates (ALT)

GZO has an agreement with a top-tier Exchange to provide liquidity to meet the daily requirements, with a stipulated daily (calendar day) rate of 1.78% payable by the exchange. **Upon funding from the capital partner, the procedure is:**



GCZ's streamlined system allocates capital segments to its bespoke bot, which subsequently initiates a smart contract with the lending pool. This bot directly communicates with the on-chain oracle, ensuring the authenticity of loan and trade data for the flash loans powered by GCZ.

KEY:   ORACLE NETWORK PROTECTION    SMART CONTRACT    AUTOMATION STEPS

STRICTLY CONFIDENTIAL

GCZ Invest - Partnership Proposal

2023



Smart Contracts, Smart Choices

With an impressive average loan duration of approximately 9 seconds, our smart contracts stand firm on a set of unwavering rules.



**FLAT DAILY RATE FOR LIQUIDITY**

Flat daily rate for liquidity provision.



**DAILY PAYOUT / NO COMPOUNDING**

Daily fee payout without compounding.




**DEPLOYMENT DAILY @ 200%**

Guaranteed capital deployment daily with a value of 200% bot origination.




**BI-MONTHLY USDT WITHDRAWAL**

Bi-monthly fee withdrawal in Tether (USDT).

**DETAILS:**

· The fees paid to GCZ for providing the liquidity to the lending pool must be a flat daily guaranteed rate.

· These fees must be paid out to GCZ daily with no compounding.

· Each smart contract must be for a period of value to equal 200% of the originating bot creation and minting, with a guarantee that the capital is deployed daily. GCZ locks the money into the lending pool for this term, guaranteeing GCZ a fixed daily rate.

· The fees must be paid in the stable token of Tether (USDT) and be available to be withdrawn from the GCZ account at the lending pool, a minimum of twice per calendar month.

STRICTLY CONFIDENTIAL



2023

GCZ Invest - Partnership Proposal



## Safety and Profitability: Hand in Hand.

GCZ's model prioritizes risk reduction by stringently dictating the timing and types of trades the oracle supports on the lending platform. Our capital is exclusively allocated to trades vetted by Logical AI and registered within established exchanges. This approach guarantees that only profitable trades gain access to GCZ funding. Additionally, all flash loans are settled within the same transaction, ensuring that funds not only facilitate the trade but also promptly return the profit to the trader's wallet.



SAFETY

PROFITABILITY

Minimizing Risk, Maximizing Return

2023

GCZ Invest - Partnership Proposal

STRICTLY CONFIDENTIAL

A New Financial Horizon

## Introducing a Revolutionary Financial Product.

GCZ's refined model has paved the way for a novel financial product, offering stakeholders the chance to engage via short-term software licensing for external USDT initiatives.

By utilizing GCZ's software, our members, partners, and associates can confidently channel their capital into the flash lending realm, guided by the precision of GCZ's bot.

STRICTLY CONFIDENTIAL

GCZ Invest - Partnership Proposal

2023





Elevate Your Investment Game

## Dive into the Future of Lending.

GCZ has created a convenient on-ramp and off-ramp for FIAT-USDT to help traditional capital partners begin to navigate opportunities within the blended traditional-crypto lending space.

STRICTLY CONFIDENTIAL

GCZ



# Thank you

End

STRICTLY CONFIDENTIAL

GCZ Invest - Partnership Proposal

2023

GCZ