# EXHIBIT 4

## <u>DECLARATION OF DAVID MIRELES</u>

I, David Mireles, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1.      I am an entrepreneur and a builder.  I am over eighteen years of age and am competent to make this declaration.

2.      I first learned about the opportunity to loan money to Triten Financial Group ("Triten") from an individual I met through a networking organization.  I had made a presentation to the networking organization that the individual had seen, and this individual suggested that I watch a presentation that he did on Triten.

3.      He sent me an email containing the video presentation.  A true and correct copy of that video presentation is attached to my declaration as Exhibit 1.

4.      Both Tanner and Jonathan Adam spoke on the video presentation.  I learned from that presentation that Jonathan is a programmer and that he wrote computer programs that were used to provide internet in South Africa.

5.      I learned from the presentation that Jonathan developed and owned patents that he had successfully defended in numerous lawsuits.  I also learned that Jonathan developed the bot that Triten was using.

6.      The bot had a high success rate and only executed trades that have a 99% chance of success.  The bot could execute the trades within 9 seconds.

7.     From the presentation, I understood that Triten provided liquidity for the trade and executed the trade.  I also understood that the money never left Triten.  I understood that Triten was running hundreds of trades and that these trades occurred 24 hours a day.

8.     From the presentation, I understood that Triten received fees for making the money available for the trades.  I also understood that the Gemini referenced in the presentation was the cryptocurrency exchange founded by the Winklevoss twins.

9.     I was told the minimum amount that I could invest was $250,000.  I was emailed the operating agreement, a non-disclosure agreement and wiring instructions.

10.     I also received a one-page document entitled "Triten Financial Group Dashboard 4.1.24."  A true and correct copy of that document is attached to my declaration as Exhibit 2.

11.     Additionally, I received a document entitled "Limited Liability Company Agreement of Triten Financial Group LLC."  A true and correct copy of that document is attached to my declaration as Exhibit 3.

12.     I spoke to Tanner Adam in May 2024 prior to wiring my money to Triten.  I asked him whether Triten had any issues with its liquidity being locked up.  I understood that this was a risk based on the information shared in the video

presentation. Tanner told me that the liquidity had never been locked and they had been operating for over a year.

13.     I also asked Tanner what happens to Triten if he dies and he told me that his brother, Garrett Adam, had access to the system.

14.     I spoke to a number of individuals who had invested in Triten and learned that they had received their interest payments as promised.  The fact that these individuals were receiving their interest payments led me to believe that the program was working as it had been represented in the presentation I saw.

15.     On May 20, 2024, I lent Triten $250,000 in return for 8% a month for a year.  The interest was to be paid by the 5th of each month and if it was not, Triten was obligated to pay a 1% late fee.  A true and correct copy of my contract with Triten is attached to my declaration as Exhibit 4.

16.     I received a prorated interest payment for the month of May on June 5, 2024.  I have not received an interest payment since then.

17.     I was not told that Triten could use my money to pay other investors. If anyone had told me that, I would not have invested.

18.     I was not told that my money could be used to pay the personal expenses of Tanner or Jonathan Adam.  If anyone had told me that, I would have sought clarification as to how the program worked.

19.     I was not told that Jonathan Adam had been convicted of securities fraud.  If I had been told that fact, I would have done more due diligence and I would have wanted to know more information about the circumstances of his conviction.

20.     Prior to making my loan to Triten, I was not told that the Securities and Exchange Commission was investigating Triten.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 25, 2024,

_____
David Mireles

# EXHIBIT 1

## EXHIBIT IS BEING MANUALLY FILED

# EXHIBIT 2

## DEBT ROUND | 71% FILLED

On 11.1.23 the debt round increased to:
**$50 million**
to meet demand

———

**$35.3 million**
now deployed in the lending pool



## TRITEN FINANCIAL
G R O U P

**DASHBOARD  |  4.1.24**

## PROJECT RETURN PAYOUTS



| | | | |
|---|---|---|---|
| Apr | | | |
| Mar | | | |
| Feb | | | |
| Jan | | | |

2310998    2537105    3708707    3920000

---

### PROJECT RETURN LENDERS
**FAMILY & FRIENDS**

**82**

### TOTAL PAYOUTS | 12 MONTHS

Total Interest and Fees paid out via bank wire by the 5th of each month April 1st 2023 – April 3rd 2024.

**$20,935,494**

### ESTIMATED 5.1.24 PAYOUT



**$4,200,000**

### AVERAGE DAILY LENDING POOL DEMAND

**$500,000,000+**
Five Hundred Million Dollars

---

## PROJECT RETURN DETAILS

- **Vehicle: Corporate Structured Debt  |**  Interest: Simple, non-compounding rate

- **Minimums: Note – $100,000  |**  Term - 4 months or 1 year blockchain smart contract

- **Monthly Interest Rate: 8%  |**  Paid via wire on the 1st of each month

- **Annual Interest Rate = 96% (ninety-six percent)**

- **This is NOT a security. This is NOT an investment.**
- **This is a debt round offering for an automated deployment system.**
- **Interest required to be paid monthly to lender.**

## PROTOCOLS & STANDARDS

- Protocol:  Lending Pool
- **Oracle:  Artificial Intelligence (AI) governs the lending pool**
- Bot:  AI Bot communicates with lending pool oracles to govern, execute and transact flash loans through the lending program.

- **The Lending Pool must have a minimum 99.9% historical repayment rate per trade presented to the Lending Pool.**

- **Lending Pool must have a minimum of $50m in loan volume per trailing 24 hr. Period.**



---

Triten Financiial Group is a proud contributor to the Magic Wand Foundation, providing 20 annual scholarships to young leaders worldwide, attending the 7 Mindsets | Ultimate Life Summit.

# EXHIBIT 3

**Limited Liability Company Agreement of**
**Triten Financial Group LLC**
**A Single Member Limited Liability Company**

**THIS OPERATING AGREEMENT** (this "Agreement") of Triten Financial Group LLC**,** (the "Company"), is executed and agreed to, for good and valuable consideration, by the undersigned members (the "Member").

**I.    Formation.**

A.00A. State of Formation. This is a Limited Liability Company Operating Agreement (the "Agreement") for Triten Financial Group LLC, a Manager-managed Wyoming single member limited liability company (the "Company") formed under and pursuant to Wyoming law.

B. Operating Agreement Controls. To the extent that the rights or obligations of the Members or the Company under provisions of this Operating Agreement differ from what they would be under Wyoming law absent such a provision, this Agreement, to the extent permitted under Wyoming law, shall control.

C. Primary Business Address. The location of the primary place of business of the Company is:

4607 Lakeview Canyon Rd #429, Westlake Village, California 91361, or such other location as shall be selected from time to time by the Member.

D. Registered Agent and Office. The Company's initial agent (the "Agent") for service of process is Rocket Lawyor Corporate Services LLC. The Agent's registered office is 1912 Capital Ave Suite 500, Cheyenne, Wyoming 82001. The Company may change its registered office, its registered agent, or both, upon filing a statement with the Wyoming Secretary of State.

E. No State Law Partnership. No provisions of this Agreement shall be deemed or construed to constitute a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of or with any other Member, for any purposes other than federal and state tax purposes.

**II.   Purposes and Powers.**

A. Purpose. The Company is created for the following business purpose:

It will operate my personal interests, capital, and equity positions.

B. Powers. The Company shall have all of the powers of a limited liability company set forth under Wyoming law.

C. Duration. The Company's term shall commence upon the filing of an Articles of Organization and all other such necessary materials with the state of Wyoming. The Company will operate until terminated as outlined in this Agreement unless:

1. The Member votes to dissolve the Company;

2. No Member of the Company exists, unless the business of the Company is continued in a manner permitted by Wyoming law;

3. It becomes unlawful for either the Member or the Company to continue in business;

4.   A judicial decree is entered that dissolves the Company; or

5.   Any other event results in the dissolution of the Company under federal or Wyoming law.

**III.  Member.**

A.  <u>The Member</u>. The sole member of Triten Financial Group LLC at the time of adoption of this Agreement is Tanner Adam (the "Member").

B.  <u>Initial Contribution</u>. The Member shall make an Initial Contribution to the Company. The Initial Contributions shall be as described in Attachment A, <u>Initial Contributions of the Member</u>.

No Member shall be entitled to interest on their Initial Contribution. Except as expressly provided by this Agreement, or as required by law, no Member shall have any right to demand or receive the return of their Initial Contribution.

C.  <u>Limited Liability of the Member</u>. Except as otherwise provided for in this Agreement or otherwise required by Wyoming law, no Member shall be personally liable for any acts, debts, liabilities or obligations of the Company beyond their respective Initial Contribution. The Member shall look solely to the Company property for the return of their Initial Contribution, or value thereof, and if the Company property remaining after payment or discharge of the debts, liabilities or obligations of the Company is insufficient to return such Initial Contributions, or value thereof, no Member shall have any recourse against any other Member, if any other Member exists, except as is expressly provided for by this Agreement.

D.  <u>Creation or Substitution of New Members</u>. Any Member may assign in whole or in part its Membership Interest only with the prior written consent of all Members.

1.   *Entire transfer*. If a Member transfers all of its Membership Interest, the transferee shall be admitted to the Company as a substitute Member upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement. Such admission shall be deemed effective immediately upon the transfer, and, simultaneously, the transferor Member shall cease to be a Member of the Company and shall have no further rights or obligations under this Agreement.

2.   *Partial transfer*. If a Member transfers only a portion of its Membership Interest, the transferee shall be admitted to the Company as an additional Member upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement.

3.   Whether a substitute Member or an additional Member, absent the written consent of all existing Members of the Company, the transferee shall be a limited Member and possess only the percentage of the monetary rights of the transferor Member that was transferred without any voting power as a Member in the Company.

E.  <u>Member Voting</u>.

1.   *Voting power*. In the event that the Company has multiple Members simultaneously, the Company's Members shall each have voting power equal to its share of Membership Interest in the Company.

F.  <u>Member's Duty to File Notices</u>. The Member shall be responsible for preparation, maintenance, filing and dissemination of all necessary returns, notices, statements, reports, minutes or other information to the Internal Revenue Service, the state of Wyoming, and any other appropriate

state or federal authorities or agencies. Notices shall be filed in accordance with the section titled "Notices" below. The Member may delegate this responsibility to an Officer or a Manager at the Members' sole discretion.

G. <u>Fiduciary Duties of the Members</u>. The Members shall have no fiduciary duties whatsoever, whether to each other or to the Company, unless that Member is a Manager or an Officer of the Company, in which instance they shall owe only the respective fiduciary duties of a Manager or Officer, as applicable. No Member shall bear any liability to the Company or to other present or former Members by reason of being or having been a Member.

## IV. Accounting and Distributions.

A. <u>Fiscal Year</u>. The Company's fiscal year shall end on the last day of December.

B. <u>Distributions</u>. Distributions shall be issued, as directed by the Company's Treasurer or Assistant Treasurer, on an annual basis, based upon the Company's fiscal year. The distribution shall not exceed the remaining net cash of the Company after making appropriate provisions for the Company's ongoing and anticipatable liabilities and expenses. Each Member shall receive a percentage of the overall distribution that matches that Member's percentage of Membership Interest in the Company.

## V. Tax Treatment Election.

A. <u>Tax Designation</u>. The Company has not filed with the Internal Revenue Service for treatment as a corporation. Instead, the Company will be taxed as a pass-through organization. The Member may elect for the Company to be treated as a C-Corporation or a S-Corporation at any time.

## VI. Board of Managers.

A. <u>Creation of a Board of Managers</u>. The Member shall create a board of Managers (the "Board") consisting of Managers appointed at the sole discretion of the Member and headed by the Chairman of the Board. The Member may install itself as a Manager and as the Chairman. The Member may determine at any time in its sole and absolute discretion the number of Managers to constitute the Board, subject in all cases to any requirements imposed by Wyoming law. The authorized number of Managers may be increased or decreased by the Member at any time in its sole and absolute discretion, subject to Wyoming law. Each Manager elected, designated or appointed shall hold office until a successor Manager is elected and qualified or until such Manager's earlier death, resignation or removal.

B. <u>Powers and Operation of the Board of Managers</u>. The Board shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the Company's purposes described herein, including all powers, statutory or otherwise.

   1. *Meetings*. The Board may hold meetings, both regular and special, within or outside the state of Wyoming. Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board. Special meetings of the Board may be called by the Chairman on not less than one day's notice to each Manager by telephone, facsimile, mail or any other means of communication.

      i. At all meetings of the Board, a majority of the Managers shall constitute a quorum for the transaction of business, and except as otherwise provided in any other provision of this Agreement, the act of a majority of the Managers present at any meeting at which there is a quorum shall be the act of the Board. If a quorum shall not be present at any meeting of the Board, the Managers present at such meeting may adjourn the meeting until a quorum shall be present. Any action required or permitted to be taken at any

meeting of the Board may be taken without a meeting if all Managers consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board.

ii.   Managers may participate in meetings of the Board by means of telephone conference or similar communications equipment that allows all persons participating in the meeting to hear each other, and such participation in a meeting shall constitute presence in person at the meeting. If all the participants are participating by telephone conference or similar communications equipment, the meeting shall be deemed to be held at the primary business address of the Company.

C.   Compensation of Managers. The Board shall have the authority to fix the compensation of Managers. The Managers may be paid their expenses, if any, of attendance at meetings of the Board, which may be a fixed sum for attendance at each meeting of the Board or a stated salary as Manager. No such payment shall preclude any Manager from serving the Company in any other capacity and receiving compensation therefor.

D.   Removal of Managers. Unless otherwise restricted by law, any Manager or the entire Board may be removed, with or without cause, by the Member, and any vacancy caused by any such removal may be filled by action of the Member.

E.   Managers as Agents. To the extent of their powers set forth in this Agreement, the Managers are agents of the Company for the purpose of the Company's business, and the actions of the Managers taken in accordance with such powers set forth in this Agreement shall bind the Company. Except as provided in this Agreement, no Manager may bind the Company.

F.   No Power to Dissolve the Company. Notwithstanding any other provision of this Agreement to the contrary or any provision of law that otherwise so empowers the Board, none of the Board shall be authorized or empowered, nor shall they permit the Company, without the affirmative vote of the Member, to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or, to the fullest extent permitted by law, take action in furtherance of any such action.

G.   Duties of the Board. The Board and the Member shall cause the Company to do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises. The Board also shall cause the Company to:

1.   Maintain its own books, records, accounts, financial statements, stationery, invoices, checks and other limited liability company documents and bank accounts separate from any other person;

2.   At all times hold itself out as being a legal entity separate from the Member and any other person and conduct its business in its own name;

3.   File its own tax returns, if any, as may be required under applicable law, and pay any taxes required to be paid under applicable law;

4.   Not commingle its assets with assets of the Member or any other person, and separately

identify, maintain and segregate all Company assets;

5. Pay its own liabilities only out of its own funds, except with respect to organizational expenses;

6. Maintain an arm's length relationship with the Members, and, with respect to all business transactions entered into by the Company with the Member, require that the terms and conditions of such transactions (including the terms relating to the amounts paid thereunder) are the same as would be generally available in comparable business transactions if such transactions were with a person that was not a Member;

7. Pay the salaries of its own employees, if any, out of its own funds and maintain a sufficient number of employees in light of its contemplated business operations;

8. Not guarantee or become obligated for the debts of any other person or hold out its credit as being available to satisfy the obligations of others;

9. Allocate fairly and reasonably any overhead for shared office space;

10. Not pledge its assets for the benefit of any other person or make any loans or advances to any person;

11. Correct any known misunderstanding regarding its separate identity;

12. Maintain adequate capital in light of its contemplated business purposes;

13. Cause its Board to meet or act pursuant to written consent and keep minutes of such meetings and actions and observe all other Wyoming limited liability company formalities;

14. Make any permitted investments directly or through brokers engaged and paid by the Company or its agents;

15. Not require any obligations or securities of the Member; and

16. Observe all other limited liability formalities.

Failure of the Board to comply with any of the foregoing covenants shall not affect the status of the Company as a separate legal entity or the limited liability of the Member.

H. <u>Prohibited Actions of the Board</u>. Notwithstanding any other provision of this Agreement to the contrary or any provision of law that otherwise so empowers the Board, none of the Board on behalf of the Company, shall, without the unanimous approval of the Board, do any of the following:

1. Guarantee any obligation of any person;

2. Engage, directly or indirectly, in any business or activity other than as required or permitted to be performed pursuant to the Company's Purpose as described in Section II (A) above; or

3. Incur, create or assume any indebtedness other than as required or permitted to be performed pursuant to the Company's Purpose as described in Section II (A) above.

**VII.   Officers.**

A.   <u>Appointment and Titles of Officers</u>. The initial Officers shall be appointed by the Member and shall consist of at least a Chairman, a Secretary and a Treasurer. Any additional or substitute Officers shall be chosen by the Board. The Board may also choose one or more President, Vice-President, Assistant Secretaries and Assistant Treasurers. Any number of offices may be held by the same person. The Board may appoint such other Officers and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board. The Officers and agents of the Company shall hold office until their successors are chosen and qualified. Any Officer elected or appointed by the Member or the Board may be removed at any time, with or without cause, by the affirmative vote of a majority of the Board. Any vacancy occurring in any office of the Company shall be filled by the Board. Unless the Board decides otherwise, if the title of an Officer is one commonly used for officers of a limited liability company formed under Wyoming law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office.

1.   *Chairman*. The Chairman shall be the chief executive officer of the Company, shall preside at all meetings of the Board, shall be responsible for the general and active management of the business of the Company and shall see that all orders and resolutions of the Board are carried into effect. The Chairman shall execute all contracts on behalf of the Company, except:

i.   where required or permitted by law or this Agreement to be otherwise signed and executed;

ii.   where signing and execution thereof shall be expressly delegated by the Board to some other Officer or agent of the Company.

2.   *President*. In the absence of the Chairman or in the event of the Chairman's inability to act, the President shall perform the duties of the Chairman, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chairman. The President shall perform such other duties and have such other powers as the Board may from time to time prescribe.

3.   *Vice-Presidents*. In the absence of the Chairman and President or in the event of their inability to act, any Vice-Presidents in the order designated by the Board (or, in the absence of any designation, in the order of their election) shall perform the duties of the Chairman, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chairman. Vice-Presidents, if any, shall perform such other duties and have such other powers as the Board may from time to time prescribe.

4.   *Secretary and Assistant Secretary*. The Secretary shall be responsible for filing legal documents and maintaining records for the Company. The Secretary shall attend all meetings of the Members and record all the proceedings of the meetings of the Company and of the Members in a book to be kept for that purpose. The Secretary shall give, or cause to be given, notice of all meetings of the Members, as required in this Agreement or by Wyoming law, and shall perform such other duties as may be prescribed by the Board or the Chairman, under whose supervision the Secretary shall serve. The Secretary shall cause to be prepared such reports and/or information as the Company is required to prepare by applicable law, other than financial reports. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Members (or if there be no such determination, then in order of their election), shall, in the absence of the Secretary or in the event of the Secretary's inability to act, perform the duties and exercise the powers

of the Secretary and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

5. *Treasurer and Assistant Treasurer*. The Treasurer shall have the custody of the Company funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company according to generally accepted accounting practices, using a fiscal year ending on the last day of the month of December. The Treasurer shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Board. The Treasurer shall distribute the Company's profits to the Member. The Treasurer shall disburse the funds of the Company as may be ordered by the Board and shall render to the Chairman and to the Board, at its regular meetings or when the Board Members so require, an account of all of the Treasurer's transactions and of the financial condition of the Company. As soon as practicable after the end of each fiscal year of the Company, the Treasurer shall prepare a statement of financial condition as of the last day of the Company's fiscal year, and a statement of income and expenses for the fiscal year then ended, together with supporting schedules. Each of said annual statements shall be prepared on an income tax basis and delivered to the Member forthwith upon its preparation. In addition, the Treasurer shall keep all financial records required to be kept pursuant to Wyoming law. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event of the Treasurer's inability to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

B. <u>Officers as Agents</u>. The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the Officers taken in accordance with such powers shall bind the Company.

## VIII. **Fiduciary Duties of the Board and Officers.**

A. <u>Loyalty and Care</u>. Except to the extent otherwise provided herein, each Manager and Officer shall have a fiduciary duty of loyalty and care similar to that of managers of business corporations organized under the laws of Wyoming.

B. <u>Competition with the Company</u>. The Managers and Officers shall refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to the Company unless a majority, by individual vote, of the Board of Managers excluding the interested Manager, consents thereto. The Managers and Officers shall refrain from competing with the Company in the conduct of the Company's business unless a majority, by individual vote, of the Board of Managers excluding the interested Manager, consents thereto.

C. <u>Duties Only to the Company</u>. The Managers' and Officers' fiduciary duties of loyalty and care are to the Company and not to the other Managers or other Officers. The Managers and Officers shall owe fiduciary duties of disclosure, good faith and fair dealing to the Company and to the other Managers, but shall owe no such duties to Officers unless the Officer is a Manager. A Manager or Officer who so performs their duties shall not have any liability by reason of being or having been a Manager or an Officer.

D. <u>Reliance on Reports</u>. In discharging the Manager's or Officer's duties, a Manager or Officer is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by any of the following:

1. One or more Members, Managers, or employees of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented.

2. Legal counsel, public accountants, or other persons as to matters the Manager or Officer reasonably believes are within the persons' professional or expert competence.

3. A committee of Members or Managers of which the affected Manager or Officer is not a participant, if the Manager or Officer reasonably believes the committee merits confidence.

IX. **Dissolution.**

A. <u>Limits on Dissolution</u>. The Company shall have a perpetual existence, and shall be dissolved, and its affairs shall be wound up only upon the provisions established in Section II (C) above.

Notwithstanding any other provision of this Agreement, the Bankruptcy of any Member shall not cause such Member to cease to be a Member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

Each Member waives any right that it may have to agree in writing to dissolve the Company upon the Bankruptcy of any Member or the occurrence of any event that causes any Member to cease to be a Member of the Company.

B. <u>Winding Up</u>. Upon the occurrence of any event specified in Section II(C), the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Member, or in the event of multiple Members, one or more Members, selected by the remaining Members, shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the liabilities of the Company and its assets, shall either cause its assets to be distributed as provided under this Agreement or sold, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided under this Agreement.

C. <u>Distributions in Kind</u>. Any non-cash asset distributed to one or more Members in liquidation of the Company shall first be valued at its fair market value (net of any liability secured by such asset that such Member assumes or takes subject to) to determine the profits or losses that would have resulted if such asset were sold for such value, such profit or loss shall then be allocated as provided under this Agreement. The fair market value of such asset shall be determined by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) approved by the Members.

D. <u>Termination</u>. The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for under this Agreement and (ii) the Company's registration with the state of Wyoming shall have been canceled in the manner required by Wyoming law.

E. <u>Accounting</u>. Within a reasonable time after complete liquidation, the Company Treasurer shall furnish the Members with a statement which shall set forth the assets and liabilities of the Company as at the date of dissolution and the proceeds and expenses of the disposition thereof.

F. <u>Limitations on Payments Made in Dissolution</u>. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of its Initial Contribution and shall have no recourse for its Initial Contribution and/or

share of profits (upon dissolution or otherwise) against any other Member, if any other such Member exists.

G. <u>Notice to Wyoming Authorities</u>. Upon the winding up of the Company, the Member with the highest percentage of Membership Interest in the Company shall be responsible for the filing of all appropriate notices of dissolution with Wyoming and any other appropriate state or federal authorities or agencies as may be required by law.

## X.   Exculpation and Indemnification.

A. No Member, Manager, Officer, employee or agent of the Company and no employee, agent or affiliate of a Member (collectively, the "Covered Persons") shall be liable to the Company or any other person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

B. To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement. Expenses, including legal fees, incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall be paid by the Company. The Covered Person shall be liable to repay such amount if it is determined that the Covered Person is not entitled to be indemnified as authorized in this Agreement. No Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions. Any indemnity under this Agreement shall be provided out of and to the extent of Company assets only.

C. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any person as to matters the Covered Person reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

D. To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement. The provisions of the Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Member to replace such other duties and liabilities of such Covered Person.

E. The foregoing provisions of this Article X shall survive any termination of this Agreement.

## XI.   Insurance.

The Company shall have the power to purchase and maintain insurance, including insurance on behalf of any Covered Person against any liability asserted against such person and incurred by

such Covered Person in any such capacity, or arising out of such Covered Person's status as an agent of the Company, whether or not the Company would have the power to indemnify such person against such liability under the provisions of Article X or under applicable law.

XII.   **General Provisions.**

    A.   <u>Notices</u>. All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and may be personally served or sent by United States mail and shall be deemed to have been given when delivered in person or three (3) business days after deposit in United States mail, registered or certified, postage prepaid, and properly addressed, by or to the appropriate party.

    B.   <u>Number of Days</u>. In computing the number of days (other than business days) for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided, however, that if the final day of any time period falls on a Saturday, Sunday or holiday on which national banks are or may elect to be closed, then the final day shall be deemed to be the next day which is not a Saturday, Sunday or such holiday.

    C.   <u>Execution of Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which shall together constitute one and the same instrument.

    D.   <u>Severability</u>. The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

    E.   <u>Headings</u>. The Article and Section headings in this Agreement are for convenience and they form no part of this Agreement and shall not affect its interpretation.

    F.   <u>Controlling Law</u>. This Agreement shall be governed by and construed in all respects in accordance with the laws of the state of Wyoming (without regard to conflicts of law principles thereof).

    G.   <u>Application of Wyoming Law</u>. Any matter not specifically covered by a provision of this Agreement shall be governed by the applicable provisions of Wyoming law.

    H.   <u>Amendment</u>. This Agreement may be amended only by written consent of the Board and the Member. Upon obtaining the approval of any such amendment, supplement or restatement as to the Certificate, the Company shall cause a Certificate of Amendment or Amended and Restated Certificate to be prepared, executed and filed in accordance with Wyoming law.

    I.   <u>Entire Agreement</u>. This Agreement contains the entire understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained.

IN WITNESS WHEREOF, the Member has executed and agreed to this Limited Liability Company Operating Agreement, which shall be effective as of February 15, 2022.

By: _____      Date: _____04/26/2023_____

Tanner Adam

ATTACHMENT A
*Initial Contributions of the Member*

The Initial Contributions of the Member of Triten Financial Group LLC are as follows:

Tanner Adam
        Contribution:

# EXHIBIT 4

# TERM LOAN AGREEMENT

This TERM LOAN AGREEMENT (the "**Agreement**") is dated as of this 20th day of May,  2024 (the "**Effective Date**") by and between **TRITEN FINANCIAL GROUP, LLC**, a Wyoming limited liability company, and or any global affiliates, and or its assigns, (the "**Borrower**") and Hardin-Marie Investments LLC, and or its assigns, (the "**Lender**"). In consideration of the Lender lending a certain amount of money (the "**Loan**") to the Borrower, and the Borrower reimbursing the Loan to the Lender, the parties agree to support, execute and satisfy the promises and conditions written in this Agreement.

1. **Loan Amount**.  The total amount of money being borrowed from the Lender under this Agreement is Two Hundred Fifty Thousand dollars (USD) ($250,000.00).

2. **Interest Rate**.  The Loan shall bear a non-compounding, simple interest rate of Eight (8.0%) monthly on the Principal balance of Two Hundred Fifty Thousand dollars (USD) ($250,000.00).

3. **Term**.  This Loan shall be for a term of Twelve (12) months and all Principal shall be due and payable of this term loan agreement. ("**Termination Date**").

4. **Payments**.  The Borrower agrees to repay the Loan to the Lender in the form of 12 monthly interest only payments of Twenty Thousand dollars (USD) ($20,000.00) and followed by a balloon payment of the **Principal** upon the Termination Date. Monthly interest payments shall be made on the first day of each calendar month to the account of Lender's choice. In the event that the money is not deposited on the first of the month any **Principal** to be deployed that following Monday would be subject to a prorated value for the remaining days in the months cycle once Principal Capital is deployed at the daily interest rate agreed to by and between both **Lender** and **Borrower** per agreement.

5. **Late Payment**.  If the Borrower is late in making its monthly payment by more than five (5) business days or for any payment due, it shall be considered late. If payment is late, the Borrower shall be charged a late fee equal to 1% of the Principal.

6. **Security**.  Both Lender and Borrower agree that this Agreement shall not be secured by any property or asset of the Borrower.

7. **Acceleration and Breach Clause**.  The Lender agrees to lock the **"Principal"** for one (1)  year unless contract is breached by Borrower, Tanner Adam, Triten Financial Group, LLC, or any member/person working/acting on behalf of Triten Financial Group, LLC. If such breach occurs, Lender has at their discretion the right to have the "**Principal**" re-paid to the bank account of Lenders's choosing plus any accrued interest paid to Lender's bank account that has not yet been paid and is owed with in two business days of Lender Written Notice of Breach and request of Withdrawal. Furthermore if Tanner Adam becomes deceased or incapacitated, or otherwise unable to continue per the terms of the contract lender has right to declare contract in default and can execute this breach clause at his discretion with principal and any interest accrued up to date due with in two business days of written breach or withdrawal

8. **Compromised Wallets**. In the event of a compromised wallet the party owning the compromised wallet shall inform the other party, in writing, that their wallet has been compromised, and provide a new wallet address within 3 business days prior to the next payout, or deposit, and it shall become the new wallet address to use from that point forward.

9. **Severability**.  The provisions of this Agreement are intended to be read and interpreted independently.  If any term, condition or provision of this Agreement is found to be invalid or unenforceable by a court of competent jurisdiction, the parties intend that the court reduce the scope of such provision to make it reasonable and enforceable and the remaining provisions of this Agreement will not be affected as a result.

10. **Non Disclosure and Agreement Not to Compete.**  Lender agrees they and/or their assignees shall not create nor acquire a flash loans bot program similar to Borrower's product. Lender also agrees to not write code and agree to not pay to have code written for a bot that would reverse engineer or compete against the flash loan pools bot program of Borrower's.  Lender also acknowledges being bound to the executed Non-Disclosure and Non-Circumvention Agreement.

11. **Governing Law**.  This Agreement will be construed, and the rights, duties, and obligations of the parties will be determined in accordance with the laws of the State of Wyoming.

12. **Entire Agreement**.  This Agreement, together with any written modifications or amendments to this Agreement hereafter entered into represents the entire understanding between the parties relative to the subject matter hereof.

13.  **Counterparts**.  This Agreement may be executed in any number of counterparts,

each of which shall be deemed an original but all of which together shall constitute and be construed as one and the same instrument, with the same effect as if all parties hereto had signed the same document. Electronic signatures are acceptable and will be binding on the parties.

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the day and year first above written.

**BORROWER**

Triten Financial Group, LLC

By: _____
C04FCF4B6DD645C...

Name: Tanner Adam

Title: Principal & CEO

**LENDER**

Hardin-Marie Investments LLC

By: _____
9FDB1C9942E649F...

David Mireles