# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Civil Action File No. 1:24-cv-03774-MHC** |
| **v.** | |
| **TANNER S. ADAM, JONATHAN L. ADAM, TRITEN FINANCIAL GROUP, LLC, and GCZ GLOBAL LLC,** | **JURY DEMAND** |
| **Defendants, and** | |
| **AVA A. ADAM, GARRETT L.W. ADAM, ROBERT S. ADAM, CARRIE L. ADAM, EMILIO F. HINOJOSA, AND VIRGINIA I. HINOJOSA,** | |
| **Relief Defendants,** | |

**AMENDED COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

**SUMMARY**

1. From January 2023 until at least as late as June 14, 2024, (the "Relevant Period"), Tanner Adam and his brother Jonathan Adam, a recidivist with prior

convictions for state securities law violations (collectively, the "Adam Brothers"),

through their respective alter-ego companies, Triten Financial Group, LLC ("Triten")

and GCZ Global LLC ("GCZ"), raised at least $61.5 million in funds from more than

80 investors.

2.      Defendants offered these investors the opportunity to participate in a

crypto asset lending pool the Adam Brothers purportedly operate in the decentralized

finance ("DeFi") space.

3.      Operating from Miami, Florida and Angleton, Texas, respectively,

Tanner and Jonathan Adam told investors that Jonathan Adam had invented an

automated software "bot" that identifies and enters into "smart contracts."

4.      The Adam Brothers told investors that the smart contracts provide

"flash loans" to arbitrage traders who trade crypto assets among crypto asset trading

platforms.

5.      Through promissory notes with Triten, and lending agreements or

technology services agreements with GCZ, the Adam Brothers offered investors the

opportunity to earn up to a 13.5 percent monthly return.

6.      The Adam Brothers told investors that these monthly returns were

generated from the fees earned on the total amount of capital purportedly made

available for such flash loans on the well-known crypto asset trading platform

operated by Gemini Trust Company.

7.     The Adam Brothers told investors that their funds would be immediately "locked up" in a bot for deployment into the lending pool, such that nobody, the Adam Brothers included, could access the money until the agreed-upon length of the promissory note or investment contract had passed.

8.     Specifically, the Adam Brothers told investors that their funds would first be wired to Kraken, another crypto asset trading platform, where the U.S. Dollars would be exchanged for the crypto asset Tether.

9.     The Adam Brothers told investors that once the U.S. Dollars were converted to Tether, the Tether would then promptly be deployed through a crypto wallet to the lending pool.

10.     The Adam Brothers did not use investors funds as represented and their representations were false and misleading.

11.     While the Adam Brothers did send a portion of investor funds to two different crypto asset trading platforms, most investor funds were not deployed as represented by the Adam Brothers.

12.     Instead, the Adam Brothers operated a Ponzi scheme until at least June 14, 2024.

13.     Of the $61.5 million of investor funds raised by Defendants, at least $53.9 million was either misappropriated or used to pay interest, pay finders fees, and return principal to existing investors.

14.     The Adam Brothers have used investor funds for a variety of personal expenses.

15.     Tanner Adam has used investor funds to make the down and installment payments to build a $30 million condominium in Miami.

16.     The Adam Brothers used over $1.8 million in investor funds to build houses in Texas for Jonathan Adam and their brother, their parents, and Jonathan's in-laws.

17.     Jonathan Adam has used at least $480,000 of investor funds to purchase cars, trucks, and recreational vehicles.

18.     Ava A. Adam, Garrett L.W. Adam, Robert S. Adam, Carrie L. Adam, Emilio F. Hinojosa, and Virginia I. Hinojosa received proceeds from this scheme without providing any value in return and were thus unjustly enriched thereby.

18.19. The Adam Brothers' dissipation of assets has continued into June 2024, and less than $400,000 in investor funds remain in bank accounts controlled by the Adam Brothers.

## VIOLATIONS

19.20. By the conduct described herein, Tanner Adam, Jonathan Adam, Triten, and GCZ have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]

-4-

and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

## **JURISDICTION AND VENUE**

~~20.~~21. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77*t*(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

~~21.~~22. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].

~~22.~~23. In connection with the transactions, acts, practices, and courses of business described in this Complaint, Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce.

~~23.~~24. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] and 28 U.S.C. § 1391 because Defendants offered and sold securities throughout the country, including in this district, and have consented to venue in this district.

**FACTS**

**Defendants**

24.25.**Jonathan L. Adam**, age 42, is a resident of Angleton, Texas.

25.26.Jonathan owns and controls GCZ Global LLC, a company that purports to operate an automated software bot on a lending platform that, within the DeFi space, enters into smart contracts that provide flash loans to arbitrage traders seeking to trade crypto assets among crypto asset trading platforms.

26.27.Jonathan is also an owner of Thissl, Inc. ("Thissl"), a data storage services company.

27.28.Jonathan has never held any securities licenses.

28.29.In 2004, in Topeka, Kansas, Jonathan was convicted of three felony securities law violations (securities fraud, engaging in business as a broker-dealer or agent without registration, and unlawful sale of unregistered securities). Jonathan was sentenced to 50 months in prison and ordered to pay $314,500 in restitution.

29.30.Jonathan has asserted the Fifth Amendment in response to a testimony subpoena that the Commission issued to him in the investigation that preceded this litigation.

30.31.**Tanner S. Adam**, age 38, is a resident of Miami, Florida.

31.32. Tanner owns and controls Triten Financial Group, LLC, a company that, together with GCZ, purports to engage in providing flash loans within the DeFi space.

32.33. Tanner has never held any securities licenses.

33.34. Tanner failed to produce any documents in response to a subpoena that the Commission issued to him in the investigation that preceded this litigation and refused to make himself available for testimony in response to a testimony subpoena that the Commission issued to him.

34.35. **GCZ Global LLC** is a Wyoming limited liability company with its principal place of business in Casper, Wyoming. GCZ is owned and controlled by Jonathan Adam. GCZ is not registered with the Commission in any capacity.

35.36. **Triten Financial Group, LLC** is a Wyoming limited liability company with its principal place of business in Angleton, Texas. Triten is owned and controlled by Tanner Adam. Triten has never been registered with the Commission in any capacity.

**Relief Defendants**

37. **Ava A. Adam**, age 39, is a resident of Angleton, Texas. Ava is Jonathan Adam's partner; they are not legally married.

38. **Garrett L.W. Adam**, age 34, is a resident of Angleton, Texas. Garrett is the younger brother of the Adam Brothers.

39.    **Robert S. Adam**, age 66, is a resident of Angleton, Texas.  Robert is the Adam Brothers' father.

40.    **Carrie L. Adam**, age 63, is a resident of Angleton, Texas.  Carrie is the Adam Brothers' mother.

41.    **Emilio F. Hinojosa**, age 45, is a resident of Angleton, Texas.  Emilio is Ava Adam's brother.

42.    **Virginia I. Hinojosa**, age 40, is a resident of Angleton, Texas.  Virginia is Ava Adam's sister-in-law.

**Related Party**

~~36.~~43. **Thissl, Inc.** is a Delaware corporation with its principal place of business in Danville, California.  Jonathan Adam is a founder of Thissl and is Thissl's treasurer and a board member.

~~37.~~44. Thissl is a start-up technology company that offers data storage services.  Thissl has never been registered with the Commission in any capacity.

**Background**

~~38.~~45. Though the Adam Brothers operated this Ponzi scheme together, soliciting investors jointly on calls and video conferences and sending funds between the bank accounts that each controls, they held themselves out to investors as having defined roles in the scheme, and each controls their own entity.

39.46. Jonathan presents himself as a self-described "tech nerd" and "the brains" of the operation who invented the bot.

40.47. Jonathan has a technology background and told investors that he had launched several successful technology businesses, including Thissl.

41.48. Jonathan is the principal of GCZ and raises investor funds through GCZ.

42.49. Jonathan controls all the funds flowing in and out of GCZ's bank accounts.

43.50. Tanner presents himself as the more social, business-minded one of the duo.

44.51. Tanner controls the Triten entity and raises investor funds through Triten.

45.52. Tanner controls all the funds flowing in and out of Triten's bank accounts.

46.53. Apart from one investor, GCZ and Triten appear to have separate pools of investors.

47.54. Mechanically, most investors entered into promissory notes or lending agreements with Triten or GCZ, agreeing to loan principal (in the form of either fiat or crypto assets) to the entities for a period ranging from one to ten years.

48.55. At least one investor entered into a "technology services agreement" with GCZ in which the investor agreed to loan principal (in the form of either fiat or crypto assets) to GCZ for a period of three years with the right to renew the agreement for an additional two years.

49.56. The Adam Bothers enticed investors to enter into these agreements with promises of earning substantial returns.

50.57. To date, the Adam Brothers, both themselves and through several individuals operating as finders, have successfully solicited more than 80 investors throughout the country to invest in Triten and GCZ.

51.58. The Adam Brothers promised those investors monthly investment returns of at least 8 percent, but in some cases of up to 13.5 percent.

**Misrepresentations Concerning the Lending Pool Investment**

52.59. The Adam Brothers consistently made numerous material misrepresentations to investors regarding the lending pool opportunity and their own backgrounds.

53.60. The Adam Brothers, in joint conversations and individually, over the telephone, through videos, or through video conferences, told investors highly specific information about the purported lending pool investment opportunity.

54.61. For example, the Adam Brothers led investors to believe that they were working with Gemini Trust Company, a New York trust company regulated

by the New York State Department of Financial Services that was founded in 2014 by Tyler and Cameron Winklevoss and operates a well-known global crypto asset trading platform.

~~55.~~62. The Adam Brothers knew that Gemini Trust Company operated a crypto asset trading platform and that none of the Defendants had any affiliation with Gemini Trust Company.

~~56.~~63. The Adam Brothers told investors that Jonathan had invented a bot that entered smart contracts to provide flash loans to arbitrage traders seeking to trade crypto assets.

~~57.~~64. Jonathan told investors that he, through GCZ, began operating the bot on the Gemini platform, where it caught the attention of Gemini because the GCZ bot "outperformed" Gemini's own bot.

~~58.~~65. When Jonathan told investors about Gemini, he knew that the investors believed that he was referring to Gemini Trust Company.

~~59.~~66. In response to an investor's question about Jonathan's relationship with Gemini Trust Company, Jonathan did not tell the investor that he was not working with Gemini Trust Company. Instead, he told the investor that Gemini has dozens of different companies and that he was working with Gemini's Panamanian platform.

60.67. During a subsequent conversation with that same investor, Tanner referenced the prior discussion of Gemini Trust Company and explained that the Adam brothers were working with Gemini's Panamanian platform.

61.68. The Adam Brothers never told investors that neither they nor their companies were associated with the crypto asset trading platform operated by Gemini Trust Company.

62.69. The Adam Brothers told potential investors that Gemini wanted to purchase Jonathan's bot, but Jonathan declined.

63.70. The Adam Brothers told investors that instead, Jonathan had entered an exclusive contract with Gemini whereby Gemini would pay the Adam Brothers a rate of one-percent interest per day on the total balance of the lending pool capital the Adam Brothers made available for flash loans.

64.71. The Adam Brothers told investors that this rate would be paid regardless of whether the funds were actually deployed for the purpose of these flash loans.

65.72. The Adam Brothers told investors that the purported arrangement with Gemini created revenues of around 30 percent per month and served as the source for the returns paid to the investors.

66.73. The Adam Brothers told investors that the Adam Brothers were compensated by taking a share of the 30-percent return paid to them by Gemini.

67.74. The Adam Brothers told investors that they were not entitled to any other fees or compensation paid by investors.

68.75. The Adam Brothers told investors that they were raising funds to service the demands of the lending pool.

69.76. Tanner told one investor that they were trying to raise $250 million from investors.

70.77. Jonathan told investors that the Gemini agreement had been entered into between the Adam Brothers and Gemini's offshore Panamanian lending pool because Gemini and other crypto asset trading platforms were moving their operations offshore to avoid SEC regulation.

71.78. The Adam Brothers told investors that once the investors wired their funds in U.S. Dollars to GCZ's or Triten's bank account, the entities would purportedly wire the funds to Kraken, where the U.S. Dollars would be exchanged for the crypto asset Tether.

72.79. The Adam Brothers told investors that the Monday following receipt of investor principal, the Tether deployed to an automated bot through a crypto wallet and then to the lending pool, to be loaned out to arbitrage traders in the so-called DeFi space.

73.80. According to the Adam Brothers, when investor capital came into a Triten or GCZ controlled account or wallet, it was purportedly immediately

deployed into the lending pool and "locked up" in a bot, such that nobody, the Adam Brothers included, could access the money until the agreed upon length of the investment contract had passed.

74.81. The Adam Brothers told investors that the risk to the investors' principal was virtually non-existent, unless there was a complete global market meltdown.

75.82. The Adam Brothers told investors that at the end of the lending period, investors could either receive their principal back, or roll it into a new investment contract.

76.83. The Adam Brothers told investors that the fees from the arrangement with Gemini were purportedly paid in Tether by Gemini to the Adam Brothers' crypto "profit wallet" and were then transferred to GCZ's or Triten's crypto "corporate wallet."

77.84. According to the Adam Brothers, the fees were sent from the "corporate wallet" to the Adam Brothers' Kraken accounts where the Tether was converted back to U.S. Dollars, sent to GCZ's or Triten's bank accounts, and then wired back to investors.

78.85. The Adam Brothers told investors that each brother had the pass keys to the other brother's crypto wallet, and that each month they would get together to unlock their crypto wallets and process the returns to investors as described above.

79.86. These representations that the Adam Brothers made to investors are false.

80.87. Instead of deploying investor capital into smart contacts, the Adam Brothers misappropriated and misspent approximately $53.9 million of the $61.5 million raised from investors.

81.88. The Adam Brothers failed to tell investors that they were using investor funds to pay existing investors.

82.89. The Adam Brothers failed to tell investors that they were using investor funds to pay their personal expenses.

83.90. The Adam Brothers failed to disclose to some investors that they were paying finders fees to individuals who introduced them to others who ultimately invested.

84.91. Though the Adam Brothers transferred $12.9 million of investor funds to Coinbase and Kraken, they withdrew $5.3 million from those platforms back to their bank accounts.

85.92. To the extent that there is a net outflow of $7.6 million to Coinbase and Kraken, there is no evidence those funds have been deployed in any manner consistent with the representations made to investors.

86.93. The $7.6 million transferred to Coinbase and Kraken has not generated a daily return of 1%.

**Adam Brothers' Misappropriation of Assets**

87.94. Bank records from February 1, 2023, through June 30, 2024, show that the Adam Brothers misappropriated more than $19 million of the investor funds that they raised.

88.95. The following table reflects the funds misappropriated by the Adam Brothers:

| | Triten | GCZ | Total |
|---|---|---|---|
| Investor funds raised in business and personal accounts | $ 40,707,612 | $ 20,852,322 | $ 61,559,934 |
| Less: Investor payments and finder fees | (27,634,470) | (6,567,081) | (34,201,551) |
| Less: Net funds sent to crypto market | (5,495,976) | (2,077,917) | (7,573,893) |
| Less: Account balance at 06/30/24 | (173,760) | (162,461) | (336,221) |
| Net misappropriation for personal use | $ 7,403,406 | $ 12,044,863 | $ 19,448,269 |

89.96. In addition to paying former investors with new investor money, the Adam Brothers used investor funds to finance their and their family's lifestyle and to invest in other business ventures.

90.97. Tanner directed investor funds in the amount of $3.725 million towards the down payment and progress payments for an 11,861 square foot, five-bedroom, nine-and-a-half-bathroom penthouse condominium he is building in Miami, with a total purchase price of nearly $30 million.

91.98. The Adam Brothers directed a total of $1.46 million of investor funds to a Texas home builder who built custom homes for their brother, their parents, Jonathan, and Jonathan's in-laws.

-16-

92.99. Jonathan, through GCZ, also provided a $3 million line of credit to the home builder to finance working capital, of which $637,000 was drawn.

93.100.    In addition to the construction cost of the new homes in Texas, Jonathan, both individually and through GCZ, used over $995,000 of investor funds to pay escrow and title companies in connection with the construction of these homes.

94.101.    Jonathan also spent over $360,000 of investor funds on home and construction related expenses, including over $75,000 for the construction of a pool.

102.   During the Relevant Period, Ava Adam resided with and shared bank accounts with Jonathan.

103.   Ava does not appear to have a source of income other than the money provided to her by Jonathan.

104.   In 2024, Ava moved into a home with Jonathan that was purchased with at least $480,000 of investor funds.

105.   That home, located at 518 Bryan Street, Angleton, Texas 77515, is jointly titled in her name and Jonathan's name.

106.   The Adam Brothers used at least $412,000 of investor funds to build the house in which Garrett currently resides, 9 Greystone Court, Angleton, Texas 77515.  The property is titled in Garrett's name.

107.   The Adam Brothers used at least $325,000 of investor funds to build the house in which Robert Adam and his wife, Carrie Adam, currently reside, 719 S. Walker Street, Angleton, Texas 77515.  This property is jointly titled in their names.

108.   The Adam Brothers used at least $319,000 of investor funds to build the house in which Emilio Hinojosa and his wife, Virginia Hinojosa, currently reside, 715 S. Walker Street, Angleton, Texas 77515.  This property is jointly titled in their names.

95.109.      Jonathan directed a total of over $480,000 of investor funds for the purchase of cars, trucks, and recreational vehicles.

96.110.      The Adam Brothers used investor funds to pay living expenses for themselves and for their parents, including designer purchases at Louis Vuitton, Carolina Herrera, and Jimmy Choo, and credit card payments of over $220,000.

97.111.      Tanner designated a Triten bank account for his parents, Robert and Carrie Adam, from which his parentsthey made credit card payments, tax payments, and payments for other living expenses exceeding $65,000 in a four-month period ending in June 2024.

112.   Defendants also used over $129,000 in investor funds from Triten to pay the personal expenses of their parents, Robert and Carrie Adam.

113.   Ava Adam received transfers of $62,000 into her personal account from accounts into which investor funds were deposited, without providing any value in return.

114.   Jonathan Adam also used at least $286,000 of investor funds to pay numerous expenses incurred by or benefitting Ava Adam, including insurance and mortgage payments on her prior home, rent while their new home was under construction, car payments, car insurance, household expenses and credit card bills.

115.   Garrett received transfers from Triten and GCZ totaling more than $166,000 from accounts into which investor funds were deposited, without providing any value in return.

116.   Jonathan Adam used investor funds transferred from Triten to purchase Garrett Adam a vehicle costing more than $85,000.

**Misrepresentations and Omissions Concerning Jonathan Adam's Background**

~~98.~~117.     Jonathan spent extensive time talking with and answering questions from potential investors about his background and Jonathan's other company, Thissl, on numerous video calls and at least one video presentation.

99.118. Jonathan also circulated a ten-minute video of himself making claims about his background and qualifications.

100.119. In those calls, presentation and videos, Jonathan made multiple misrepresentations about his background.

101.120. Jonathan falsely told investors that he serves as the cyber ambassador to the State of Kansas.

102.121. The State of Kansas does not employ anyone in the position of cyber ambassador.

103.122. Jonathan falsely told investors that Thissl received $59 million pursuant to a Simple Agreement for Future Equity investment from Sequoia Capital Operations LLC, a venture capital firm that specializes in seed stage, early stage, and growth stage investments in private companies across technology sectors.

104.123. Sequoia Capital Operations LLC Inc. has never made an investment in Thissl.

105.124. Jonathan falsely told investors that Thissl powers the entire network for Basecamp, LLC ("Basecamp"), a program management software company that previously used Amazon Web Services for its data storage needs and in October 2022 publicly announced that it would no longer be using Amazon Web Services.

106.125.    Thissl has never provided any services to Basecamp.

107.126.    Jonathan falsely told investors that Thissl has a large contract with Rackspace Technology, Inc. ("Rackspace"), a cloud computing services company.

108.127.    Thissl has never had any contracts with Rackspace Technology.

109.128.    Jonathan falsely told investors that Thissl has successfully litigated over its patents after being sued by large corporations, including Comcast, Oracle and IBM.

110.129.    Neither Thissl, nor any prior owner of patents developed by Jonathan, has ever been involved in litigation over the patents developed by Jonathan.

111.130.    These misrepresentations regarding Jonathan's technical abilities and successes were important to many investors in making their decision to invest.

112.131.    In touting his background and expertise, Jonathan also failed to disclose that he had previously been convicted of securities fraud and sentenced to 50 months in prison.

113.132.    Tanner repeated to investors the misrepresentations about Sequoia's investment in Thissl to investors.

114.133.    Tanner also repeated to investors the misrepresentation about Jonathan's involvement as cyber ambassador to the State of Kansas.

115.134.    Additionally, Tanner repeated to investors the misrepresentation about Thissl's contract with Rackspace.

116.135.    Tanner failed to disclose Jonathan's criminal history to investors.


**Risk of Dissipation of Remaining Investor Funds**

117.136.    The Adam Brothers continued to raise, and misappropriate, investor funds through at least June 2024.

118.137.    In May and June 2024, the Adam Brothers raised $10.96 million and paid $8.8 million to investors with those funds.

119.138.    Additionally, in June, Jonathan made credit card payments of over $50,000, paid at least $180,000 in attorney fees, sent $974,000 to other businesses he is affiliated with, and transferred $100,000 to his personal bank accounts.

120.139.    As of June 30, 2024, $336,000 of investor funds remain in the bank accounts of Triten and GCZ.

121.140.   As of June 30, 2024, the net outflow of funds to Coinbase and Kraken is $7.6 million which represents investor funds transferred to and still within crypto wallets.

**COUNT I**

**Violations of Section 17(a)(1) of the Securities Act
[15 U.S.C. § 77q(a)(1)]**

122.141.   The Commission realleges paragraphs 1 through 121140 above.

123.142.   Between January 2023 and June 14, 2024During the Relevant Period, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

124.143.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

125.144.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**COUNT II**

**Violations of Section 17(a)(2) and (a)(3) of the Securities Act**
**[15 U.S.C. § 77q(a)(2) and (a)(3)]**

~~126.~~145.    Paragraphs 1 through ~~121~~140 are hereby realleged and are incorporated by reference.

~~127.~~146.    ~~Between January 2023 and June 14, 2024~~During the Relevant Period, Defendants, in the offer and sale of securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

      a.    obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      b.    engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

~~128.~~147.    Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

**COUNT III**

**Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

~~129.~~148.    The Commission realleges paragraphs 1 through ~~121~~140 above.

~~130.~~149.    ~~Between January 2023 and June 14, 2024~~During the Relevant Period, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

a.    employed devices, schemes, and artifices to defraud;

b.    made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

~~131.~~150.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.

132.151.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

Permanent injunctions enjoining Defendants and their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Permanent injunctions enjoining Defendants Tanner Adam and Jonathan Adam from directly or indirectly participating in the issuance, purchase, offer, or sale of any security, provided that such injunction shall not prevent Defendants Tanner Adam and Jonathan Adam from purchasing or selling securities listed on a national securities exchange for their own personal accounts.

### III.

An order requiring an accounting by Defendants of the use of proceeds of the fraudulent conduct described in this Complaint and the disgorgement by Defendants

and Relief Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

**IV.**

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against Defendants.

**V.**

An order freezing the assets of Defendants pending further order of the Court.

**VI.**

An order preventing Defendants from destroying or concealing documents or other evidence until further order of this Court.

**VII.**

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY TRIAL DEMAND**

The Commission hereby demands a trial by jury as to all issues that may be so tried.

Respectfully submitted this ~~26th~~21st day of ~~August, 2024~~March, 2025,

*/s/ Kristin W. Murnahan*
M. Graham Loomis
Regional Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7622
Georgia Bar No. 457868
loomism@sec.gov

Kristin W. Murnahan
Senior Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7655
Georgia Bar No. 759054
murnahank@sec.gov

COUNSEL FOR PLAINTIFF