## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Civil Action File No. 1:24-cv-03774-MHC** |
| **v.** | |
| **TANNER S. ADAM, JONATHAN L. ADAM, TRITEN FINANCIAL GROUP, LLC, and GCZ GLOBAL LLC,** | |
| **Defendants, and** | |
| **AVA A. ADAM, GARRETT L.W. ADAM, ROBERT S. ADAM, CARRIE L. ADAM, EMILIO F. HINOJOSA, AND VIRGINIA I. HINOJOSA,** | |
| **Relief Defendants.** | |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR REMEDIES AND FOR ENTRY OF DEFAULT JUDGMENTS

Plaintiff Securities and Exchange Commission (the "Commission") submits this Brief in Support of its motion for remedies against Defendants Tanner S. Adam, Jonathan L. Adam (collectively the "Adam Brothers"), Triten Financial Group ("Triten"), and GCZ Global LLC ("GCZ") and for default judgments against Relief Defendants Ava A. Adam, Garrett L.W. Adam, Robert S. Adam, Carrie L.

Adam, Emilio F. Hinojosa, and Virginia L. Hinojosa (collectively "Relief Defendants"). From January 2023 until at least as late as June 14, 2024, the Adam Brothers, through Triten and GCZ, engaged in an offering fraud and Ponzi scheme.

On August 26, 2024, the Commission filed this action against the Defendants. The same day, the Defendants consented, without admitting or denying the allegations of the complaint, to the entry of permanent injunctions prohibiting them from future violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. The judgment entering the settlements provided that the Defendants agreed to pay disgorgement, prejudgment interest, and civil penalties in amounts to be determined by the Court upon motion by the Commission and that for purposes of that motion, Defendants are precluded from contesting the allegations of the complaint.

On April 17, 2025, the Commission filed an amended complaint naming Ava Adam, Garrett Adam, Robert Adam, Carrie Adam, Emilio Hinojosa, and Virginia Hinojosa as relief defendants, seeking disgorgement and prejudgment interest from them. None of the Relief Defendants responded to the amended complaint. On September 29, 2025, the Clerk entered defaults against the Relief Defendants. This matter is now ripe for a determination of the appropriate remedies to be imposed against the Defendants and Relief Defendants.

The Commission respectfully requests that the Court find Defendants jointly and severally liable for disgorgement of $30,512,775, plus prejudgment interest thereon of $6,221,302, for a total of $36,734,077. The Commission also requests that the Court order the Adam Brothers to each pay a civil penalty of $3 million.

Because the Defendants used a portion of the $30 million they misappropriated from investors to benefit each relief defendant, the Commission requests that the Court find each relief defendant jointly and severally liable with Defendants for the amount of investor funds that were used for his or her benefit. Specifically, the Commission requests that the Court order disgorgement and prejudgment interest against the Relief Defendants as follows:

| Relief Defendant | Disgorgement | Prejudgment Interest | Joint & Several Liability |
|---|---|---|---|
| Ava Adam | $931,000 | $64,202 | w/Defendants |
| Garrett Adam | $657,254 | $64,277 | w/Defendants |
| Robert and Carrie Adam | $515,782 | $39,280 | w/each other and Defendants |
| Emilio and Virginia Hinojosa | $379,695 | $34,345 | w/each other and Defendants |

Included in the disgorgement amounts set forth above are investor funds that were used to purchase properties titled in each relief defendant's name. To ensure that the Commission can collect the relief ordered against Defendants and the Relief Defendants, the Commission requests that the Court order the following parties to relinquish all rights, interest and title in the following real properties:

1.   Ava and Jonathan Adam to relinquish the property located at 518
     Bryan Street, Angleton, Texas 77515;

2.   Garrett Adam to relinquish the property located at 9 Greystone
     Court, Angleton, Texas 77515;

3.   Robert and Carrie Adam to relinquish the property located at 719
     S. Walker Street, Angleton, Texas 77515; and

4.   Emilio and Virginia Hinojosa to relinquish the property at 715 S.
     Walker Street, Angleton, Texas 77515.

Finally, to avoid double-counting, the Commission requests that the Court offset

any amounts collected from the Relief Defendants from the disgorgement and

prejudgment interest obligation of Defendants.

## **FACTS**

The relevant facts supporting the Commission's Motion are evidenced by the

allegations in the Complaint[1] and the September 30, 2025 Declaration of Krysta M.

Cannon ("Cannon Dec.").

From January 2023 until at least as late as June 14, 2024 (the "Relevant

Period"), Defendants raised at least $61.5 million in funds from more than 80

investors.  Defendants offered these investors the opportunity to participate in a

---

[1]     Defendants consented to the Commission's allegations being accepted as true
for the purposes of determining the remedies to be imposed against them.  The Relief
Defendants failed to respond to the allegations of the complaint, and thus, it is
appropriate to deem the allegations true for purposes of entering a default judgment
against them. 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*,
§ 2688, p. 412 (2d ed. 1983); *Thomson v. Wooster*, 5 S. Ct. 788 (1885)

crypto asset lending pool that the Adam Brothers purportedly operated in the

decentralized finance ("DeFi") space.  The Adam Brothers told investors that

Jonathan Adam had invented an automated software "bot" that identifies and enters

into "smart contracts."  In reality, the Adam Brothers were operating a Ponzi scheme.

Of the $61.5 million of investor funds raised by Defendants, at least $53.9 million

was either misappropriated or used to pay interest, pay finders fees, and return

principal to existing investors.  The Adam Brothers used investor funds for a variety

of personal expenses.  [Dkt No. 1 ¶¶ 1-3, 12-14; Dkt. No. 19 ¶¶ 1-3, 12-14.]  Ava A.

Adam, Garrett L.W. Adam, Robert S. Adam, Carrie L. Adam, Emilio F. Hinojosa,

and Virginia I. Hinojosa received proceeds from this scheme without providing any

value in return and were thus unjustly enriched thereby.  [Dkt. No. 19 ¶ 18.]

## Background

Mechanically, most investors entered into promissory notes or lending

agreements with Triten (a company controlled by Tanner Adam) or GCZ (a company

controlled by Jonathan Adam), agreeing to loan principal to the entities for a period

ranging from one to ten years.  The Adam Brothers enticed investors to enter into

these agreements with promises of earning substantial returns.  During the Relevant

Period, the Adam Brothers, both themselves and through several individuals

operating as finders, successfully solicited more than 80 investors throughout the

country to invest in Triten and GCZ.  The Adam Brothers promised those investors

monthly investment returns of at least 8 percent, but in some cases of up to 13.5 percent. [Dkt. No. 1 ¶¶ 47, 49-51; Dkt. No. 19 ¶¶ 54, 56-58.]

**Misrepresentations Concerning the Lending Pool Investment**

The Adam Brothers made numerous material misrepresentations to investors regarding the lending pool opportunity and their own backgrounds. The Adam Brothers, in joint conversations and individually, over the telephone, through videos, or through video conferences, told investors specific information about the purported lending pool investment opportunity. [Dkt. No. 1 ¶¶ 52-53; Dkt. No. 19 ¶¶ 58-60.]

For example, the Adam Brothers led investors to believe that they were working with Gemini Trust Company, a New York trust company regulated by the New York State Department of Financial Services that was founded in 2014 by Tyler and Cameron Winklevoss and operates a well-known global crypto asset trading platform. The Adam Brothers knew that Gemini Trust Company operated a crypto asset trading platform and that none of the Defendants had any affiliation with Gemini Trust Company. [Dkt. No. 1 ¶¶ 54-55; Dkt. No. 19 ¶¶ 61-62.]

The Adam Brothers told investors that Jonathan had invented a bot that entered smart contracts to provide flash loans to arbitrage traders seeking to trade crypto assets. Jonathan told investors that he, through GCZ, began operating the bot on the Gemini platform, where it caught the attention of Gemini because the GCZ bot "outperformed" Gemini's own bot. When Jonathan told investors about Gemini, he

6

knew that the investors believed that he was referring to Gemini Trust Company.
[Dkt. No. 1 ¶¶ 56-58; Dkt. No. 19 ¶¶ 63-65.]

In response to an investor's question about Jonathan's relationship with
Gemini Trust Company, Jonathan did not tell the investor that he was not working
with Gemini Trust Company. Instead, he told the investor that Gemini has dozens of
different companies and that he was working with Gemini's Panamanian platform.
During a subsequent conversation with that same investor, Tanner referenced the
prior discussion of Gemini Trust Company and explained that the Adam brothers
were working with Gemini's Panamanian platform. The Adam Brothers never told
investors that neither they nor their companies were associated with the crypto asset
trading platform operated by Gemini Trust Company. [Dkt. No. 1 ¶¶ 59-61; Dkt. No.
19 ¶¶ 66-68.]

The Adam Brothers told potential investors that Gemini wanted to purchase
Jonathan's bot, but Jonathan declined. The Adam Brothers told investors that
instead, Jonathan had entered an exclusive contract with Gemini whereby Gemini
would pay the Adam Brothers a rate of one-percent interest per day on the total
balance of the lending pool capital the Adam Brothers made available for flash loans.
The Adam Brothers told investors that this rate would be paid regardless of whether
the funds were actually deployed for the purpose of these flash loans. [Dkt. No. 1 ¶¶
62-64; Dkt. No. 19 ¶¶ 69-71.]

7

The Adam Brothers told investors that the purported arrangement with Gemini created revenues of around 30 percent per month and served as the source for the returns paid to the investors. The Adam Brothers told investors that they were compensated by taking a share of the 30-percent return paid to them by Gemini. The Adam Brothers told investors that they were not entitled to any other fees or compensation paid by investors. The Adam Brothers told investors that they were raising funds to service the demands of the lending pool. Tanner Adam told one investor that they were trying to raise $250 million from investors. [Dkt. No. 1 ¶¶ 38, 65-69; Dkt. No. 19 ¶¶ 72-76.]

Jonathan Adam told investors that the Gemini agreement had been entered into between the Adam Brothers and Gemini's offshore Panamanian lending pool because Gemini and other crypto asset trading platforms were moving their operations offshore to avoid SEC regulation. The Adam Brothers told investors that once the investors wired their funds in U.S. Dollars to GCZ's or Triten's bank account, the entities would purportedly wire the funds to Kraken, where the U.S. Dollars would be exchanged for the crypto asset Tether. The Adam Brothers told investors that the Monday following receipt of investor principal, the Tether deployed to an automated bot through a crypto wallet and then to the lending pool, to be loaned out to arbitrage traders in the so-called DeFi space. [Dkt. No. 1 ¶¶ 70-72; Dkt. No. 19 ¶¶ 77-79.]

When investor capital came into a Triten or GCZ controlled account or wallet, it was purportedly immediately deployed into the lending pool and "locked up" in a bot, such that nobody, the Adam Brothers included, could access the money until the agreed upon length of the investment contract had passed. They told investors that the risk to the investors' principal was virtually non-existent, unless there was a complete global market meltdown. They told investors that at the end of the lending period, investors could either receive their principal back or roll it into a new investment contract. [Dkt. No. 1 ¶¶ 73-75; Dkt. No. 19 ¶¶ 80-82.]

The Adam Brothers told investors that the fees from the arrangement with Gemini were purportedly paid in Tether by Gemini to the Adam Brothers' crypto "profit wallet" and were then transferred to GCZ's or Triten's crypto "corporate wallet." According to the Adam Brothers, the fees were sent from the "corporate wallet" to the Adam Brothers' Kraken accounts where the Tether was converted back to U.S. Dollars, sent to GCZ's or Triten's bank accounts, and then wired back to investors. The Adam Brothers told investors that each brother had the pass keys to the other brother's crypto wallet, and that each month they would get together to unlock their crypto wallets and process the returns to investors as described above. [Dkt. No. 1 ¶¶ 76-78; Dkt. No. 19 ¶¶ 83-85.]

These representations that the Adam Brothers made to investors were false. Instead of deploying investor capital into smart contacts, the Adam Brothers

misappropriated and misspent approximately $53.9 million of the $61.5 million raised from investors. They failed to tell investors that they were using investor funds to pay: (a) existing investors; (b) their personal expenses; and/or (c) finders fees to individuals who introduced them to others who ultimately invested. [Dkt. No. 1 ¶¶ 79-83; Dkt. No. 19 ¶¶ 86-90.]

Though the Adam Brothers transferred $12.9 million of investor funds to Coinbase and Kraken, they withdrew $5.3 million from those platforms back to their bank accounts. To the extent that there is a net outflow of $7.6 million to Coinbase and Kraken, there is no evidence those funds have been deployed in any manner consistent with the representations made to investors. The $7.6 million transferred to Coinbase and Kraken has not generated a daily return of 1%. [Dkt. No. 1 ¶¶ 84-86; Dkt. No. 19 ¶¶ 91-93.]

**Misrepresentations and Omissions Concerning Jonathan Adam's Background**

Jonathan Adam spent extensive time talking with and answering questions from potential investors about his background and Jonathan's other company, Thissl, on numerous video calls and at least one video presentation. He also circulated a ten-minute video of himself making claims about his background and qualifications. In those calls, presentation and videos, Jonathan made multiple misrepresentations about his background. [Dkt. No. 1 ¶¶ 98-100; Dkt. No. 19 ¶¶ 117-19.]

Jonathan falsely told investors that he serves as the cyber ambassador to the State of Kansas. The State of Kansas does not employ anyone in the position of cyber ambassador. Jonathan falsely told investors that Thissl received $59 million pursuant to a Simple Agreement for Future Equity investment from Sequoia Capital Operations LLC, a venture capital firm that specializes in seed stage, early stage, and growth stage investments in private companies across technology sectors. Sequoia Capital Operations LLC Inc. has never made an investment in Thissl. [Dkt. No. 1 ¶¶ 101-04; Dkt. No. 19 ¶¶ 120-23.]

Jonathan falsely told investors that Thissl powers the entire network for Basecamp, LLC ("Basecamp"), a program management software company that previously used Amazon Web Services for its data storage needs and in October 2022 publicly announced that it would no longer be using Amazon Web Services. Thissl has never provided any services to Basecamp. Jonathan falsely told investors that Thissl has a large contract with Rackspace Technology, Inc. ("Rackspace"), a cloud computing services company. Thissl has never had any contracts with Rackspace Technology. Jonathan falsely told investors that Thissl has successfully litigated over its patents after being sued by large corporations, including Comcast, Oracle and IBM. Neither Thissl, nor any prior owner of patents developed by Jonathan, has ever been involved in litigation over the patents developed by Jonathan. [Dkt. No. 1 ¶¶ 105-10; Dkt. No. 19 ¶¶ 124-29.]

11

These misrepresentations regarding Jonathan Adam's technical abilities and successes were important to many investors in making their decision to invest. In touting his background and expertise, Jonathan also failed to disclose that he had previously been convicted of securities fraud and sentenced to 50 months in prison. [Dkt. No. 1 ¶¶ 111-12; Dkt. No. 19 ¶¶ 130-31.]

Tanner Adam repeated to investors the misrepresentations about Sequoia's investment in Thissl to investors. Tanner also repeated to investors the misrepresentation about Jonathan Adam's involvement as cyber ambassador to the State of Kansas. Additionally, Tanner repeated to investors the misrepresentation about Thissl's contract with Rackspace. Tanner failed to disclose Jonathan's criminal history to investors. [Dkt. No. 1 ¶¶ 113-16; Dkt. No. 19 ¶¶ 132-35.]

**Adam Brothers' Misappropriation of Assets**

Bank records from February 1, 2023, through June 30, 2024, show that the Adam Brothers misappropriated over $30 million in investor funds. [Cannon Dec. ¶ 7.} In addition to paying former investors with new investor money, the Adam Brothers used investor funds to finance their and their family's lifestyle and to invest in other business ventures. [Dkt. No. 1 ¶¶ 87-89; Dkt. No. 19 ¶¶ 94-96.] Jonathan paid at least $480,000 to the builder for construction of a new home for himself and his partner, Ava Adam. Additionally, Jonathan paid over $131,000 on home and construction related expenses for his new home, including over $75,000 for the

construction of a pool, and $44,000 to a construction company owned by his in-laws.  [Cannon Dec. ¶¶ 11, 14.]

Ava Adam, benefitted from the use of investor funds for virtually all living expenses for the period from March 1, 2023 through July 31, 2024.  At least $258,000 of investor funds were used to pay numerous expenses incurred by or benefitting Ava, including health insurance, mortgage payments, car payments, car insurance, household expenses, and credit card bills.  Ava Adam also received direct transfers of $62,000 to her personal checking account.  [*Id*. ¶¶ 12-13.]

The Adam Brothers used investor funds to pay living expenses for themselves and for their parents, Robert and Carrie Adam, including designer purchases at places like Louis Vuitton and credit card payments of over $290,000.  Tanner designated a Triten bank account for his parents from which his parents made credit card payments, tax payments, and payments for other living expenses exceeding $65,000 in a four-month period ending in June 2024.  In total, the Adam Brothers designated over $190,000 to the benefit of their parents' account and payments on their behalf.  The Adam Brothers also directed $325,782 in investor funds to build a home for their parents.  [*Id*. ¶¶ 17-19.]  In addition to $412,000 paid towards the construction of a home for their brother, Garrett Adam, the Adam Brothers purchased him a vehicle for $85,254 and made payments to him in excess of $160,000 during the Relevant Period.  Jonathan paid $379,695 for construction

of a new home for his in-laws, Emilio and Virginia Hinojosa and purchased the land upon which the home was built.  [*Id.* ¶¶ 20-21.]

## ARGUMENT

**A.    The Facts Alleged in the Complaint Provide a Sufficient Basis Upon which to Find Defendants Liable for Violating the Securities Laws**

   *1.    Defendants Misrepresented and Omitted Material Facts*

Defendants violated Section 10(b) and Rule 10b-5(b) of the Exchange Act by making material misrepresentations and omissions in connection with their offering of promissory notes and lending agreements.  Defendants made material misrepresentations about the nature of the investment, the use of investor funds, and Jonathan Adam's background.  Defendants knew that investor funds were not "locked up" in a lending bot as represented.  Defendants also knew that the limited funds that were deployed to crypto exchanges did not generate a 1% daily return.  Additionally, Defendants knew that they had no relationship with Gemini Trust Company, yet they led investors to believe that they had an arrangement with its trading platform in order to persuade individuals to invest.

Defendants acted with scienter when they made these representations because they knew that investor funds were not being invested as represented and that they were instead misappropriating investor funds to pay their personal expenses as well as the personal expenses of family members.  Because Jonathan Adam controlled GCZ and Tanner Adam controlled Triten, it is appropriate to impute each brother's

14

scienter to his respective entity. *SEC v. Manor Nursing Centers, Inc*., 458 F.2d 1082, 1096, n.16 (2d Cir. 1972). The representations were material because Defendants used these falsehoods to entice new investments.

### 2. Defendants Engaged in a Deceptive Scheme

To establish scheme liability under Rule 10b-5(a) and (c) of the Exchange Act, and Sections 17(a)(1) and 17(a)(3) of the Securities Act, the Commission must show that the defendant committed a deceptive or manipulative act in furtherance of a scheme to defraud. *SEC v. Complete Business Solutions Grp., Inc.*, 538 F. Supp. 3d 1309, 1339 (S.D. Fla. 2021). A defendant also may violate these provisions by disseminating false or misleading statements. *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019); *SEC v. Malouf*, 933 F.3d 1248, 1259 (9th Cir. 2019).[2] Defendants violated these provisions by engaging in deceptive conduct in addition to disseminating the false and misleading statements discussed *supra*. *See IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 858 (11th Cir. 2016) (unpublished) (*quoting WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011)). Here, the Adam Brothers, and through them GCZ and Triten, engaged in deceptive acts and practices in connection with the purchase or sale of securities and in the offer or sale of securities. Specifically,

---

[2]     While Section 17(a)(1) of the Securities Act requires scienter, Section 17(a)(3) does not. *Aaron v. SEC*, 446 U.S. 680, 697 (1980).

Defendants knowingly made and disseminated repeated material misrepresentations and materially misleading statements via written materials, recorded videos, and calls with investors, concerning Jonathan Adam's background and the use of investor money, and secretly used investor proceeds to make principal and interest payments to earlier investors.  Their practice and course of business also included misappropriating investor funds for the personal benefit of the Adam Brothers and their family.  These fraudulent practices demonstrate that Defendants were engaged in an overall scheme to defraud.

**B.**    **The Court Should Order Disgorgement and Prejudgment Interest Against Defendants**

Once there has been a finding that a defendant has violated the securities laws, the Commission "is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains."  *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004); *SEC v. Mannion*, 28 F. Supp. 3d 1304, 1308 (N.D. Ga. 2014).  Additionally, the Court "may add prejudgment interest to the disgorgement amount to avoid a defendant's benefitting [from] the use of his ill-gotten gains interest free."  *SEC v. Bravata*, 3 F. Supp. 3d 638, 662 (E.D. Mich. 2014) *aff'd sub nom. U.S. v. Bravata*, 636 F. App'x 277 (6th Cir. 2016) (quotations omitted).

In the context of a fraudulent securities offering, "the proper starting point for a disgorgement award is the total proceeds received from the sale of the securities."  *SEC v. AmeriFirst Funding, Inc.*, 2008 WL 1959843, at *2 (N.D. Tex.

16

May 5, 2008), citing *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1104 (2d Cir. 1972). Consistent with the Supreme Court's decision in *SEC v. Liu,* 591 U.S. 71, 91 (2020), the disgorgement calculation must then deduct any "legitimate expenses," to derive net profits. For purposes of this analysis, "legitimate" means those expenses that "arguably have value independent of fueling a fraudulent scheme." *Id.* at 92. The Commission need only produce "a reasonable approximation of the defendant's ill-gotten gains," including appropriate deductions for legitimate business expenses. *SEC v. Zada*, 787 F.3d 375, 382 (6th Cir. 2015). Once the SEC does so, "the defendant bears the burden of proving that the . . . estimate is unreasonable." *Zada*, 787 F.3d at 382.

Here, the Court should order Defendants to pay, jointly and severally, $30,512,775 in disgorgement, plus prejudgment interest of $6,221,302, for a total of $36,734,077. [*See* September 30, 2025 Declaration of Kristin Murnahan ("Murnahan Dec."), ¶ 3 & Ex. 1.] This amount reflects the total that Defendants raised from investors between February 1, 2024 and June 30, 2024 ($61,559,934) less $31,047,159 of "legitimate expenses" in the form of interest and principal payments made back to investors. [Cannon Dec. ¶ 7.]

For purposes of calculating disgorgement, the Commission excluded (did not consider as "legitimate expenses" and thus did not deduct from the funds raised by Defendants) the amounts that the Defendants transferred to the crypto

exchanges or the amounts that Defendants paid in finders fees.  It is appropriate to consider as illegitimate (not deduct from total funds raised) both these purported expenses for at least three reasons.  First, these funds were utilized in a manner inconsistent with Defendants representations as to how investor funds would be used (*i.e.* to fund flash loans).  *See, e.g., SEC v. Yang,* 2022 WL 3278995, at *1 (9th Cir. 2022) (finding expenditure of investor funds that "contravened the purpose for which the funds were invested" to be "illegitimate under *Liu*."); *SEC v. Wilson*, 2022 WL 18275941, *8 (N.D. Tex. Dec. 28, 2022) (measuring disgorgement by the amount of investor funds used for "expenses that were contrary to the statements [Defendants] made to investors' representatives regarding the use of their assets.").

Second, these expenses did not provide any benefit to investors.  Even if the Defendants could show that these expenses were somehow intended to benefit investors, these expenses would still not qualify as "legitimate" for purposes of the disgorgement calculation because they were not disclosed to investors. *Restatement (Third) of Restitution and Unjust Enrichment* § 51 (cmt. h) ("A defendant's claim to credit or deduction will predictably be denied if allowance of the credit would permit a conscious wrongdoer to force the claimant to pay for unrequested services that the claimant had no opportunity to refuse.").

Third, when performing the net profits analysis "all doubts are to be resolved against the defrauding party." *SEC v. Bernath*, 2017 WL 527662, *2 (W.D.N.C. Feb. 8, 2017); *SEC v. Owings Group*, 2021 WL 1909606, *5 (D. Md. May 12, 2021). Thus, the Court should not consider any expense to be legitimate if the defendants' records (or lack thereof) obscure the purpose of that expense. *See Rubber Co. v. Goodyear,* 76 U.S. 788, 803-04 (1870) (declining to deduct claimed expenses where the "manner in which the books ... were kept renders such an account impossible as to the business done in [the company's] name."). Here, Defendants have provided no support or documentation to assess whether any of the purported expenses benefitted investors. Accordingly, when calculating Defendants' net profits, the Court should exclude (not deduct from the gross proceeds raised) any transfers for which there is no contemporaneous documentation demonstrating how these transfers benefitted investors. *See, e.g., SEC v. Putnam*, 2024 WL 4135684, * 17 (D. Utah Sept. 10, 2024) ("Without more, like substantiating documentation to prove the amounts of these payments, their purpose, and their link to legitimate business activities, the court cannot find that [defendant's] opinion [that certain expenses were legitimate] is reliable.").

The Court should impose the requested disgorgement and prejudgment interest jointly and severally because the Adam Brothers were joint actors in the fraudulent scheme with each other and with Triten and GCZ. *Liu v. SEC*, 140 S. Ct. 1936, 1949

(2020) (recognizing that joint-and-several liability may be imposed against "partners engaged in concerted wrong-doing"); *see also Calvo*, 378 F.3d at 1215 ("It is a well settled principle that joint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct.") (internal citations omitted).  During the relevant time, Tanner Adam was the sole owner of Triten and controlled the decisions of Triten.  During the relevant time, Jonathan Adam was the sole owner of GCZ and controlled the decisions of the GCZ.  While Triten and GCZ were ostensibly separate entities, the investment opportunities they offered were based on the same fraudulent scheme. The Adam Brothers jointly conducted investor calls in which they falsely represented the operations of the two entities, and the Adam Brothers drafted the misleading solicitation materials that were provided to investors.  Joint and several liability is also appropriate in this case because the Defendants commingled funds and transferred funds between entities making it difficult to identify which net profits benefitted each specific defendant.  [Cannon Dec. ¶ 7.]

**C.**    **The Court Should Order Disgorgement Against the Relief Defendants**

In addition to using investor funds for a variety of personal expenses, the Adam Brothers also used substantial investor funds to benefit the Relief Defendants.  The Relief Defendants provided nothing of value in return.  For this reason, the Commission requests that the Court order the Relief Defendants to

disgorge the investor funds that were transferred to them or used for their benefit. *SEC v. Eldridge*, 2007 WL 7654404, at *14 (N.D. Ga. Mar. 20, 2007) (holding that the SEC may seek disgorgement from persons not accused of wrongdoing when that person has (1) received ill-gotten gains; and (2) does not have a legitimate claim to the funds).

The Court should find Ava Adam, jointly and severally, liable with Defendants for disgorgement of $931,000, plus prejudgment interest of $64,202, for a total of $995,202 from Ava Adam. The requested disgorgement reflects the $611,000 in investor funds spent on the construction of a house, which is jointly titled in Ava and Jonathan Adam's name and in which Ava currently resides, and the $320,000 in investor funds that Ava either received directly as transfers from Defendants or were used to pay her personal expenses. [Cannon Dec. ¶¶ 11-14; Murnahan Dec. ¶ 4 & Ex. 2.]

The Court should find Garrett Adam, jointly and severally, liable with Defendants for disgorgement of $657,254, plus prejudgment interest of $64,277, for a total of $721,531. The requested disgorgement reflects the $412,000 in investor funds used to build a house, which is titled in Garrett's name and in which Garrett currently resides, the $160,000 of investor funds that Garrett received in transfers from Triten and GCZ, and the $85,254 used to purchase a vehicle for him. [Cannon Dec. ¶ 20; Murnahan Dec. ¶ 5 & Ex. 3.]

The Court should find Robert and Carrie Adam, jointly and severally liable with each other and with Defendants for disgorgement of $515,782, plus prejudgment interest of $39,280, for a total of $555,062.  The requested disgorgement reflects the $325,782 in investor funds used to build a house, which is jointly titled in Robert and Carrie's name and in which Robert and Carrie currently reside and the $190,000 of investor funds that the Adam Brothers provided Robert and Carrie to pay their personal expenses.  [Cannon Dec. ¶¶ 18-19; Murnahan Dec. ¶ 6 & Ex. 4.]

Finally, the Court should find Emilio and Virginia Hinojosa, jointly and severally, liable with each other and with Defendants for disgorgement of $379,695, plus prejudgment interest of $34,345, for a total of $414,040.  The requested disgorgement reflects the amount of investor funds that were used to build a house, which is titled in Emilio and Virginia's name and in which Emilio and Virginia currently reside.  [Cannon Dec. ¶¶ 21; Murnahan Dec. ¶ 7 & Ex. 5.]

Because investor funds were used to purchase properties that are titled in the Relief Defendants' names, it is appropriate to view the Relief Defendants as holding a constructive trust over the properties.  *See, e.g.*, *United States v. Cannistraro*, 694 F. Supp. 62, 72 n.11 (D.N.J. 1988), *order aff'd in part, vacated in part*, 871 F.2d 1210 (3d Cir. 1989) (noting that courts generally impose the "[equitable] remedy of constructive trust [over specific property] where, rightfully

or wrongfully, a party has obtained property that unjustly enriches him"). For this reason, the Commission requests that the Court order Jonathan Adam and the Relief Defendants to relinquish all legal and equitable rights, interests, and title to the properties held by them. None of the Relief Defendants contributed their own funds to purchase these properties. Thus, the Relief Defendants have no legitimate claim to the funds or property being sought. *See, e.g.*, *SEC v. Complete Business Solutions Group*, 528 F.Supp.3d 1309, 1342 (S.D. Fla. 2021) ("In the securities context, to have no legitimate claim to the ill-gotten funds means that an individual gave no consideration for the funds and thus received them as a gift.").

Because the requested disgorgement against the Defendants includes amounts that Defendants transferred to the Relief Defendants, the Court should offset from the Defendants' disgorgement and prejudgment interest any amount collected from the Relief Defendants. This will avoid the possibility of double recovery. *SEC v. World Capital Markets*, 864 F.3d 996, 1008 n.8 (9th Cir. 2017) (offsetting defendants' disgorgement by any amounts recovered from relief defendants to avoid double recovery by the Commission).

**D.     The Court Should Impose a Substantial Civil Penalty Against the Adam Brothers**

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the Commission to seek civil penalties against any person or entity who violated those acts. For violations that involve "fraud, deceit, manipulation, or

deliberate or reckless disregard of a regulatory requirement," and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," a court may impose a civil penalty against a natural person equal to greater of (a) that person's "gross pecuniary gain" or (b) $236,451 per violation.  17 C.F.R. § 201.1005 and Table V, Adjustment of Civil Monetary Penalties (2025); *see also* https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.

When determining whether and what civil penalties to impose, courts consider numerous factors, including the egregiousness of the violations, the isolated or repeated nature of the violations, the degree of scienter involved, and the deterrent effect given the defendants' financial worth.  *See, e.g.*, *SEC v. Revolutions Medical Corp.*, 2018 WL 2057357, at *5 (N.D. Ga. Mar. 16, 2018).  *SEC v. Sargent*, 329 F.3d 34, 42 (1st Cir. 2003); *see also Phoenix Telecom*, 231 F. Supp. 2d at 1226.  Here, the Adam Brothers were the masterminds of the fraudulent scheme, acted with a high degree of scienter, and inflicted substantial investor losses on investors over a twenty-month period.

The Commission requests that the Court order Tanner Adam and Jonathan Adam to each pay a civil penalty in the amount of $3,000,000.   Such a penalty is permissible under the applicable statutes because $3,000,000 is less than the Adams' Brothers's gross pecuniary gains.  The penalty is also justified because the Adam

Brothers' conduct involved egregious fraud with a high level of scienter: they repeatedly used investor funds to pay not only their personal expenses, but also the personal expenses of their extended family.  The conduct is repeated, as the fraud lasted for several years and involved numerous investors.  The recommended penalty is also consistent with the approach taken by at least one recent court in a case involving an offering fraud.  *See* Final Judgment [Dkt. No.49], *SEC v. Empires Consulting Corp.*, 1:22-cv-21995 (S.D. Fla. June 22, 2023) (awarding penalties of $5 and $6 million against the individual defendants in a nearly identical fraudulent scheme in which the court found them jointly and severally liable for disgorgement of $32 million); *see also SEC v. Harkins*, 2022 WL 3597453, * 17 (D. Col. Aug. 23, 2022) (finding a $3.5 million penalty, equaling half the individual defendant's disgorgement and prejudgment interest, was sufficiently punitive).[3]

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court issue final judgments against the Defendants and Relief Defendants imposing the requested relief.

---

[3] The Commission does not seek separate penalties against Triten or GCZ.

Respectfully submitted, this 1st day of October 2025,

/s/ M. Graham Loomis
M. Graham Loomis
Supervisory Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7622
Georgia Bar No. 457868
loomism@sec.gov

Kristin W. Murnahan
Senior Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7655
Georgia Bar No. 759054
murnahank@sec.gov

COUNSEL FOR PLAINTIFF

## <u>CERTIFICATION OF COMPLIANCE</u>

This is to certify that the foregoing was prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 (B).

<u>*/s/ M. Graham Loomis*</u>
M. Graham Loomis
Supervisory Trial Counsel