**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>TANNER S. ADAM, *et al.*,<br><br>Defendants, and<br><br>AVA A. ADAM, *et al.*,<br><br>Relief Defendants. | Civil Action No. 1:24-cv-03774-VMC |

**<u>DEFENDANTS' AND RELIEF DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MOTION FOR REMEDIES AND DEFAULT JUDGMENT</u>**

Mary M. Weeks, GA Bar No. 559181
Derek L. Centola, GA Bar No. 749911
Hannah L. Baskind, GA Bar No. 276384
**TROUTMAN PEPPER LOCKE LLP**
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
T: 404-885-3000
mary.weeks@troutman.com
derek.centola@troutman.com
hannah.baskind@troutman.com

Patrick Clendenen
(admitted *pro hac vice*)
**PRACTUS, LLP**
555 Long Wharf Drive
New Haven, CT 06511
T: 203-212-9046
patrick.clendenen@practus.com

*Counsel for Defendants Tanner S. Adam, Jonathan L. Adam, Triten
Financial Group, LLC and GCZ Global LLC and Relief Defendants
Ava A. Adam, Garrett L.W. Adam, Robert S. Adam, Carrie L. Adam,
Emilio F. Hinojosa, and Virginia I. Hinojosa*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................1

II.   BACKGROUND ..................................................................................5

III.  PROCEDURAL POSTURE ..................................................................12

IV.   ARGUMENT......................................................................................13

    A.   The SEC's Disgorgement Calculation Improperly Treats Net
Investor Losses as Defendants' "Profits," and It Further Fails to
Account for Legitimate Expenses. ......................................................13

        1.   The SEC's Calculations Improperly Conflate All
Lenders' Alleged Losses with Defendants' Actual
Profits. ...............................................................................14

        2.   The SEC Improperly Fails to Account for Lender
Payments and Other Legitimate Business Expenses. ..............18

    B.   Joint-and-Several Liability in Disgorgement Is Improper
Among Defendants and Especially as to Relief Defendants..............20

    C.   The SEC's Request for a Constructive Trust Over Real
Properties Exceeds This Court's Equitable Powers.........................23

    D.   Prejudgment Interest Should Be Reduced.........................................26

    E.   The Requested Third-Tier Civil Penalties Are Unsupported by
the Evidence of Scienter and Are Excessive in Amount. ..................29

V.    CONCLUSION ..................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gov't Emps. Ins. Co. v. KJ Chiropractic Ctr. LLC*,
   No. 6:12-cv-1138-Orl-40DCI,
   2017 WL 9939048 (M.D. Fla. Aug. 22, 2017).................................................27

*Liu v. Sec. & Exch. Comm'n*,
   591 U.S. 71 (2020)...................................................................................*passim*

*Osterneck v. E.T. Barwick Indus., Inc.*,
   825 F.2d 1521 (11th Cir. 1987) .........................................................................26

*Osterneck v. Ernst & Whinney*,
   489 U.S. 169 (1989).........................................................................................26

*Sec. & Exch. Comm'n v. Ahmed*,
   72 F.4th 379 (2d Cir. 2023) ...............................................................................25

*Sec. & Exch. Comm'n v. Ahmed*,
   783 F. Supp. 3d 652 (D. Conn. 2025)................................................................25

*Sec. & Exch. Comm'n v. Almagarby*,
   92 F.4th 1306 (11th Cir. 2024) ..........................................................................14

*Sec. & Exch. Comm'n v. Antar*,
   97 F. Supp. 2d 576 (D. N.J. 2000)......................................................................28

*Sec. & Exch. Comm'n v. Calvo*,
   378 F.3d 1211 (11th Cir. 2004) ............................................................2, 13, 14

*Sec. & Exch. Comm'n v. Carrillo*,
   325 F.3d 1268 (11th Cir. 2003) .........................................................................26

*Sec. & Exch. Comm'n v. City of Miami*,
   No. 13-22600, 2016 WL 11783322 (S.D. Fla. Dec. 5, 2016) ...........................30

*Sec. & Exch. Comm'n v. Complete Bus. Sols. Grp., Inc.*,
   No. 22-13811, 2023 WL 4196949 (11th Cir. June 27, 2023) ......................17, 18

*Sec. & Exch. Comm'n v. Converge Glob.*,
No. 04-80841CV, 2006 WL 907567 (S.D. Fla. Mar. 10, 2006)........................30

*Sec. & Exch. Comm'n v. Crews*,
No. 1:23-cv-03658-TRJ,
2025 WL 4058272 (N.D. Ga. June 2, 2025).....................................................17

*Sec. & Exch. Comm'n v. Donnan*,
No. 1:12-CV-2831-ODE,
2014 WL 11829334 (N.D. Ga. Sept. 15, 2014)................................................22

*Sec. & Exch. Comm'n v. E-Smart Techs., Inc.*,
No. 11-895, 2016 WL 183503 (D.D.C. Jan. 14, 2016) ....................................27

*Sec. & Exch. Comm'n v. Eldridge*,
No. 1:05-CV-0735-CC,
2007 WL 7654404 (N.D. Ga. Mar. 20, 2007) ..................................................22

*Sec. & Exch. Comm'n v. Erwin*,
553 F. Supp. 3d 895 (D. Colo. 2021).........................................................24, 28

*Sec. & Exch. Comm'n v. ETS Payphones, Inc.*,
408 F.3d 727 (11th Cir. 2005) ..........................................................................2

*Sec. & Exch. Comm'n v. Founding Partners Cap. Mgmt.*,
639 F. Supp. 2d 1291 (M.D. Fla. 2009)............................................................24

*Sec. & Exch. Comm'n v. French*,
No. 1:23-CV-01443-JPB,
2024 WL 6882685 (N.D. Ga. Apr. 30, 2024)...................................................24

*Sec. & Exch. Comm'n v. Garcia*,
No. 22-CV-00118, 2023 WL 2824395 (D. Colo. Mar. 29, 2023).....................30

*Sec. & Exch. Comm'n v. Hayter*,
96 F. Supp. 3d 1299 (M.D. Fla. 2015)..............................................................30

*Sec. & Exch. Comm'n v. Huff*,
758 F. Supp. 2d 1288 (S.D. Fla. 2010).......................................................14, 15

*Sec. & Exch. Comm'n v. Jones*,
No. 3:21-cv-98-TCB, 2022 WL 17882114 (N.D. Ga. July 7, 2022) ................32

*Sec. & Exch. Comm'n v. Keener*,
644 F. Supp. 3d 1290 (S.D. Fla. 2022) ........................................................... 14

*Sec. & Exch. Comm'n v. Lauer*,
478 F. App'x 550 (11th Cir. 2012) .................................................................. 26

*Sec. & Exch. Comm'n v. Levin*,
849 F.3d 995 (11th Cir. 2017) ......................................................................... 14

*Sec. & Exch. Comm'n v. Martin*,
No. 1:12-CV-2922-AT,
2019 WL 13214088 (N.D. Ga. Mar. 26, 2019) ............................................... 27

*Sec. & Exch. Comm'n v. Miller*,
744 F. Supp. 2d 1325 (N.D. Ga. 2010) .................................................. 27, 29, 30

*Sec. & Exch. Comm'n v. Molen*,
704 F. Supp. 3d 1341 (N.D. Ga. 2023) ............................................................ 31

*Sec. & Exch. Comm'n v. Mooney*,
No. 1:22-cv-02320-SDG,
2025 WL 901802 (N.D. Ga. Mar. 25, 2025) .............................................. 29, 32

*Sec. & Exch. Comm'n v. Murphy*,
50 F.4th 832 (9th Cir. 2022) ............................................................................ 30

*Sec. & Exch. Comm'n v. Sanchez-Diaz*,
88 F.4th 81 (1st Cir. 2023) .............................................................................. 25

*Sec. & Exch. Comm'n v. Spartan Sec. Grp., Ltd.*,
164 F.4th 1231 (11th Cir. 2026) ..................................................... 14, 17, 26, 28

*Sec. & Exch. Comm'n v. Star Chain, Inc.*,
No. 1:21-CV-03944-JPB,
2023 WL 1785764 (N.D. Ga. Feb. 3, 2023) .................................................... 18

*Sec. & Exch. Comm'n v. Sun Capital, Inc.*,
No. 2:09-CV-229-FTM-29SPC,
2009 WL 1362634 (M.D. Fla. May 13, 2009) ................................................. 22

*Sec. & Exch. Comm'n v. Torchia*,
No. 1:15-CV-3904-ELR-CCB,
2024 WL 4541456 (N.D. Ga. Sept. 25, 2024) ................................................. 21

*Sec. & Exch. Comm'n v. Warren*,
   534 F.3d 1368 (11th Cir. 2008) ............................................................................32

*Sec. & Exch. Comm'n v. Watkins*,
   317 F. Supp. 3d 1244 (N.D. Ga. 2018),
   *aff'd sub nom. Sec. & Exch. Comm'n v. Watkins Pencor, LLC*,
   810 F. App'x 823 (11th Cir. 2020)......................................................................25

*Sec. & Exch. Comm'n v. Wells Fargo Bank, N.A.*,
   848 F.3d 1339 (11th Cir. 2017) ...........................................................................24

*Sec. Sec. & Exch. Comm'n v. Graham*,
   823 F.3d 1357 (11th Cir. 2016) .............................................................................3

*U.S. Commodity Futures Trading Comm'n v. Gresham*,
   No. 3:09-CV-75-TWT, 2012 WL 1606037 (N.D. Ga. May 7, 2012) ................22

*U.S. Commodity Futures Trading Comm'n v. Walsh*,
   658 F.3d 194 (2d Cir. 2011) ................................................................................22

*U.S. v. 1419 Mt. Alto Rd., Rome, Floyd Cty., Ga.*,
   830 F. Supp. 1476 (N.D. Ga. 1993).....................................................................23

*Validsa, Inc. v. PDVSA Servs., Inc.*,
   424 F. App'x 862 (11th Cir. 2011).......................................................................27

**Statutes**

15 U.S.C. § 77t(d)(2)(C) ...........................................................................................30

15 U.S.C. § 78t(d) ("Section 20(d)")........................................................................30

15 U.S.C. § 78u(d)(3)(iii) ..........................................................................................30

**Other Authorities**

17 C.F.R. § 201.1005 .................................................................................................29

Fed. R. Civ. P. 55(b)(2)(A)–(C)................................................................................20

Defendants Tanner S. Adam, Jonathan L. Adam (the "Individual Defendants"), Triten Financial Group, LLC ("Triten") and GCZ Global LLC ("GCZ") (together with the Individual Defendants, the "Defendants"), and Relief Defendants Ava A. Adam, Garrett L.W. Adam, Robert S. Adam, Carrie L. Adam, Emilio F. Hinojosa, and Virginia I. Hinojosa (collectively, the "Relief Defendants"; together with Defendants, the "Responding Parties"), respectfully file this Brief in Opposition to Plaintiff Securities and Exchange Commission's ("SEC") Motion for Remedies and Default Judgment ("Remedies Motion").

## I.   Introduction

At issue in this case is a fraud perpetrated by a Panamanian company called Grupo Gemini International, S.A. ("GGP") that made off with millions of dollars of money owed to Defendants and to various lenders, whom the SEC now calls "investors."[1]   On August 27, 2024, Defendants consented to an SEC permanent injunction without admitting or denying its factual allegations.  (ECF Nos. 9–12.)

In its Remedies Motion, the SEC now seeks financial and property-based relief that sprawls far beyond what equity and controlling Supreme Court and Eleventh Circuit precedent allow.  It improperly relies on a high-level accounting

---

[1] The SEC uses the term "investors" for the individual and entities that provided funds to Defendants for investment.  (*See, e.g.*, ECF No. 29-1 ("Remedies Mot.") at 4–5.)  In actuality, these individuals and entities were lenders who entered into standard promissory notes, which contained integration clauses, with GCZ and Triten.

that disregards substantial assets held at the ultimate bad actor GGP, ignores Defendants' own losses, and treats nearly every non-repayment dollar owed to the lenders as "profit" earned by the Defendants.  On that basis, the SEC aggressively seeks an order from this Court: (1) awarding $30,512,775 in disgorgement and $6,221,302 in prejudgment interest (for a total of $36,734,077) against all four Defendants, jointly and severally; (2) requiring five family members—the Relief Defendants—to disgorge additional millions of dollars, also jointly and severally with all Defendants; (3) forcing Relief Defendants (and Jonathan Adam) to relinquish all rights and title to four modest family-owned and occupied homes in Texas under a constructive-trust theory; and (4) imposing excessive third-tier civil penalties of $3,000,000 per Individual Defendant.

Though Defendants do not contest liability at this stage, as they previously consented to permanent injunctions, this consent does not entitle the SEC to indiscriminately treat net lender alleged losses as Defendants' "ill-gotten gains," or to obtain punitive remedies under the guise of "disgorgement."  The Supreme Court's decision in *Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71 (2020), and Eleventh Circuit precedent make clear that disgorgement must be limited to a reasonable approximation of net profits causally connected to the violations, not gross receipts or net investor loss, and disgorgement must be remedial, not punitive.  *See Sec. & Exch. Comm'n v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004); *Sec. & Exch.*

*Comm'n v. ETS Payphones, Inc.*, 408 F.3d 727, 734–35 (11th Cir. 2005); *Sec. Sec. & Exch. Comm'n v. Graham*, 823 F.3d 1357, 1363–64 (11th Cir. 2016). The SEC's Motion flouts this law.

As to Defendants, the SEC's accounting improperly and completely disregards assets held at GGP at the time GGP ceased honoring withdrawals, even though the loans were current and balance-sheet positive until GGP disappeared. The SEC's accounting also: (1) understates payments that had regularly been made to the lenders by Defendants; (2) ignores net cryptocurrency deposits, including Defendants' own financial contributions; (3) provides zero credit for interest and appreciation ***actually earned*** in clients' GGP accounts; (4) fails to deduct legitimate expenses required under *Liu*; and (5) treats Defendants' own investment losses as if they were "ill-gotten gains," effectively (and inappropriately) transforming disgorgement into a penalty. All told, when properly accounting for these improprieties in the SEC's calculations, the SEC's sought after disgorgement amount should be reduced by at least **$12,654,075**, none of which can properly be viewed as "ill-gotten gains."[2]

---

[2] Defendants and Relief Defendants reserve the right to further contest, at the requested hearing, the SEC's accounting, including its characterization of Net Deposits. It is, for example, not clear from the SEC's presentation whether certain Net Deposits, including substantial ones, should be characterized as loans for, or purchases of, financial contributions in the platform.

As to the Relief Defendants, the SEC's request for multi-hundred-thousand-dollar judgments, joint and several liability with Defendants, is especially improper. The SEC alleges no partnership, agency, or concerted wrongdoing by the Relief Defendants—they are alleged to be purely passive recipients. The SEC has produced no transaction-level schedules showing, with reasonable detail, the specific "tainted funds" each Relief Defendant is alleged to have received. And the SEC makes no allegations of any trustee or agent relationship between Defendants and Relief Defendants. Despite these deficiencies, the SEC nevertheless seeks joint-and-several liability and constructive trusts over their family homes.

Finally, as to penalties, the SEC seeks maximum penalties premised on an unfounded assertion that Defendants acted with the requisite scienter. The evidentiary record does not support that conclusion. Defendants did not act with the intent to deceive, manipulate, or defraud. To the contrary, they invested their own funds, kept lenders' loans current while the strategy remained asset-positive, and themselves suffered substantial losses when GGP failed to return its customers' assets. Despite Defendants' counsel explaining these facts to the SEC, the SEC chose to disregard them entirely in the complaint it filed and would have this Court ignore them now through their Remedies Motion.

Accordingly, the Court should deny the SEC's Remedies Motion by:

1.    Rejecting the SEC's disgorgement calculation as overbroad and inconsistent with *Liu*, requiring a refined accounting (following an evidentiary hearing), and limiting any disgorgement to each Defendant's net profits, not net lender (or "investor") losses, *see Liu*, 591 U.S. at 71–72;

2.    Declining to impose joint-and-several liability in disgorgement across all Defendants, and certainly against Relief Defendants;

3.    Denying or substantially limiting Relief-Defendant disgorgement and rejecting the requested constructive trusts on family-owned and occupied homes;

4.    Reducing or eliminating altogether prejudgment interest; and

5.    Denying or substantially reducing the requested civil penalties, given the absence of scienter and the sheer magnitude of disgorgement and interest sought by the SEC.

## II.    Background

The Individual Defendants are the only individuals the SEC has charged with violations of the federal securities laws in this case.  Tanner Adam owns and controls Triten, and Jonathan Adam owns and controls GCZ.  (ECF No. 19 ("AC") ¶¶ 26, 32, 35–36; ECF No. 29-1 ("Remedies Mot.") at 5.)  Triten and GCZ are the entities through which the Individual Defendants raised capital for the flash lending protocol at issue.

On May 25, 2023, Jonathan Adam entered into a written "Partnership and Confidentiality Agreement" with GGP, a purported Panamanian corporation registered under Public Registry number 73248/2019 and headquartered in Panama. (*See* Declaration of Jonathan L. Adam, a true and correct copy of which is attached hereto as **Exhibit A** ("Adam Decl.") ¶¶ 3-4.)[3]  That agreement provides that all "financial contributions" Jonathan Adam makes to GGP, between May 25, 2023 and June 30, 2033 will earn a daily yield of 1.78%, with profits to be calculated weekly and paid to a specified digital wallet.  (*Id.* ¶ 5, Ex. 1) (Referencing Partnership & Confidentiality Agreement §§ 10, 10.1–10.3, 12, 23.)

The way the crypto wallets functioned in the overall structure is reflected both in what the Individual Defendants told lenders and in the SEC's own interpretation. In communications with lenders, the Individual Defendants described a process whereby funds of Triten or GCZ would be sent to a centralized crypto exchange account (typically Kraken, sometimes Coinbase), converted to Tether, and then transferred into a crypto wallet that would provide liquidity to an offshore lending pool associated with "Gemini's Panamanian platform."  (*See* AC ¶¶ 66–67, 77–80,

---

[3] Despite the SEC's allegations to the contrary, Jonathan Adam maintained a relationship with GGP (Adam Decl. ¶ 3), a Panamanian Gemini entity—***not*** Gemini Trust Company, with which the SEC alleges none of the Defendants had any affiliation.  (AC ¶¶ 61–62; Remedies Mot. at 6–7.)  At no point did either Individual Defendant claim that GGP was Gemini Trust Company.

83–84, 91, 140; Remedies Mot. at 7–10.)  They further represented that "fees" from Gemini for the use of that capital and Jonathan Adam's trading bot would be paid first into a crypto "profit wallet" and then moved into a "corporate wallet" for GCZ or Triten, from which funds would be sent back to Kraken, converted to U.S. dollars, and wired out; they also represented that each brother had the passkeys to the other's wallets.  (AC ¶¶ 78–85; Remedies Mot. at 8–9.)  Lenders entered into promissory notes or lending agreements with Triten, and, in one instance, purchase and sale agreements and a technology services agreement with GCZ.

The SEC alleges that this operation constituted a Ponzi scheme and the statements made by the Individual Defendants were materially false.  (AC ¶¶ 25–36, 45–58; Remedies Mot. at 4–6.)

However, two different blockchain analyses, conducted by AlixPartners, LLC ("AlixPartners") and Nardello & Co. ("Nardello"), confirm that Jonathan Adam used identifiable wallets on Tron and Solana to send substantial U.S. Dollar Tether ("USDT") balances to GGP, that GGP operated as a functioning platform routing funds through payment processor and exchange wallets, and that customer funds— including Jonathan Adam's—were at least in part returned from GGP to customer-controlled wallets.  (*See* Declaration of Justin Sutherland, a true and

correct copy of which is attached hereto as **Exhibit B** ("Sutherland Decl.")[4] ¶ 16, Ex. 4; Declaration of Kevin Strenksi, a true and correct copy of which is attached hereto as **Exhibit C** ("Strenski Decl.")[5] ¶ 15, Ex. 1 at 3–9, 11.)

In its analysis, AlixPartners identified multiple cryptocurrency wallets controlled by Jonathan Adam and Triten (collectively, "TFG Exchange Accounts")

---

[4] Mr. Sutherland is an expert in financial reporting and accounting and regulatory compliance and a Certified Public Accountant (CPA) in the states of Utah and Ohio with experience in complex accounting and financial investigations, including matters involving asset tracing. (Sutherland Decl. ¶ 5.) He holds a Master of Accountancy and a Bachelor of Science with an emphasis in Accounting and Information Systems from Brigham Young University and is a member of the American Institute of Certified Public Accountants. (*Id.* ¶ 6.) Mr. Sutherland previously served as a Senior Accountant and Senior Advisor to the Chief Accountant for the Enforcement Division of the SEC where he conducted and oversaw investigations of potential violations of the U.S. Securities Laws. (*Id.* ¶ 7.) While at the SEC, he primarily focused on accounting and financial reporting matters of public companies of various sizes and industries, as well as auditors' and accountants' adherence to professional standards. (*Id.*)

[5] Mr. Strenski is a Senior Analyst at Nardello & Co. LLC in its Financial Investigations & Forensic Accounting practice group, where he conducts investigations into cryptocurrencies and other digital assets in civil, criminal, and regulatory matters. (Strenksi Decl. ¶ 1.) He has five years of experience in the investigations field, including three years focused on blockchain investigations. (*Id.* ¶ 3.) Previously, Mr. Strenski served as a Blockchain Analyst and Cyber Threat Analyst at the U.S. Department of Defense Cyber Crime Center (DC3), where he traced and analyzed billions of dollars in blockchain transactions, including those involving money laundering by transnational organized crime groups, hacktivists, and other cybercriminals. (*Id.*) He has particular expertise in following transactions through complex obfuscation techniques such as bridges, mixers, and decentralized exchanges. (*Id.*) Mr. Strenski is active in the anti-money laundering community and holds several industry-recognized certifications, including Certified Anti-Money Laundering Specialist (CAMS), Chainalysis Reactor Certification, and Chainalysis Investigations Specialist Certification. (*Id.*)

that interacted with GGP across multiple blockchains. (*See* Declaration of David White, a true and correct copy of which is attached hereto as **Exhibit D** ("White Decl.")[6] ¶¶ 10–11.)  According to that analysis, the TFG Exchange Accounts controlled 13 addresses on the Tron blockchain and three principal addresses on the Solana blockchain, and from January 20 to September 9, 2023, the TFG Exchange Accounts deposited approximately $10,030,105 in cryptocurrency—(Bitcoin ("BTC") and USDT—to GGP across the Bitcoin, Tron, and Solana networks. (*Id.* ¶ 12.) On Solana alone, Jonathan Adam's wallets sent approximately $9.22 million in USDT to GGP.  (*Id.*)  In return the TFG Exchange Accounts received approximately $2.05 million back, leading AlixPartners to calculate a net shortfall of about $7.9 million across the three chains. (*Id.*)[7]

---

[6] Mr. White is an expert in digital currencies, blockchain, smart contracts, and non-fungible tokes (NFTs). (*See* White Decl. ¶¶ 6–7, Ex. 1.)  He is a Certified Cryptocurrency Forensic Investigator (CCFI) and has provided forensic investigations expertise into numerous disputes involving various forms of digital assets and blockchain technologies. (*Id.*)  Over the course of the past 30 years, he has advised and assisted numerous Fortune 100 and many other smaller corporations and their attorneys to investigate financial issues, including supporting the Department of Justice as a member of their multi agency Bank Fraud Task Force, and most recently assisting the FTX bankruptcy estate to rebuild the company's books and records. (*Id.*)

[7] Importantly, these cryptocurrency transactions incurred costs to convert to fiat currency. (*See* White Decl. ¶ 13.)  For each step of the transaction—including for both deposits to GGP's accounts and withdrawals from GGP's accounts—the flow of funds incurred various fees. (*Id.* ¶¶ 13–15.)

In reviewing the SEC's accounting, AlixPartners also analyzed the deposits and payouts related to GCZ and Triten to determine any discrepancies between the amounts identified by the SEC. (Sutherland Decl. ¶¶ 13–15, Ex. 3.) This analysis demonstrates that the SEC's accounting severely undercounted the amount GCZ and Triten paid to lenders. The SEC's accounting shows that GCZ and Triten paid a total of $33,518,332, while the AlixPartners analysis shows that GCZ and Triten paid a total of $37,175,574. (*See id.* ¶ 15, Ex. 3.) That is a difference of $3,657,242 in unaccounted for payments to lenders in fiat currency. For lenders who engaged in fiat activity, AlixPartners also prepared a schedule of monthly cashflows. (*See id.* ¶ 16, Ex. 4.) This shows that Defendants conducted their business as they expressed to their lenders.

The AlixPartners analysis also summarizes the balance of crypto deposits from lenders to the Defendants and crypto payments from the Defendants to their lenders. (*See* White Decl. ¶¶ 16–17.) Based on this analysis, Defendants incurred a net loss of $404,568. (*Id.*)

Finally, AlixPartners analyzed CGZ's and Triten's legitimate business expenses (Legal, Compliance and Consulting, Software & Technology, Bank-Related Fees, and Administration & Office) for a net cost of $886,809. (*See* Sutherland Decl. at ¶ 18, Ex. 5.)

- 10 -

Separately, the analysis conducted by Nardello shows that GGP operated through a central address and intermediary addresses, maintained a hosted wallet at the payment processor CoinPayments, routed a portion of customer deposits to major exchanges such as Binance, Kraken, KuCoin, Bitget, Coinbase, Bybit, and Gate, and returned at least 58% of deposited funds to 429 different customers, with only a minority of those return flows—about 13%—going back to Jonathan Adam's wallets. In other words, there are hundreds of other GGP customers who are not Jonathan Adam. (*See* Strenski Decl., Ex. 1 at 3–4, 8–9.) The wallet mapping by Nardello concerns Jonathan Adam's on-chain activity; it does not identify any crypto wallets owned or controlled by Tanner Adam, or by any of the Relief Defendants.

Importantly, none of these wallet structures or flows show any direct participation or control by the Relief Defendants. None of the six Relief Defendants—Ava Adam (Jonathan Adam's common law wife), Garrett Adam (the Individual Defendants' younger brother), Robert and Carrie Adam (their parents), and Emilio and Virginia Hinojosa (Ava's brother and sister-in-law)—are alleged to have offered or sold any security, solicited any lender, made any misrepresentation, or participated in the design or operation of the alleged trading or "Gemini" arrangements. The SEC does not accuse them of any wrongdoing; it names them solely in a "relief" capacity on the theory that they indirectly benefited from funds that at some point passed through Triten or GCZ accounts. (AC ¶¶ 18, 37–42, 104–

- 11 -

08, 110–16; Remedies Mot. at 5, 12–14, 20–23.)  Nevertheless, the SEC now asks the Court to require these non-party family members to relinquish the Texas homes in which they currently reside—and of which are titled in the Relief Defendants' names—on the ground that construction or purchase of those residences was funded, in whole or in part, with investor money.  (AC ¶¶ 104–08; Remedies Mot. at 3–4, 12–14, 21–23.)  This amounts to the SEC's attempt to strip Relief Defendants of their homes despite not accusing them of participating in the alleged scheme at all.

## III.    Procedural Posture

Defendants have consented to permanent injunctions.  (*See* ECF Nos. 9–12.) Their consents provide that, solely for purposes of determining monetary relief, they will not contest the allegations in the Complaint.  (*See, e.g.*, ECF No. 9 (Consent Judgment of Jonathan Adam) at 5–6.)  The Court has entered injunctions, and the case now proceeds solely on the SEC's requested monetary and property-based remedies.

In its supporting brief, the SEC asks the Court to hold all four Defendants jointly and severally liable for disgorgement of $30,512,775, plus prejudgment interest of $6,221,302, for a total of $36,734,077.  (Remedies Mot. at 3, 17.)  The SEC contends that this amount represents approximately $61,559,934 raised from investors (lenders), less roughly $31,047,159 in principal and interest payments it characterizes as "legitimate expenses."  (*Id.* at 17.)

- 12 -

The SEC also seeks separate disgorgement judgments against each Relief Defendant—ranging from roughly $379,695 to $931,000 in principal, plus prejudgment interest—in each instance to be imposed jointly and severally with all Defendants (and, in some cases, with each other).  (*Id.* at 3, 21–22.)  In addition, the SEC asks the Court to order Ava and Jonathan Adam and the Relief Defendants to relinquish all rights, interests, and titles in four family homes in Angleton, Texas on the theory that those properties are subject to a constructive trust in favor of investors.  (*Id.* at 3–4, 22–23.)

Finally, the SEC seeks third-tier civil penalties of $3,000,000 against each of Tanner Adam and Jonathan Adam, asserting that these amounts are less than their alleged pecuniary gain and are warranted in light of what the SEC characterizes as "egregious fraud with a high level of scienter."  (*Id.* at 3, 24.)

For the foregoing reasons, the remedies sought by the SEC should be denied.

## IV.   Argument

### A.   The SEC's Disgorgement Calculation Improperly Treats Net Investor Losses as Defendants' "Profits," and It Further Fails to Account for Legitimate Expenses.

The SEC may seek disgorgement only if it can first establish, with competent evidence, a reasonably accurate and non-speculative calculation of any net profits actually attributable to the alleged misconduct.  *See Calvo*, 378 F.3d at 1217.  Only upon such showing, "[t]he burden then shifts to the defendant to demonstrate that

- 13 -

the SEC's estimate is ***not*** a reasonable approximation" in fact. *Id.* (emphasis added). Under *Liu*, that amount must be limited to "net profits" and requires the deduction of "legitimate expenses." *Liu*, 591 U.S. at 92; *see also Sec. & Exch. Comm'n v. Spartan Sec. Grp., Ltd.*, 164 F.4th 1231, 1271 (11th Cir. 2026) (a district court's "power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment.") (internal citation and quotation marks omitted); *Sec. & Exch. Comm'n v. Keener*, 644 F. Supp. 3d 1290, 1303 (S.D. Fla. 2022) ("Disgorgement is an equitable remedy intended to prevent unjust enrichment from ill-gotten gains and must not be used punitively.") (internal citation and quotation marks omitted).

> ### 1.     The SEC's Calculations Improperly Conflate All Lenders' Alleged Losses with Defendants' Actual Profits.

The foundational principle in disgorgement jurisprudence is that the remedy targets defendant enrichment rather than investor compensation. "'[T]he [disgorgement] inquiry focuses on a defendant's gain, not investors' losses.'" *Keener*, 644 F. Supp. 3d at 1304 (citing *Sec. & Exch. Comm'n v. Huff*, 758 F. Supp. 2d 1288, 1359 (S.D. Fla. 2010)); *see also Sec. & Exch. Comm'n v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017) ("We conclude that the district court properly based the disgorgement upon [defendant's] gains and not the investors' losses."); *Sec. & Exch. Comm'n v. Almagarby*, 92 F.4th 1306, 1320 (11th Cir. 2024) ("[D]isgorgement must not exceed a wrongdoer's net profits and must be awarded for victims to be

- 14 -

permissible") (internal citation and quotation marks omitted).  Indeed, there is a critical distinction between "gain causation" and "loss causation" in SEC enforcement actions.  *See Huff*, 758 F. Supp. 2d at 1365 ("[T]he statutory language ties the potential maximum penalty to the gain that a defendant would otherwise enjoy as a result of transgressions of the securities laws[,]" and the statute "neither requires nor even permits consideration of investors' losses in determining the potential maximum penalty.").

Here, the SEC's disgorgement request begins with a "total raised" amount of $61,559,934, subtracts *only* principal and interest repayments, and unceremoniously declares the residual $30,512,775 to be "net profits."  (Remedies Mot. at 17.)  In so doing, the SEC ignores assets held at GGP prior to the point where GGP ceased honoring Defendants' withdrawal requests—even though Defendants' books reflected that loans were current and asset positive up until that very event.  This accounting methodology treats the loss of those GGP-held assets as if Defendants personally pocketed (and benefited from) all those funds and, consequently, demands "disgorgement" of amounts that were *never* realized as profits and were, instead lost when GGP refused to return them.  Unavailingly, the SEC's calculation constitutes a gross overreach as it is, in substance, a measure of *net investor losses*. The SEC thereby wrongly treats Defendants as if they personally retained every dollar not repaid—even when those dollars were deployed to GGP and lost there,

- 15 -

used for trading activity or platform costs, or were otherwise never received by Defendants in the first instance.

As demonstrated by the Declaration of David White, Defendants sustained a loss of approximately **$7,946,550** in hard cryptocurrency, tracked on the Bitcoin, Tron, and Solana blockchains, in the course of transacting with GGP.  (*See* White Decl. at ¶ 12.)  Once GGP ceased communicating with Defendants and honoring Defendants' withdrawal requests, which coincided with the SEC's investigation and filing of the Complaint, that existing value continued to be held at GGP and was in no way retained by or accessible to Defendants at all—let alone as recoverable ill-gotten gains.  Similarly, the Declaration of Kevin Strenski demonstrates in detail that Defendants' crypto wallets interfaced and interacted with GGP (exactly as represented to Defendants' lenders) through a series of crypto exchanges resulting in a net loss of at least **$7,705,456** by Defendants and the lenders.  (*See* Strenski Decl. at ¶ 12.)

The SEC acknowledges "the amounts that the Defendants transferred to the crypto exchanges or the amounts that Defendants paid in finders fees" and, flippantly and incorrectly, disregards them as not "legitimate expenses," without further analysis.  (Remedies Mot. at 17–18.)  Instead of framing the amount this way, the SEC should have observed this amount as lenders' loss.  Cryptocurrency deposits, including Defendants' own contributions, which were commingled with lenders'

- 16 -

funds, were all subject to the same risk.  When GGP disappeared, Defendants' assets were lost as well.

It is axiomatic that a proper net profits analysis must recognize that Defendants contributed their own capital, kept loans current, and ultimately suffered net losses on those contributions.  *See Spartan Sec. Grp., Ltd.*, 164 F.4th at 1272 (affirming disgorgement calculation noting that the district court excluded payments made by defendants to investors and excluded legitimate expenses); *Sec. & Exch. Comm'n v. Complete Bus. Sols. Grp., Inc.*, No. 22-13811, 2023 WL 4196949, at *2 (11th Cir. June 27, 2023) ("Courts must restrict disgorgement awards to 'net profits from wrongdoing after deducting legitimate expenses.'") (quoting *Liu*, 591 U.S. at 72); *Sec. & Exch. Comm'n v. Crews*, No. 1:23-cv-03658-TRJ, 2025 WL 4058272, at *4 (N.D. Ga. June 2, 2025) (approving disgorgement representing estimated amount received from investors, less potentially legitimate expenses paid to an entity engaged in purported business activity).  The SEC's refusal even to analyze Defendants' contributions and net cryptocurrency losses is inconsistent with that requirement.  This is not a *Liu*-compliant net profits calculation, but rather, it is a request by the SEC for this Court to levy an unlawful and sensational penalty.  *See*

*Liu*, 591 U.S. at 92.  The Court should refuse the SEC's inapt invitation and reduce the disgorgement amount by at least **$7,705,456**.[8]

### 2. The SEC Improperly Fails to Account for Lender Payments and Other Legitimate Business Expenses.

In addition to tying the proper amount of disgorgement to Defendants' alleged profits, the SEC must also account for legitimate business expenses.  *Id.*; *Sec. & Exch. Comm'n v. Star Chain, Inc.*, No. 1:21-CV-03944-JPB, 2023 WL 1785764, at *3 (N.D. Ga. Feb. 3, 2023) (allowing substantial business expense deductions totaling approximately $8.4 million from gross proceeds of $14.9 million).  The SEC fails to do so for payments made to lenders and for other professional services and operating costs.  This approach is problematic for several reasons.

*First*, the SEC's "net profit" figure understates payments made to lenders.  In assessing the amount of disgorgement, the SEC must account for payments made to lenders, which constitute legitimate business expenses, as payments to third parties may "arguably have value independent of fueling a fraudulent scheme[,]" making them qualified for deduction with proper substantiation.  *See, e.g.*, *Liu*, 591 U.S. at 92 (reasoning that lease payments could be legitimate expenses); *Complete Bus. Sols. Grp., Inc.*, 2024 WL 4826059, at *12 n.14 (reasoning that payments to banks, internet providers, janitorial services, "payroll to non-insiders" could be legitimate

---

[8] Notably, this is the lower of the two estimates of payments to lenders between the analysis conducted by Nardello and AlixPartners.

expenses).  As demonstrated by AlixPartners' analysis, the SEC's calculation omits approximately **$4,061,810**, constituting an error in not crediting additional fiat repayments and net crypto payments made to lenders, inflating the alleged profit. *See* Sutherland Decl. ¶ 15, Table 1 (showing $3,657,242 in additional repayments to lenders); White Decl. ¶ 17 (showing $404,568 in net crypto payments to lenders).

*Second*, as demonstrated by the Declaration of Justin Sutherland, Defendants expended approximately **$886,809** on professional services in furtherance of their business, including: legal, compliance and consulting; software and technology; bank-related fees; and administration and office expenses.  *See* Sutherland Decl. ¶ 18, Ex. 5.  These services also must be credited against the SEC's disgorgement calculation.

In total, based on the number of losses sustained by GGP's disappearance, Defendants' payment to lenders, and Defendants' other legitimate expenses, the SEC's disgorgement amount should be reduced by a total of **$12,654,075**, as set forth in the following table:

| Category | Amount | Source |
|---|---|---|
| SEC's Disgorgement Calculation | $30,512,775 | |
| Deduction for Investor/Lender Losses | (-$7,705,456)[9] | *See* Strenski Decl. ¶ 12. |

---

[9] This is the lower of two amounts as identified by AlixPartners and Nardello and, thus, is a conservative approximation of lender losses (not Defendants' profits).  *See supra* n.8.

- 19 -

| Category | Amount | Source |
|---|---|---|
| Credit for Payments to Lenders | (-$4,061,810) | *See* Sutherland Decl. ¶ 15; White Decl. ¶ 17. |
| Credit for Other Legitimate Expenses | (-$886,809) | *See* Sutherland Decl. ¶ 18. |
| Defendants' Total Calculation | **$17,858,700** | |

At a bare minimum, under Fed. R. Civ. P. 55(b)(2)(A)–(C), the Court should conduct an accounting and evidentiary hearing to determine Defendants' true net profits, if any, before entering any disgorgement judgment.[10]

### B.    Joint-and-Several Liability in Disgorgement Is Improper Among Defendants and Especially as to Relief Defendants.

The SEC also seeks to impose disgorgement jointly and severally across all Defendants and to extend that liability to Relief Defendants.   This result is unwarranted under the circumstances.

As to Defendants, the SEC asks the Court to hold all four Defendants (the Individual Defendants, Triten, and GCZ) jointly and severally liable for the full disgorgement and prejudgment interest amount of $36,734,077.  (ECF No. 19 at 3, 17.)   However, the SEC's request for joint and several liability exceeds the limitations established in *Liu*.  There, the Supreme Court cautioned that joint and several liability is permissible, if at all, only in limited instances—such as where true

---

[10] This argument is laid out more fully in Defendants and Relief Defendants' Motion for Hearing on Plaintiff's Motion for Remedies and Default Judgment ("Motion for Hearing"), filed concurrently herewith.

partners in a common enterprise share profits and where apportionment is not practicable. *Liu*, 591 U.S. at 91–93. The Court warned that indiscriminate joint and several disgorgement risks transforming an equitable remedy into a penalty, and this result shall not lie. *See id.* at 91; *see also Sec. & Exch. Comm'n v. Torchia*, No. 1:15-CV-3904-ELR-CCB, 2024 WL 4541456, at \*5 (N.D. Ga. Sept. 25, 2024). Here, the SEC fails to establish that each defendant directly participated in and benefited equally from each alleged violation.

To the contrary, the key facts indicate quite differently. *First*, Triten and GCZ were legally distinct entities with separate operations. *Second*, the SEC does not claim each Defendant received equal shares of any profits, and, in fact, the SEC's own Cannon and Murnahan declarations show that fund flows can be—and have been—traced to particular accounts and individuals. (ECF Nos. 29-2, 29-8.) The mere commingling of funds does not justify holding each defendant responsible for all violations and all ill-gotten gains. *Liu*, 591 U.S. at 90 (joint and several liability "runs against the rule to not impose joint liability in favor of holding defendants liable to account for such profits only as have accrued to themselves . . . and not for those which have accrued to another, and in which they have no participation"). The Court should instead apportion liability based on each Defendant's actual participation and benefit from the alleged misconduct.

Critically, as to Relief Defendants, joint-and-several liability is even more inappropriate. They are not at all alleged to have violated the securities laws, participated in the scheme, or acted as partners or agents. (*See* AC ¶¶ 18, 102–08, 110–16 (alleging Relief Defendants only received proceeds of the scheme).) They are undisputedly no more than passive recipients. Under the Eleventh Circuit's Relief Defendant doctrine, the SEC must show both that a relief defendant received funds traceable to the underlying violation ***and*** has no legitimate claim to those funds. *See Sec. & Exch. Comm'n v. Donnan*, No. 1:12-CV-2831-ODE, 2014 WL 11829334, at *8 (N.D. Ga. Sept. 15, 2014); *Sec. & Exch. Comm'n v. Eldridge*, No. 1:05-CV-0735-CC, 2007 WL 7654404, at *14 (N.D. Ga. Mar. 20, 2007). However, if a relief defendant has a legitimate claim to the payments, then the court should not grant disgorgement. *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. Gresham*, No. 3:09-CV-75-TWT, 2012 WL 1606037, at *3 (N.D. Ga. May 7, 2012); *U.S. Commodity Futures Trading Comm'n v. Walsh*, 658 F.3d 194, 197 (2d Cir. 2011); *Sec. & Exch. Comm'n v. Sun Capital, Inc.*, No. 2:09-CV-229-FTM-29SPC, 2009 WL 1362634, at *2 (M.D. Fla. May 13, 2009). Those cases stand for the proposition that any disgorgement award against a relief defendant must be limited to the amount by which the relief defendant was unjustly enriched and that legitimate consideration—including services, contributions, or assumption of obligations—creates a "legitimate claim" barring disgorgement.

Here, the SEC has made no attempt to show that each Relief Defendant provided "nothing of value" in exchange for the benefits at issue.  Rather, the SEC simply assumes that, because investor funds passed through accounts controlled by the Individual Defendants and were used in connection with certain homes, vehicles, or expenses, the Relief Defendants *necessarily* have "no legitimate claim" to the properties titled in their name.  The SEC has not presented evidence that the Relief Defendants contributed *no* funds to the properties, provided *no* services or labor (*e.g.*, construction, management, or caregiving), or did not assume *any* associated obligations (*e.g.*, mortgages, taxes, insurance).  It goes without saying that family members often contribute income, credit, or labor to household expenses and real-property projects.  *See, e.g.*, *U.S. v. 1419 Mt. Alto Rd., Rome, Floyd Cty., Ga.*, 830 F. Supp. 1476, 1480-81 (N.D. Ga. 1993) (finding legally significant a wife's contribution of "time and labor in improving the residence").  Consequently, equity cannot allow Relief Defendants to have joint-and-several liability with Defendants for multi-million-dollar judgments that results in the loss to their very homes in which they have a legitimate claim.

### C.    The SEC's Request for a Constructive Trust Over Real Properties Exceeds This Court's Equitable Powers.

The SEC also argues that because investor funds were used to purchase properties titled in Relief Defendants' names, they should be viewed as holding a constructive trust over the properties.  Remedies Mot. at 22–23.  The SEC requests

- 23 -

the Court order Jonathan Adam and Relief Defendants to relinquish all rights to these properties since none contributed their own funds to purchase them.  *Id.*  Despite these accusations, the SEC has not established the specific tracing of investor funds into each property required for a constructive trust.  *See Sec. & Exch. Comm'n v. French*, No. 1:23-CV-01443-JPB, 2024 WL 6882685, at *3 (N.D. Ga. Apr. 30, 2024) (ordering relief defendants to relinquish all rights in properties **only after** SEC presented evidence that investor funds purchased and improved real estate and that relief defendants contributed no funds of their own).[11]   Moreover, the Relief Defendants may have legitimate interests in these properties beyond the purportedly tainted funds, including homestead protections, marital property rights, and potential improvements made with untainted funds.  *See, e.g.*, *Sec. & Exch. Comm'n v. Erwin*, 553 F. Supp. 3d 895, 904 (D. Colo. 2021) ("A legitimate claim to ill-gotten funds may be established if the relief defendant can demonstrate that he provided some services as consideration for the identified funds.") (internal citations omitted); *Sec. & Exch. Comm'n v. Founding Partners Cap. Mgmt.*, 639 F. Supp. 2d 1291, 1294 (M.D. Fla. 2009) (dismissing claims against relief defendants entirely because their

---

[11] Recent decisions in this Circuit approach equitable remedies pertaining to property, like a constructive trust, cautiously.  *See, e.g.*, *Sec. & Exch. Comm'n v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1344–45 (11th Cir. 2017) (addressing receivership assets, the court emphasized the need to respect legitimate third-party claims—including secured creditors—when disposing of alleged tainted property).

written loan agreements created sufficient legitimate ownership interests in loan proceeds). The SEC cannot simply declare all property interests void without addressing these complex property rights. *See Sec. & Exch. Comm'n v. Sanchez-Diaz*, 88 F.4th 81, 92 (1st Cir. 2023) (relief defendants who provide "some value that is more than nominal in exchange for an asset" retain "a rightful claim to that asset, even if some accounting could suggest they obtained it at a discount"). The request for complete relinquishment of all rights is overbroad and fails to account for potentially innocent partial interests in the properties. *Sec. & Exch. Comm'n v. Ahmed*, 783 F. Supp. 3d 652, 676 (D. Conn. 2025) ("'Relief Defendants, have a *bona fide* purchase defense,'" an "'inherently asset[-]specific'" defense which requires courts 'to determine whether a third party (1) gave value in exchange for an asset in particular and (2) lacked notice as to that asset's true provenance.'") (quoting *Sec. & Exch. Comm'n v. Ahmed*, 72 F.4th 379, 408 (2d Cir. 2023)). A constructive trust must be tailored to the amount of unjust enrichment actually traceable to investors and must account for legitimate third-party interests. *Sec. & Exch. Comm'n v. Watkins*, 317 F. Supp. 3d 1244, 1259 (N.D. Ga. 2018), *aff'd sub nom. Sec. & Exch. Comm'n v. Watkins Pencor, LLC*, 810 F. App'x 823 (11th Cir. 2020) (declining to impose a constructive trust where there was no presently "identifiable *res* on which to impose a constructive trust" and no "accounting of how much [the defendant] or his companies were unjustly enriched"). It is not an automatic forfeiture device.

- 25 -

The SEC's request that Relief Defendants relinquish all legal and equitable rights, interests, and titles goes far beyond that and should be denied.

###    D.    Prejudgment Interest Should Be Reduced.

The Court should decline to impose prejudgment interest at the rate requested. "[T]he decision to grant prejudgment interest, as well as the rate at which interest is awarded, are within the district court's discretion[.]" *Sec. & Exch. Comm'n v. Carrillo*, 325 F.3d 1268, 1273 (11th Cir. 2003). Because awards of prejudgment interest are compensatory, not punitive, the district court should make the interest decision through an "assessment of the equities." *Spartan Sec. Grp., Ltd.*, 620 F. Supp. 3d at 1228. Courts consider several factors in determining whether to impose prejudgment interest, including: (1) whether prejudgment interest is necessary to compensate the plaintiff fully for his injuries; (2) the degree of personal wrongdoing on the part of the defendant; (3) the availability of alternative investment opportunities to the plaintiff; (4) whether the plaintiff delayed in bringing or prosecuting the action; and (5) other fundamental considerations of fairness. *See Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176 (1989) (addressing prejudgment interest in federal securities actions); *Sec. & Exch. Comm'n v. Lauer*, 478 F. App'x 550, 557 (11th Cir. 2012) ("We have noted that awards of prejudgment interest are compensatory, not punitive, and that the district court should make its interest decision through 'an assessment of the equities.'") (quoting *Osterneck v. E.T.*

- 26 -

*Barwick Indus., Inc.*, 825 F.2d 1521, 1536 (11th Cir. 1987)); *Sec. & Exch. Comm'n v. Martin*, No. 1:12-CV-2922-AT, 2019 WL 13214088, at \*6 (N.D. Ga. Mar. 26, 2019) (finding a much shorter duration of prejudgment interest than requested by the SEC "appropriate"); *Sec. & Exch. Comm'n v. Miller*, 744 F. Supp. 2d 1325, 1343 (N.D. Ga. 2010) (finding prejudgment interest on disgorgement award unwarranted).

Here, the SEC seeks over $6.2 million in prejudgment interest against the Defendants—in addition to its already overstated disgorgement request, *see supra* Section IV.A—but neither identifies nor applies these factors.  Each such factor weighs in Defendants' favor.  *First*, any harm to the lenders would not be "fully compensate[d]" by the disgorgement award.  *See, e.g.*, *Gov't Emps. Ins. Co. v. KJ Chiropractic Ctr. LLC*, No. 6:12-cv-1138-Orl-40DCI, 2017 WL 9939048, at \*2 (M.D. Fla. Aug. 22, 2017) (denying prejudgment interest when it would give plaintiff—who was "adequately compensate[d]" by the damages award—a windfall); *Validsa, Inc. v. PDVSA Servs., Inc.*, 424 F. App'x 862, 878–79 (11th Cir. 2011) (same).  *Second*, considerations of fairness and the relative equities also weigh in Defendants' favor.  Defendants did not enjoy unfettered use of these funds—substantial assets were immobilized at GGP and then subsequently stolen.  Thus, Defendants did not benefit from these costs and losses.  Under these same circumstances, courts "have routinely refused to award prejudgment interest when defendants are unable to use or secure a benefit from" the disgorged profits.  *Sec. &*

- 27 -

*Exch. Comm'n v. E-Smart Techs., Inc.*, No. 11-895, 2016 WL 183503, at \*8 (D.D.C. Jan. 14, 2016).   *Third*, layering full prejudgment interest atop an inflated disgorgement figure risks improperly crossing over into punishment.  *See Spartan Sec. Grp., Ltd.*, 620 F. Supp. 3d at 1228 ("awards of prejudgment interest are compensatory, not punitive").

As to Relief Defendants, who are not alleged wrongdoers, accruing prejudgment interest is especially harsh as to them.  *See Sec. & Exch. Comm'n v. Antar*, 97 F. Supp. 2d 576, 592 (D. N.J. 2000) (holding equity considerations require modification of standard calculation of prejudgment interest as to relief defendants who "neither participated in nor were aware of the frauds" and "neither substantively participated in the litigation process nor caused the delays").

At a minimum, the Court should reduce the amount of prejudgment interest calculated against the Relief Defendants as of the date of the filing of the Amended Complaint (*i.e.*, April 17, 2025) and not the date of the last payment made for their alleged benefit, as the SEC seeks here.  (*See* ECF No. 29-2, Exs. 3–5); *see also Erwin*, 2022 WL 2063227 at \*5 n.5 ("'[P]rinciples of equity have somewhat more force with respect to the relief defendants'" and "'[w]hile admittedly imprecise, calculating prejudgment interest from the filing of the complaint in some measure diminishes the prejudice to the relief defendants for conduct which they had no part

- 28 -

in.'") (quoting *Antar*, 97 F. Supp. 2d at 592). Thus, the Court should exercise its broad discretion to reduce or eliminate prejudgment interest.

### E.    The Requested Third-Tier Civil Penalties Are Unsupported by the Evidence of Scienter and Are Excessive in Amount.

The SEC proposes civil penalties against the Individual Defendants that are excessive and disproportionate to the violations alleged. Yet the SEC has not provided a clear methodology for calculating the $3 million penalty for each Individual Defendant. Fortunately, instead of merely relying on the SEC's unilateral and one-sided assessment, "the statute leaves the amount of the penalty to the discretion of the district judge[.]" *Sec. & Exch. Comm'n v. Mooney*, No. 1:22-cv-02320-SDG, 2025 WL 901802, at *6 (N.D. Ga. Mar. 25, 2025). Courts in this Circuit weigh several factors in determining the amount of penalties, including: (1) degree of scienter; (2) recognition of wrongdoing and assurances against future violations; (3) financial condition and ability to pay; (4) deterrent effect in combination with other sanctions; (5) failure to admit to their wrongdoing; and (6) lack of cooperation and honesty with authorities, if any. *Id.* (citing *Miller*, 744 F. Supp. 2d at 1344). The SEC's Motion recites this framework only in the most general terms, but it does not meaningfully apply it to each Individual Defendant. (Remedies Mot. at 23–25.) Instead, the SEC asks for a flat $3 million penalty ***per person*** without specifying the number of "violations" for tier three purposes, bothering to tie its request to the per violation cap in 17 C.F.R. § 201.1005 & Table

- 29 -

V, addressing Defendants' current and realistic future ability to pay in light of massive disgorgement, or even explaining why this particular amount—rather than a smaller third-tier penalty—is necessary for deterrence.

By contrast, courts within this Circuit have conducted defendant specific analyses, often imposing penalties far smaller than the maximum where disgorgement and other sanctions already provided substantial deterrence. *See Sec. & Exch. Comm'n v. Hayter*, 96 F. Supp. 3d 1299, 1305 (M.D. Fla. 2015) (reducing requested penalties from $6,500 per defendant to $100 each); *Miller*, 744 F. Supp. 2d at 1344–46 (reducing requested penalties from $225,000 to $75,000); *Sec. & Exch. Comm'n v. Converge Glob.*, No. 04-80841CV, 2006 WL 907567, at *6 (S.D. Fla. Mar. 10, 2006) (reducing to $25,000 from requested amount of $120,000).[12]

Applying the factors, the Court will see that it should impose a significantly lower penalty. As to scienter, third-tier penalties under the Securities Act § 20(d) and Exchange Act § 21(d)(3) require violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" that

---

[12] Federal courts repeatedly exercise their discretion to reduce SEC civil penalty requests by 20% to over 95% below the amounts sought by the SEC. *See, e.g.*, *Sec. & Exch. Comm'n v. Murphy*, 50 F.4th 832, 842 (9th Cir. 2022) (affirming 20% reduction); *Sec. & Exch. Comm'n v. City of Miami*, No. 13-22600, 2016 WL 11783322, at *7 (S.D. Fla. Dec. 5, 2016) (97% reduction from $450,000 to $15,000); *Sec. & Exch. Comm'n v. Garcia*, No. 22-CV-00118, 2023 WL 2824395, at *9 (D. Colo. Mar. 29, 2023) (40% reduction).

result in or risk substantial losses.  15 U.S.C. § 77t(d)(2)(C) & § 78u(d)(3)(iii).
While Defendants have consented to injunctive relief and do not contest liability for
purposes of remedies, the record shows that: (1) Defendants deployed their own
capital alongside lender funds; (2) loans were current and asset-positive until GGP's
refusal to respond; and (3) the collapse was driven by counterparty fraud, rather than
any scheme by Defendants to siphon funds for personal gain.[13]

Decidedly absent from the Amended Complaint are allegations that the
Individual Defendants acted with the requisite intent.  There are no forged account
statements, no fabricated audited financials, or backdated documents.  In short, there
is no "smoking gun" documentary fraud alleged.  Furthering this absence, the SEC
omits any mention of the clear evidence that GGP was a fully operational trading
platform that held substantial assets owed to Defendants and the lenders, with
compounding value, and that the asset value was mounting to the very day that GGP
refused to further communicate with Defendants.

Those facts sharply distinguish this case from ones where courts have imposed
large third-tier penalties on defendants who admitted—or were found to have acted
with—deliberate, egregious fraud.  *See Sec. & Exch. Comm'n v. Molen*, 704 F. Supp.

---

[13] As stated in the Declaration of Senior Director at Nardello, Alex Vosghanian, a
true and correct copy of which is attached hereto as **Exhibit E** ("Vosghanian Decl."),
the ROI balance of the combined wallets held by the Defendants on the GGP
platform was $171,967,233.49.  (*See* Vosghanian Decl. ¶ 8.)

3d 1341, 1348 (N.D. Ga. 2023) (finding requisite scienter where defendants knowingly made several false statements of material facts to public and took steps to conceal their behavior, including by certifying fraudulent financial statements); *Sec. & Exch. Comm'n v. Jones*, No. 3:21-cv-98-TCB, 2022 WL 17882114, at *2 (N.D. Ga. July 7, 2022) (imposing penalties where defendant falsely represented aspects of investments, including that investors' principal was protected).  Thus, the scienter factor weighs in favor of a lower penalty amount.  As to recognition of wrongdoing and cooperation with authorities, each Individual Defendant has consented to the entry of permanent injunctions, agreed to pay appropriate remedies, and has cooperated with the SEC in responding to the SEC's subpoenas and with the Federal Bureau of Investigation concerning financial records, both fiat and crypto. This likewise weighs in favor of a lower penalty amount.

Moreover, the Court should consider Defendants' ability to pay in its penalty determination.  *Sec. & Exch. Comm'n v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008) ("[A]bility to pay is one factor to be considered in imposing a penalty."); *see also Mooney*, 2025 WL 901802 at *7 (weighing defendants' inability to pay in favor of a "lighter penalty").  Here, any properly calculated disgorgement—limited to actual net profits—will already impose crushing financial consequences upon Defendants.   Double punishment through both disgorgement and substantial

- 32 -

penalties may exceed that which is necessary for deterrence, particularly when the disgorgement itself already incorporates prejudgment interest.

The Court should, therefore, impose significantly reduced penalties calibrated to each Defendant's role, scienter, and actual net gains.[14]

## V.    Conclusion

For the foregoing reasons, Responding Parties respectfully request the Court:

1.      Reject the SEC's disgorgement calculation as overbroad and inconsistent with *Liu*, and require a refined accounting and an evidentiary hearing to determine each Defendant's net profits, considering assets held and lost at GGP; all payments to lenders; net cryptocurrency deposits (including Defendants' own contributions); interest and appreciation earned in clients' Gemini wallets; legitimate expenses; and Defendants' own losses;

2.      Decline to impose joint-and-several liability in disgorgement across all Defendants, and instead apportion any disgorgement among Defendants based on their individual net gains;

3.      Deny or substantially limit Relief-Defendant disgorgement, finding that the SEC has not proven that Relief Defendants have "no legitimate claim" to the

---

[14] For the Court's assessment of the SEC's Remedies Motion, this Opposition in Response, and supporting declarations and evidence, Defendants and Relief Defendants hereby request this Court hold an evidentiary hearing, which is briefed more fully in the Motion for Hearing filed contemporaneously herewith.

funds or properties, and in any event decline to impose joint-and-several liability upon them;

4.     Reject the requested constructive trusts and orders compelling Relief Defendants (and Jonathan Adam) to relinquish title to the four homes, and instead, if any relief is warranted, impose narrow monetary judgments based on any proven net benefit to each Relief Defendant;

5.     Reduce or eliminate prejudgment interest in light of the equities, including Defendants' own losses and the already substantial remedial relief; and

6.     Deny or significantly reduce civil penalties, in recognition of the absence of scienter, Defendants' own losses, and the powerful deterrent effect of any properly calculated equitable monetary relief.

Respectfully submitted, this 16th day of March, 2026.

**TROUTMAN PEPPER LOCKE LLP**

*/s/ Mary M. Weeks*
Mary M. Weeks
Georgia Bar No. 559181
Derek L. Centola
Georgia Bar No. 749911
Hannah L. Baskind
Georgia Bar No. 276384
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
T: 404-885-3000
F: 404-885-3900
mary.weeks@troutman.com
derek.centola@troutman.com
hannah.baskind@troutman.com

- 34 -

Patrick Clendenen (admitted *pro hac vice*)
**PRACTUS, LLP**
555 Long Wharf Drive
New Haven, CT 06511
T: 203-212-9046
patrick.clendenen@practus.com

*Counsel for Defendants Tanner S. Adam, Jonathan L. Adam, Triten Financial Group, LLC and GCZ Global LLC and Relief Defendants Ava A. Adam, Garrett L.W. Adam, Robert S. Adam, Carrie L. Adam, Emilio F. Hinojosa, and Virginia I. Hinojosa*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Northern District of Georgia Civil Local Rule 7.1.D, I certify that the foregoing document was prepared in Times New Roman 14-point font, in compliance with Local Rule 5.1.C.

*/s/ Mary M. Weeks*
Mary M. Weeks
mary.weeks@troutman.com
Georgia Bar No. 559181

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which automatically serves notification of such filing to all counsel of record.

This 16th day of March, 2026.

/s/ Mary M. Weeks
Mary M. Weeks
mary.weeks@troutman.com
Georgia Bar No. 559181