UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TANNER S. ADAM, JONATHAN L. ADAM, TRITEN FINANCIAL GROUP, LLC, and GCZ GLOBAL LLC,<br><br>Defendants, and<br><br>AVA A. ADAM, GARRETT L.W. ADAM, ROBERT S. ADAM, CARRIE L. ADAM, EMILIO F. HINOJOSA, AND VIRGINIA I. HINOJOSA,<br><br>Relief Defendants. | Civil Action File No.<br>1:24-cv-03774-VMC |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR REMEDIES
AND FOR ENTRY OF DEFAULT JUDGMENTS**

Plaintiff Securities and Exchange Commission (the "Commission") submits

this Reply Brief in Support of its Motion for Remedies against Defendants Tanner

S. Adam, Jonathan L. Adam (collectively the "Adam Brothers"), Triten Financial

Group ("Triten"), and GCZ Global LLC ("GCZ") and for default judgments against

Relief Defendants Ava A. Adam, Garrett L.W. Adam, Robert S. Adam, Carrie L.

Adam, Emilio F. Hinojosa, and Virginia L. Hinojosa (collectively "Relief Defendants").

## I.    INTRODUCTION

In an effort to limit the amount of disgorgement, prejudgment interest, and civil penalties imposed by the Court, Defendants point to a third party who they contend is really the fraudster in this case. Building on this theme, Defendants ask the Court to view them as innocent victims of this third party's fraud who should not be held accountable for disgorging their ill-gotten gains or paying a substantial penalty for their conduct. They go so far to say that it would be inequitable to force them and their family members to give up title to the homes in which they reside even though they themselves contributed nothing of value for those homes, but rather paid for them with fraudulently obtained investor funds.

This argument ignores that Defendants were the mastermind of the fraudulent scheme that has cost investors more than $30 million. Defendants, rather than a third party: (a) lured investors into their fraudulent scheme by telling investors that this was a virtually risk-free investment made possible by Defendants' own invention; (b) told investors that as soon as their money was invested it would be deployed into a "bot" controlled by Defendants; and (c) told investors that it was their own prowess that made this investment opportunity available. [Dkt. No. 1 ¶¶ 3, 7, 39, 56-57, 62, 73, & 74.]

Defendants never told investors what they are now claiming—that they would transfer investor funds to a third party who would control those funds and prevent Defendants from accessing these funds. Instead, they touted their experience and expertise and told investors that they would be paid regardless of whether any investor money was actually used to fund loans. [Dkt. No. 1 ¶¶ 56-57 & 62-64.]

Nevertheless, they now admit that they voluntarily transferred investors funds to a third party between April and September 2023, and that their last withdrawal from the third party was in July 2023. [Dkt. No. 47-3 at 2-4.] Those facts are directly contrary to what they told investors during the scheme which continued until June 2024. Defendants solicited investors, telling those investors that they were the ones who controlled the "bot" and that they were processing "returns" from the lending pool on a monthly basis. [Dkt. No. 1 ¶¶ 1, 3, 7, 73 & 78.] And, undisclosed to investors, they did not use the "returns" generated from the "bot" to pay investors. Instead, they used new investor funds to pay returns to prior investors and to pay personal expenses for themselves and their family. [Dkt. No. 1 ¶¶ 87-97.] Defendants' conduct was egregious and caused extensive harm to investors.

Defendants engaged in a classic Ponzi scheme in violation of the securities laws. They cannot now shield themselves from the consequences of their actions by

3

pointing to what they claim was fraudulent conduct by another.[1]  Instead, the Court should order Defendants to pay the disgorgement, prejudgment interest, and civil penalties set forth in the Commission's motion for remedies.  The Court also should enter default judgments against the Relief Defendants because they have offered no evidence to show that they provided value for the money and homes they received from Defendants.

## II.    ARGUMENT

### A.    The Commission's Disgorgement Calculation Accurately Reflects Defendants' Ill-Gotten Gains.

Defendants do not and cannot contest that the Commission's allegations, which are deemed true, are sufficient to establish that they violated the securities laws.  Once there has been a finding that a defendant has violated the securities laws, the Commission "is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004); *SEC v. Mannion*, 28 F. Supp. 3d 1304, 1308 (N.D. Ga.

---

[1] Defendants statement that the third party's failure to honor Defendants' withdrawal request "coincided with the SEC's investigation and filing of the Complaint" is misleading and not supported by evidence.  [Dkt. No. 47 at 22.]  According to Defendants' own expert, Defendants' last withdrawal occurred on July 12, 2023.  [Dkt. No. 47-3 at 4.]  This litigation was not filed until August 2024.  There is no evidence in the record establishing why Defendants did not seek to withdraw money from the crypto exchanges after July 12, 2023, and Defendants' failure to withdraw money to pay investor returns is contrary to representations they made to investors.  [Dkt. No. 1 ¶¶ 76-78.]

2014).  In the context of a fraudulent securities offering, "the proper starting point for a disgorgement award is the total proceeds received from the sale of the securities." *SEC v. AmeriFirst Funding, Inc.*, 2008 WL 1959843, at *2 (N.D. Tex. May 5, 2008), citing *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1104 (2d Cir. 1972).

As reflected in the Commission's opening brief, the Commission calculated disgorgement by starting with the total amount raised in the fraudulent offering. Defendants do not challenge the Commission's use of investor deposits as the starting point for calculating disgorgement.  According to Defendants, however, the Commission overstated Defendants' ill-gotten gains by failing to deduct certain amounts when calculating disgorgement.

Specifically, Defendants argue that the Commission should deduct amounts Defendants voluntarily transferred to third parties to further their fraudulent scheme and purported business expenses that have no value independent of the fraudulent scheme.  [Dkt No. 47 at 3 & 14-19.]  Neither of the categories constitute legitimate business expenses, and Defendants have failed to satisfy their burden to establish that the Commission's disgorgement calculation is not a reasonable approximation of their ill-gotten gains.  *Calvo*, 378 F.3d at 1217.

1.     Transfers to Gemini Should Not Be Deducted

The largest category of expenses Defendants contend should be deducted are transfers they purportedly made to Grupo Gemini International, S.A. ("Gemini"), an entity that they now claim is the bad actor in this case. [Dkt. 47 at 13-18.] According to Defendants, at least $7,705,456, in transfers to Gemini should be deducted from the Commission's disgorgement calculation. [*Id*. at 18.] But none of the investors sent any money to that entity.

Instead, investors sent their money to Defendants based on Defendants' representation that their money would be locked up in a "bot" that Jonathan Adam invented and controlled. Defendants told investors that no one could access the money until the end of the investor's contract. [Dkt. No. 1 ¶¶ 71-75.] Defendants never told investors that their money would be transferred to wallets controlled by a third party nor did Defendants tell investors that the third party would have access to investor funds to do with what they wanted. Because these funds were not used as represented to investors, it is not appropriate to deduct them as legitimate business expenses. *See, e.g., SEC v. Yang,* 2022 WL 3278995, at *1 (9th Cir. 2022) (finding expenditure of investor funds that "contravened the purpose for which the funds were invested" to be "illegitimate under *Liu*").

Moreover, as now recognized by Defendants, these transfers to Gemini provided no benefit to investors. If Defendants' representations are to be believed,

Gemini has taken the investor funds that Defendants voluntarily transferred to it

and provided nothing of value in return.  Because these transfers do not provide a

benefit to investors, they are not deductible.  *See SEC v. Liu*, 591 U.S. 71, 91-92

(2020) (stating that for an expense to be deductible, it must "arguably have value

independent of fueling a fraudulent scheme.").

### 2.    Payment of Finders' Fees Are Not Deductible

In addition to arguing that their improper transfers to a third party should be

deducted, Defendants also argue that the Commission understated the payments

made to investors by approximately $4 million.[2]  [Dkt. No. 47 at 18-20.]  But that

is not true.  The majority of the payments that are reflected in the $4 million are

not payments to investors, but finders fees.  *See* April 2, 2026 Declaration of

---

[2] The largest variances between Defendants' calculations and the Commission's are due to the Commission's decision not to deduct from its disgorgement calculation the investor funds Defendants: 1) transferred to the crypto exchanges; 2) paid in finders fees; and 3) claim as business expenses.  In an effort to explain the additional variance between the two calculations, the Commission's accountant, Krysta Cannon, reviewed every transaction, identified the transactions that were treated differently, and then provided an explanation for why the Commission categorized those transactions as it did.  *See generally* Ex. 1.  As a result of her review, Ms. Cannon revised the manner in which she categorized some of the transactions, resulting in an increase of her disgorgement calculation from $30,512,775 to $31,881,447.  Because disgorgement need only be a reasonable approximation of ill-gotten gains, the Commission does not seek the additional disgorgement calculated by Ms. Cannon and only requests the Court order disgorgement and prejudgment interest as set forth in its motion.

Krysta Cannon, attached hereto as Exhibit 1, at ¶¶ 42-44. The Commission did not deduct $3,154,392 in payments that Defendants made to third parties as finders fees, and it was Defendants who identified those payments as finders fees. *Id.* at ¶ 44. Those payments are not legitimate business expenses because they have no value independent of fueling the fraud.

The only purpose of paying finders fees was to increase the number of individuals who invested in Defendants' fraudulent scheme. Defendants needed those new investors to continue their fraudulent scheme. Each additional investor provided funds to Defendants that were then used to pay illegitimate returns to other investors as well as Defendants' personal expenses. The payment of finders fees allowed Defendants to prop up their fraudulent scheme to the detriment of investors.

While the payment of finders fees provided no benefit to investors, those payments did benefit Defendants by allowing them not only to continue their fraudulent scheme but also to continue misappropriating assets to fuel their lifestyle. There is simply no basis for concluding that Defendants' payments to finders should be deducted from the disgorgement calculation. *See, e.g., SEC v. TKO Farms*, 2025 WL 2684199, at * 9 (C. D. Cal. Aug. 18, 2025) (no deduction for payments to third parties who unlawfully sold securities for defendants); *SEC v. Fisher*, 2022 WL 13650848, at * 4 (S.D. Fla. Oct. 21, 2022) ("Any funds spent in

furtherance of drawing in more victims to [defendant's] fraud are not, by any stretch of the imagination, legitimate business expenses.").

As stated in the Commission's opening brief, these payments were also contrary to the Defendants' representations about how investor funds would be used. Specifically, Defendants told investors that they were compensated by taking their share of the returns paid to them by Gemini and that they were not entitled to any other fees or compensation paid by the investors. [Dkt. No. 1 ¶¶ 66-67.] Using investor funds to pay finders fees is inconsistent with these representations, and thus it is not appropriate to deduct these payments when calculating disgorgement. *See SEC v. Wilson*, 2022 WL 18275941, \*8 (N.D. Tex. Dec. 28, 2022) (measuring disgorgement by the amount of investor funds used for "expenses that were contrary to the statements [Defendants] made to investors' representatives regarding the use of their assets").

3.    Other Expenses Identified by Defendants Are Not Legitimate

Finally, Defendants contend that it is appropriate to deduct $886,809 in business expenses consisting of four categories of expenses: 1) legal, compliance and consulting; 2) software & technology; 3) bank-related fees; 4) administration & office, but they provide no explanation of what purpose these expenses served independent of the fraud. [Dkt. No. 47 at 19.] "[Defendant] has the burden of providing concrete, credible evidence to demonstrate the amount of money spent

9

on alleged business expenses and to show that the expenses were legitimate." *SEC v. Jones*, 2022 WL 17882114, at *1 (N.D. Ga. July 7, 2022) (internal citation omitted).

When the line items of each category are analyzed more closely, it becomes clear that the claimed expenses are not legitimate. For example, the "administration" expenses consist of over $11,000 in Miami restaurant expenses and over $5,000 in travel expenses (for two) from Miami. Ex. 1 at ¶ 68 & Ex. A. Even if these expenses were related to meetings with investors and not personal expenses for Tanner Adam and his significant other, there is no reason why investors should be responsible for those costs. *Id*. at *2.

Similarly, Defendants claim $100,000 in legal expenses paid to Dechert Law Firm. *Id.* What they fail to disclose is that they hired Dechert to represent them during the Commission's investigation that led to this case. Ex. 1 at ¶ 69. It would be highly inequitable to hold investors responsible for costs associated with Defendants' efforts not to be found liable for defrauding those exact same investors. And there obviously is no benefit to investors from such expenses. Additionally, there are numerous other unidentified individuals to which Defendants made payments that they are now claiming constitute legal, compliance, and consulting, but they have failed to present any evidence of the purported services those individuals provided. *Id*. at ¶ 68 & Ex. A. In the absence

of such evidence, there is simply no basis for concluding such expenses should be deducted.

Defendants do identify computing expenses that could constitute deductible business expenses in a legitimate business. *Id.* But there was no aspect of Defendants' business that was not intended to further their fraudulent scheme. Most importantly, Defendants told investors that their expenses and compensation would come from the returns generated by the lending pool, not from investor funds. [Dkt. No. 1 ¶¶ 66-67.] Given that representation, it was not legitimate for Defendants to use investor funds to pay any of Defendants' business expenses and thus, the Court should not deduct the $886,809 from Defendants' ill-gotten gains.[3]

In determining the appropriate disgorgement amount, all doubts "are to be resolved against the defrauding party." *SEC v. First City Fin. Corp.*, 688 F. Supp. 705, 727 (D.D.C. 1988) (quoting *SEC v. McDonald*, 699 F.2d 47, 55 (1st Cir. 1983)). "Once the [Commission] has established that the disgorgement figure is a reasonable approximation of unlawful profits, the burden of proof shifts to the defendants, who must demonstrate that the disgorgement figure is not a reasonable approximation." *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D. N.J.

---

[3] Had Defendants been required to use their own funds to pay their business expenses rather than new investor money, it is unlikely that the harm to investors would have been as large.

1996) (quotations omitted).  Defendants have failed to meet this burden, and the Court should impose disgorgement of $30,512,775 against Defendants.

B.     *Joint and Several Liability is Appropriate.*

1.     Defendants Should Be Held Jointly and Severally Liable

Defendants next contend that imposing the requested disgorgement and prejudgment interest jointly and severally against the Defendants is inappropriate. This argument should be rejected because joint and several liability is appropriate under several equitable theories.  First, joint-and-several liability can be imposed "for partners engaged in concerted wrongdoing." *Liu*, 591 U.S. at 90.  In such circumstances, the "historic profits remedy thus allows some flexibility to impose collective liability." *Id*. at 90-91.

The complaint allegations establish Defendants as "equally culpable codefendants," and thus, it is appropriate to impose disgorgement against Defendants jointly and severally.  *Id*. at 91; *see also Calvo*, 378 F.3d at 1215 ("It is a well settled principle that joint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct.") (internal citations omitted).  Defendants solicited investors together, made the same material misrepresentations about the use of funds, and transferred funds between Triten and GCZ with no legitimate purpose other than sustaining the fraudulent scheme.  [Dkt No. 1 ¶¶ 38 & 52-53.]

12

Joint and several liability is also appropriate because Defendants used investor funds for their joint benefit. Each Defendant "benefitted substantially" from the fraudulent scheme. *See, e.g.*, *SEC v. Hughes*, 124 F.3d 449, 455-56 (3d Cir. 1997). Given Defendants' admission that they could not withdraw funds they transferred to the third party, the only way the scheme could continue is if they raised new investor money.

Moreover Defendants, who are brothers, jointly benefitted by misappropriating investor funds for the benefit of their parents and brother. For example, funds to purchase the homes titled in Garrett Adam and Robert and Carrie Adam came from accounts held by both GCZ and Triten as well as Jonathan Adam's personal account. Ex. 1 at ¶ 65. Triten transferred investor funds to Jonathan Adam's personal account which were then used to pay to purchase a vehicle that was gifted to Garrett Adam. *Id*. at ¶ 66. Moreover, funds were transferred to and from Defendants as needed to make Ponzi payments to investors. *Id*. at ¶¶ 59-64.

Finally, joint and several liability is appropriate because "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946). Defendants' financial records show considerable commingling of investor funds. *Id*. at ¶ 58. Funds were transferred between Defendants' bank accounts as needed to make investor payments, to pay finders fees, and to pay Defendants' expenses. *Id*. at ¶¶ 59-67. If it was as easy to

13

apportion the ill-gotten gains between each defendant as Defendants contend, it is unclear why their experts did not perform such an analysis and submit it to the Court.

2.    Relief Defendants are Jointly and Severally Liable with Defendants

As for the Relief Defendants, it is appropriate to hold them jointly and severally liable for the amounts they received from Defendants.  As set forth below, the Relief Defendants have no legitimate claim to those funds, and the Relief Defendants have presented no evidence to the contrary.  In the absence of such a showing, the Court should order the Relief Defendants to disgorge the investor funds that were transferred to them or used for their benefit.  *See SEC v. Martin*, 1, 2019 WL 13214088, at *8 (N.D. Ga. March 26, 2019) ("[I]t is also without question that she is the holder of assets for which she has failed to establish a legitimate interest and, as such, these assets must be recovered (jointly and severally with that recovered from Defendant himself) in order to ensure complete relief is achieved.").

C.    *The Court Should Order Jonathan Adam and the Relief Defendants to Relinquish their Rights to Properties Purchased using Investor Funds.*

Disgorgement is appropriate when a relief defendant has no legitimate claim to the funds received from a fraudulent scheme.  *See, e.g.*, *SEC v. Complete Business Solutions Group*, 528 F. Supp. 3d 1309, 1342 (S.D. Fla. 2021) ("In the securities context, to have no legitimate claim to the ill-gotten funds means that an individual gave no consideration for the funds and thus received them as a gift.").  In this case,

14

Relief Defendants received the benefit of investor funds both in the form of direct transfers of investor funds and the use of investor funds to purchase the homes in which they currently reside.  For this reason, the Commission requested that the Court order the Relief Defendants to disgorge the investor funds they received and to relinquish their rights in the homes purchased with investor funds.  *SEC v. Eldridge*, 2007 WL 7654404, at *14 (N.D. Ga. Mar. 20, 2007) (holding that the SEC may seek disgorgement from persons not accused of wrongdoing when that person has (1) received ill-gotten gains; and (2) does not have a legitimate claim to the funds).

As set forth in the Amended Complaint, the Relief Defendants provided nothing of value in return for the investor funds they received, and each Relief Defendant was found to be in default on September 29, 2025.  [Dkt. 19 ¶¶ 18, 113 & 115.]  As such, the allegations of the Amended Complaint are deemed admitted.  *Cotton v. Mass. Mut. Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005) (stating that "a defaulted defendant is deemed to admit the plaintiff's well-pleaded allegations of fact").  Absent evidence to the contrary, the Commission has established it is entitled the relief requested against the Relief Defendants.

As recognized in a case cited by the Relief Defendants, "[a] legitimate claim to ill-gotten funds may be established if the relief defendant *can demonstrate* that he provided some services as consideration for the identified funds."  *SEC v. Erwin*, 553 F. Supp. 3d 895, 904 (D. Colo. 2021) (emphasis added).  Notably absent from the

Relief Defendants' brief is any evidence showing that they provided value for the investor funds they received.  Instead, the brief discusses the type of evidence that might establish that a relief defendant had a legitimate claim to the property at issue in this case.  [Dkt No. 47 at 23.]  But the Relief Defendants provided no actual evidence to establish that any of them have a legitimate claim to the funds they received or the properties in which they are currently residing that were purchased with investor funds.  The Relief Defendants also do not challenge the undisputed evidence that the houses were purchased with investor funds.  Notably, none of the experts that Defendants hired to scour their financial records identify a single payment made by any of the Relief Defendants for the homes in which they are residing or a single service that any of the Relief Defendants provided justifying the use of substantial investor funds for their benefit.

Instead, Defendants contend that the Commission has not established the specific tracing of funds required for a constructive trust, citing to *SEC v. French*, No. 1:23-CV-01443-JPN, 2024 WL 6882685, at *3 (N.D. Ga. Apr. 30, 2024). [Dkt. No. 47 at 24.]  Yet, the evidence deemed sufficient in *French* is the exact same type of evidence that the Commission has offered in this case.  In *French*, the Commission presented a declaration from a staff accountant identifying the amount of investor money used to buy the houses found to be subject to a constructive trust.  *See* April 2, 2026 Declaration of Kristin W. Murnahan, attached hereto as Exhibit 2, at ¶ 3 & Ex.

16

A.  In this case, the Commission also submitted a declaration of a staff accountant identifying the amount of investor money used to purchase the homes in which the Relief Defendants currently reside.  [Dkt. No. 29-8.]

Defendants' argument that the Commission has not satisfied the tracing requirement is particularly disingenuous given that counsel for Defendants requested, and the Commission provided, all documents underlying Ms. Cannon's analysis as well as work product created by Ms. Cannon that identified the total amount of investor funds transferred to the homebuilder from each account controlled by Defendants.  Ex. 2 at ¶ 4.  Defendants have failed to present evidence contesting any of those transfers or establishing that any of the Relief Defendants put any of their own money into the homes.[4]  Because the Relief Defendants did not satisfy their burden to establish that they gave value in return for the funds they received or were used for their benefit, the Court should impose the requested disgorgement against the Relief Defendants and order the Relief Defendants to relinquish all rights to the homes titled in their names.  *See, e.g.*, *United States v. Cannistraro*, 694 F. Supp. 62,

---

[4] Even were the Relief Defendants to show that they made improvements to the home with their own money, a constructive trust over the homes is still appropriate. *SEC v. Aragon Capital Management, LLC*, 672 F. Supp. 2d 421, 443 (S.D.N.Y. 2009) *citing S.E.C. v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, 181 (D.D.C. 1998) (when legitimate assets are co-mingled with illegitimate ones such that the assets cannot be separated out, a constructive trust may extend over the entire asset pool).

72 n.11 (D.N.J. 1988), *order aff'd in part, vacated in part*, 871 F.2d 1210 (3d Cir. 1989) (noting that courts generally impose the "[equitable] remedy of constructive trust [over specific property] where, rightfully or wrongfully, a party has obtained property that unjustly enriches him").

>    *D. It is Appropriate to Impose Prejudgment Interest on the Ill-Gotten Gains Enjoyed by the Defendants and Relief Defendants.*

When consenting to the entry of judgment against them, Defendants agreed that prejudgment interest "shall be calculated from January 1, 2023 based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. 6621(a)(2)." Defendants are bound by the terms of that agreement, so their argument that the prejudgment interest calculated by the Commission should be reduced is without merit.

Moreover, even were it appropriate to ignore the clear terms of the judgment to which Defendants agreed, the factors enumerated by Defendants weigh heavily in favor of the imposition of prejudgment interest. [Dkt No. 47 at 26.] First, investors have suffered substantial harm due to Defendants' fraud. There is no risk that the imposition of prejudgment interest will overcompensate investors for their harm. Second, as set forth in the complaint (and accepted as true for purposes of this motion), Defendants acted with a high degree of scienter by engaging in a massive Ponzi scheme and misappropriating millions in investor funds. Defendants' hollow contention that they did not have unfettered access to investor funds during the

18

course of the fraud should be rejected.  Every dime of investor money was sent by investors to accounts that Defendants controlled, and Defendants made the decisions as to how to use that money.

Even were the Court to accept all the arguments Defendants proffer and conclude that the disgorgement amount should be reduced, which the Commission believes it should not, these arguments do not address the more than $18 million in investor funds that Defendants misappropriated.  Moreover, Defendants and Relief Defendants have been living rent free in homes purchased with investor funds for almost two years.  It would be inequitable for Defendants to have reaped the benefits of their fraud for years while investors have suffered enormous losses unrecompensed for years.  *SEC v. Lauer*, 478 F. Appx 550, 557 (11th Cir. 2012) *cert. denied*, 133 S.Ct. 545, 184 L.Ed.2d 341 (U.S. 2012) ("An award of prejudgment interest is not a punitive award but rather is compensatory in nature.").

The Relief Defendants do not dispute that they received the payments identified by the Commission, nor do they dispute the date upon which the last payment was made.  Instead, they simply argue that it is inequitable to use that date for purposes of calculating prejudgment interest because they have not been accused of wrongdoing.  The date of the last payment, however, is an appropriate starting date

19

for calculating prejudgment interest.[5] *See, e.g., SEC v. Knox*, 18-CV-12058-RGS, 2002 WL 1912877, at *6 (D. Mass. June 3, 2022) (finding it appropriate to use the "final date each Relief Defendant received the relevant transfers as the starting date" for calculating prejudgment interest).

The Relief Defendants' purported lack of knowledge of the fraud does not insulate them from paying prejudgment interest on funds to which they have no legitimate claim. *See, e.g., SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996) (stating that the purpose of prejudgment interest is to prevent "what amounts to an interest free loan procured as a result of illegal activity"). The Relief Defendants have enjoyed the benefits of Defendants' fraudulent scheme without providing anything of value in exchange. Moreover, the Relief Defendants have enjoyed the benefit of living rent free in homes purchased with investor funds for almost two years. Given the difficulty of quantifying the value of that benefit, it is appropriate to impose prejudgment interest.

### E. The Requested Civil Penalties Should Be Imposed.

To determine if a penalty should be imposed, the "Commission need only make 'a proper showing' that a violation has occurred, and a penalty is warranted."

---

[5] The Commission's calculation of prejudgment interest ended as of July 25, 2025 even though both the Defendants and Relief Defendants have continued to enjoy the benefit of Defendants' ill-gotten gains to the present day.

*SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008) (finding the Commission made a proper showing that a violation occurred sufficient to warrant a civil penalty imposed by the court as the defendant entered into a consent and stipulated to the facts of the complaint).  The Commission has satisfied this standard.

Defendants speciously argue that the requested penalties are unwarranted due to Defendants' purported lack of scienter, but the complaint is replete with examples of Defendants' knowing misconduct.  [Dkt No. 1 ¶¶ 10-12, 80-83 & 101-16.]  *See, e.g., SEC v. Traffic Monsoon*, LLC, 245 F. Supp. 3d 1275, 1302 (D. Utah 2017) ("[T]he operation of a Ponzi scheme itself is evidence of scienter.").  Defendants also disingenuously state that this case is distinguishable from other cases imposing third-tier civil penalties, but it is not.  Just like the defendants in those cases, the Adam Brothers made multiple false statements of material facts.  In fact, in one of the cases cited by Defendants, *SEC v. Jones*, 2022 WL 17882114, at *2 (N.D. Ga. July 7, 2022), the Court imposed a third-tier penalty because the defendant had misrepresented that "the investors' principal was protected."  [Dkt No. 47 at 32.] Defendants, in this case, told investors that their investment was "locked up" and could not be touched by anyone until the end of the investment term and "that the risk to the investors' principal was virtually non-existent, unless there was a complete global meltdown."  [Dkt No. 1 ¶¶ 7, 73 & 74.]  As recognized by the court in *Jones*, such misrepresentations warrant the imposition of a third-tier penalty.

Moreover, Defendants concede that as of September 9, 2023, they were not "deploying" investor capital into smart contracts, and that as of July 12, 2023, they were not withdrawing any "returns" from the accounts to which they had transferred investor funds.  [Dkt. No. 47-3 at 2-4.]  Undaunted by this knowledge, they continued to raise funds from investors making the same representations that:  1) investor capital was immediately deployed into the lending pool upon receipt by Defendants; 2) fees were being paid in Tether by Gemini and then being sent to Defendants' bank accounts; and 3) Defendants got together monthly to process investors returns.  [Dkt. No. 1 ¶¶ 72-73 & 76-78.]  Defendants also knowingly used new investor money to pay the promised returns to existing investors.  Finally, knowing that they no longer had access to the investor funds they transferred, Defendants, nevertheless, chose to take investor funds over which they had control and use those funds to purchase homes for themselves and their family members as well as vehicles and other luxury goods.  The facts fully support the conclusion that Defendants' conduct involved "fraud, deceit, [and] manipulation" and "directly . . . resulted in substantial losses . . . to other persons" meriting a third-tier penalty.

As set forth in the Commission's opening brief, the requested civil penalties are consistent with the penalties imposed for substantially similar conduct and are far less than the civil penalties that could be imposed had the Commission chosen the "violations" approach as suggested by Defendants.  For example, the Commission

could have requested a third-tier penalty for each investor defrauded under the "violations" approach.  Given the more than 80 investors Defendants defrauded during the course of their scheme, such a penalty would exceed $20 million.

Defendants also cite several cases for the proposition that it is appropriate for the Court to impose smaller civil penalties "where disgorgement and other sanctions already provided substantial deterrence."  [Dkt. No. 47 at 30.]  Because disgorgement and penalties serve different purposes, however, a substantial disgorgement award does not justify a lesser penalty.  *SEC v. Melton*, 2025 WL 2807651, at * 6 (M.D.N.C. Oct. 2, 2025) (disgorgement and penalties serve different purposes, such that large disgorgement award does not warrant reduced penalty).  Indeed, asking the Court not to impose a significant civil penalty because the disgorgement amount is large is contrary to the statutory rubric governing the imposition of civil penalties. The Court should impose a more substantial civil penalty precisely because Defendants' ill-gotten gains are so large.  Defendants' conduct was intentional, egregious, and caused substantial losses.

Moreover, the cases cited do not stand for the proposition that penalties should be reduced when disgorgement is imposed.  In two of the cases cited, no disgorgement was requested or imposed, and in the third case, the total disgorgement imposed with just over $110,000.  Defendants, in a footnote, offer three additional cases to suggest that it is appropriate for a court to reduce a civil penalty from the

23

amount requested by the Commission.  Again, in two of the three cases, no disgorgement was imposed, and in the third case, the Court chose not to impose the statutory penalty because it exceeded the defendant's gross pecuniary gain.  The present case is distinguishable from all the cited cases because it involves a fraud in which Defendants, even by their own calculations, misappropriated more than $18 million from investors.

Defendants further argue that a lower penalty should be imposed because Defendants have "cooperated with the SEC in responding to the SEC's subpoenas."  That statement is demonstrably false.  Defendants produced no documents in response to the subpoenas served on them by the Commission and declined to appear in response to testimony subpoenas served on them.  [Dkt. No. 1 ¶¶ 29 & 33.]  Other than the documents their experts prepared to support Defendants' response to the Commission's motion and the accounting Defendants were ordered to provide by the Court, Defendants have produced no financial records from the relevant time period, nor have they produced any contemporaneous communications to support any of their representations about the third party to which they voluntarily transferred investor funds.  Moreover, "responding to compulsory subpoenas . . . does not constitute 'cooperation' and do[es] not justify reduced sanctions."  *Melton*, 2025 WL 2807651 at * 6.

Finally, Defendants contend that the Court should lower the penalty amount because of Defendants' financial condition, but they have presented no financial information demonstrating their inability to pay. *SEC v. Molen*, 704 F.Supp.3d 1341, 1348 and n. 4 (N.D.GA. 2023) (suggesting conclusory declarations regarding inability to pay are insufficient to preclude or reduce a penalty).

Pursuant to the statutory language, the Court could impose a civil penalty against each Adam Brother in the amount of his "gross pecuniary gain," which greatly exceeds the $3 million penalty sought by the Commission. 17 C.F.R. § 201.1005 and Table V, Adjustment of Civil Monetary Penalties (2025). The requested civil penalties fall within the permissible range of a third-tier penalty and should be imposed.

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court issue a final judgment, in the form attached, against the Defendants and Relief Defendants imposing the requested relief.[6]

Respectfully submitted, this 2nd day of April 2026,

> */s/ Kristin W. Murnahan*
> M. Graham Loomis
> Supervisory Trial Counsel

---

[6] The Commission is submitting a revised judgment that includes provisions directing the entities holding frozen assets to disburse those assets to the Commission.

United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7622
Georgia Bar No. 457868
loomism@sec.gov

Kristin W. Murnahan
Senior Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7655
Georgia Bar No. 759054
murnahank@sec.gov

COUNSEL FOR PLAINTIFF

## <u>CERTIFICATION OF COMPLIANCE</u>

This is to certify that the foregoing was prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 (B).


*/s/ Kristin W. Murnahan*
Kristin W. Murnahan
Senior Trial Counsel

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of this Court using the CM/ECF system which will send notice of such filing to counsel of record.

This 2nd day of April 2026.

/s/ Kristin W. Murnahan
Kristin W. Murnahan