# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TANNER S. ADAM, JONATHAN L. ADAM, TRITEN FINANCIAL GROUP, LLC, and GCZ GLOBAL LLC,<br><br>Defendants, and<br><br>AVA A. ADAM, GARRETT L.W. ADAM, ROBERT S. ADAM, CARRIE L. ADAM, EMILIO F. HINOJOSA, AND VIRGINIA I. HINOJOSA,<br><br>Relief Defendants. | Civil Action File No.<br>1:24-cv-03774-VMC<br><br>JURY DEMAND |

## DECLARATION OF KRYSTA M. CANNON

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.     I am a Senior Accountant in the Enforcement Division of the United States Securities and Exchange Commission (the "Commission"). I have been licensed by the State of Georgia as a CPA since November 2000. I am over eighteen years of age and am competent to make this declaration.

2.    I am the staff accountant who was part of the team assigned to the investigation of possible violations of the securities laws by the Defendants in the above-entitled cause of action, and I submit this declaration in support of the Commission's Motion for Remedies and Default Judgments.

3.    This Declaration is based upon my personal review of the following financial records, including monthly account statements, cancelled checks, deposit records, and wire details for the accounts listed below:

| Account Name | Financial Institution | Account Number | Start Date | End Date |
|---|---|---|---|---|
| GCZ Global, LLC | Wells Fargo | 1975215573 | June 6, 2023 | June 30, 2024 |
| GCZ Global, LLC | Wells Fargo | 8892573372 | February 12, 2024 | June 30, 2024 |
| Jonathan Adam Ava Adam | Wells Fargo | 3865624153 | January 31, 2022 | May 31, 2024 |
| Jonathan Adam Ava Adam | Wells Fargo | 7450691972 | January 3, 2022 | June 12, 2024 |
| Shorestream Limited | Wells Fargo | 7250931925 | April 1, 2024 | June 30, 2024 |
| Tanner Adam | First Carolina Bank | 4004002767 | May 10, 2023 | March 8, 2024 |
| Tanner Adam | JPMC | 219593016 | December 23, 2021 | June 25, 2024 |
| Tanner Adam | JPMC | 514347478 | March 18, 2024 | June 28, 2024 |
| Tanner Adam | JPMC | 514347486 | March 18, 2024 | June 28, 2024 |
| Tetragon FLP, LLC | JPMC | 929116082 | February 23, 2023 | June 28, 2024 |
| Triten Financial Group LLC | Comerica Bank | 1883178368 | January 20, 2023 | March 31, 2023 |
| Triten Financial Group LLC | Comerica Bank | 1883189126 | January 1, 2023 | March 31, 2023 |
| Triten Financial Group LLC | First Carolina Bank | 1004002773 | May 1, 2023 | February 29, 2024 |
| Triten Financial Group LLC | First Carolina Bank | 1004002906 | March 20, 2023 | February 29, 2024 |
| Triten Financial Group LLC | First Carolina Bank | 1004002964 | July 3, 2023 | February 29, 2024 |
| Triten Financial Group LLC | JPMC | 514347767 | March 4, 2024 | June 28, 2024 |
| Triten Financial Group LLC | JPMC | 3376207451 | March 4, 2024 | June 28, 2024 |
| Triten Financial Group LLC | JPMC | 586638689 | February 26, 2024 | June 28, 2024 |
| Triten Financial Group LLC | JPMC | 586700919 | February 26, 2024 | June 28, 2024 |
| Triten Financial Group LLC | JPMC | 936898912 | March 23, 2023 | June 28, 2024 |
| Triten Financial Group LLC | JPMC | C58437002 | June 1, 2024 | June 28, 2024 |

4.    The Commission obtained the financial account information detailed in paragraph 3 above from the listed financial institutions.

2

5.      I have reviewed the Declaration of Justin Sutherland and supporting schedules in order to reconcile the differences between his calculations and mine.

6.      I prepared the calculations reflected in paragraph 88 of the Complaint and paragraph 95 of the Amended Complaint.  Those summaries are identical and are set forth below.

|  | Triten | GCZ | Total |
|---|---|---|---|
| Investor funds raised in business and personal accounts | $    40,707,612 | $    20,852,322 | $    61,559,934 |
| Less: Investor payments and finder fees | (27,634,470) | (6,567,081) | (34,201,551) |
| Less: Net funds sent to crypto market | (5,495,976) | (2,077,917) | (7,573,893) |
| Less: Account balance at 06/30/24 | (173,760) | (162,461) | (336,221) |
|  |  |  |  |
| Net misappropriation for personal use | $    7,403,406 | $    12,044,863 | $    19,448,269 |

7.      I also performed the calculations in my September 30, 2025 Declaration.  I was asked to calculate disgorgement by taking the amount of investor funds raised and deducting from that amount the payments Defendants made to investors.  That summary is set forth below:

|  | Triten | GCZ | Total |
|---|---|---|---|
| Investor funds raised in business and personal accounts | $    40,707,612 | $    20,852,322 | $    61,559,934 |
|  |  |  |  |
| Investor Payments | (24,480,078) | (6,567,081) | (31,047,159) |
|  |  |  |  |
| Net Disgorgement | 16,227,534 | 14,285,241 | 30,512,775 |

8.      In preparing the table for my September 30, 2025 declaration, I made a mistake in calculating the investor deposits and payments from accounts associated with GCZ and Jonathan Adam.  My declaration states that there were $20,852,322 in deposits into GCZ from investors and $6,567,081 in payments from GCZ, resulting in net disgorgement of $14,285,241 from GCZ accounts.

3

9.   When preparing my declaration, I inadvertently transposed deposits and payments that were attributable to investors in Jonathan Adam's personal account.  Specifically, rather than including $997,981 in my calculations of deposits to GCZ from investors, I included $174,587 in my calculation.  And rather than deducting $174,587 as payments from GCZ to investors, I deducted $997,981.  This mistake led to investor deposits to GCZ accounts being understated by $823,394, and investor payments by GCZ being overstated by $823,394.

10.   I identified my mistake when I was reviewing my analysis to provide it to Defendants.  It is my understanding that counsel for the Commission notified Defendants' counsel of this mistake and noted that my mistake benefited Defendants.

11.   Additionally, I did not include a payment that Defendants made to one investor of $140,175 in any of my summaries because it was paid in June 2024 and was not part of the bank's production to the Commission at the time the Commission filed the complaint.

12.   Because I was asked to review my numbers in connection with producing my analysis to Defendants, I made the decision to update my analysis to reflect information we learned after the complaint was filed.  As a result, I included the payment to the investor in the analysis I provided to Defendants, resulting in an

increase of $140,175 in the amount that GCZ paid to investors from the amount I included in my September 30, 2025 declaration.

13.    As a result, my numbers in my September 30, 2025 declaration should be changed as follows:  1) net deposits should be increased by $823,394; and 2) net payments should be decreased by $683,219 (the $823,394 overstatement of payments due to my transposition error minus the $140,175 understatement of payments due to a payment not reflected in the bank records I reviewed).  The result of these changes is that my calculation of Defendants disgorgement increased from $30,512,775 to $32,019,388.

14.    A corrected summary, which was provided to Defendants, is set forth below:

|  | Triten | GCZ | Total |
|---|---|---|---|
| Investor funds raised in business and personal accounts | $    40,707,612 | $    21,675,716 | $    62,383,328 |
|  |  |  |  |
| Investor Payments | (24,480,078) | (5,883,862) | (30,363,940) |
|  |  |  |  |
| Net Disgorgement | $    16,227,534 | $    15,791,854 | $    32,019,388 |

15.    Using the above chart as my starting point, I then reviewed every transaction to determine why my disgorgement calculation differed from the one presented by Defendants.

16.    In making the determination of how to categorize transactions, I used the information I had available to me from the bank records, investigative files, and

my own internet research.  I received no factual support from Defendants to support any of their categorization of transactions.

17.    For accounts controlled by GCZ and Jonathan Adam, I calculated a net loss to investors of $15,791,854 and Defendants report a net loss of $12,607,105, resulting in a variance of $3,184,749.

18.    My explanation of the reason for the variance is set forth below and includes my rational for my decision why I categorized a transaction as I did in my analysis.

19.    In calculating investor deposits and payments, I did not include money received from or paid to the following individuals:  Hiren Patel, Emilio Hinojosa, and Heberto Hinojosa.

20.    Additionally, I did not include in my calculations any money received from or paid to Andrew Lake from the GCZ account.  I did include in my calculations the money received and paid to Andrew Lake from Jonathan Adam's personal account because of the timing and nature of money sent and received.

21.    Finally, I did not include in my calculations $92,000 in payments made to Vanessa Tellez.  I saw no transactions reflecting that Ms. Tellez made any investment into GCZ or Triten.

22.    The net effect of Defendants' decisions to characterize these individuals as investors is to overstate investors payments by $1,310,179 as compared to my calculations.

23.    Hiren Patel sent $250,000 to GCZ and received $990,000 in payments from GCZ.  I excluded both amounts from my calculations due to the timing and large variance between deposits and payments.  Patel received back his full principal, plus a 30% gain, within three months of his initial investment and continued to receive payments totaling an additional $665,000 from GCZ for seven months until April 2024, with no evidence of continued investments.  Defendants have provided no factual evidence to support their expert's decision to identify Mr. Patel as an investor.

24.    During the investigation, the Commission took the testimony of Andrew Lake.  In that testimony, Mr. Lake stated that he was employed by GCZ. While Mr. Lake sent $125,000 to GCZ, he was paid $588,515 via wires from GCZ. Three wires totaling $311,515 in payments made to Mr. Lake had notations of "Compensation," "Payment for services," and "3 months salary."  Because it was not clear from the bank records which payments to or from Andrew Lake and GCZ truly constituted investment money, I elected not to include any of the transactions in my analysis.

7

25.     Emilio Hinojosa sent $30,000 to Jonathan Adam and received $24,664 from GCZ.  I excluded both transactions because of the familial relationship between Mr. Hinojosa and the Defendants. It is also noteworthy that Mr. Hinojosa's purported $30,000 investment was made in March 2023 and deposited into Jonathan Adam's personal account and the $24,664 payment was made directly to Mr. Hinojosa in February 2024 from GCZ's account.  In addition to the extended length of time between deposit and payment compared to other investors and the use of two bank accounts, there was nothing about these transactions to suggest they were investment related.

26.     I included Heberto Hinojosa as an investor in GCZ, with an investment of $28,000 and returns in the amount of $180,000; however, he also wrote a check to Jonathan Adam in the amount of $5,750 which was deposited in Jonathan Adam's personal account, and Mr. Hinojosa received a payment from Jonathan Adam's personal account in the amount of $20,000.  Defendants did not include the $5,750 deposit but classified the $20,000 payment to be a return on investment.  I excluded both the payment to Jonathan Adam and the payment from Jonathan Adam to Mr. Hinojosa due to the familial relationship.  I also excluded both payments because they were sent to and from Jonathan Adam's personal account whereas the other payments were made into the GCZ account and one of the payments from GCZ included a memo "Draw 02/26/24."

8

27.    Defendants deducted $249,108 as investor payments claiming that the amount should be categorized as investor payments to Emilio Hinojosa.  The payments they have deducted are not payments to Mr. Hinojosa, but rather payments made to Heritage Residential Solutions for the construction of Mr. Hinojosa's home.

28.    Defendants also deducted $90,000 as an investor payment to Heberto Hinojosa, but the $90,000 payment is a check written to and endorsed by Heritage Residential Solutions and the memo line states "Emilio Hinojosa."

29.    I did not deduct $339,108 from investor payments due to the amounts being written to and endorsed by a third party for home construction.

30.    Defendants deducted three cash withdrawals totaling $322,731 claiming, without support, that they were investor payments to Violet Financial. On July 3, 2023, GCZ transferred $192,731 to Jonathan Adam's personal account and included a notation in the transfer of "Violet Financial."  Since the deposit into Jonathan Adam's personal account referenced Violet Financial, I included that as an investor deposit, without linking it to the transfer from GCZ.  Defendants have noted in their analysis that Violet Financial actually made a deposit via cryptocurrency of $192,731 which they claim Jonathan Adam then withdrew as cash and paid that cash to Violet Financial.  Accepting Defendants' representation that Violet Financial made a deposit that was immediately withdrawn and returned

9

to Violet Financial, there should be no impact on investor deposits or payments. I included the $192,731 as a deposit but did not include the cash withdrawal as a payment. Based on Defendants' representation, I believe it is appropriate to deduct the $192,731 from my calculation of investor deposits.

31.    Removing the $192,731 deposit from my calculation results in a net decrease in my disgorgement calculation of $192,731. Because Defendants' description of these two transactions reflect that Jonathan Adam's account was simply used as a passthrough, Defendants should not have included the payment in their disgorgement calculation, resulting in a net increase in Defendant's disgorgement calculation of the same amount.

32.    I have no basis from the records to conclude that three additional cash withdrawals in July and October 2023 totaling $130,000 from GCZ's account were investor payments to Violet Financial, so I have not deducted those amounts in my calculations.

33.    Defendants deducted $950,000 as investor payments claiming that payments made to two entities, Grizzly Manufacturing and National Financial Services, were payments made to investor Bliss Creek. There is no evidence that these entities are related to Bliss Creek. Moreover, during the investigation, we sought and obtained information from Bliss Creek reflecting their investments in

GCZ and payments from GCZ.  These payments are not reflected in Bliss Creek's production, so I did not include them in my calculations.

34.     The net effect of Defendants' decisions to characterize the $130,000 cash withdrawal and the $950,000 in payments to unknown third parties as investor payments is an overstatement of investor payments of $1,080,000 as compared to my calculations.

35.     Defendants included a check written to Jose Delgado in the amount of $5,000 as an investor payment in their calculations.  I included wire transfers in and out for an individual identified as Joe G. Delgado in my calculations of investor deposit and payments, but I did not include the $5,000 check written to a different name in my calculations.

36.     Defendants included in their calculations a payment of $10,000 to joint investors Joshua Sklut and Stephanie Berry.  I did not include that $10,000 as an investor payment in my calculations because the payment occurred after the end date of the financial records we had analyzed at the time we filed the complaint.

37.     Finally, I included a wire return of $25,000 as an investor deposit.

38.     If the three transactions identified in paragraphs 35-37 are included in my calculations, my net disgorgement calculation would be reduced by $40,000.

39.     In addition to the transactions above, there is an additional variance between my calculations and Defendants' expert that is a result of an error made

11

by Defendants' expert. In Table 1 in paragraph 15 of his declaration, Defendants' expert summarizes his calculation of GCZ payments to investors as $9,255,880. The supporting spreadsheet underlying his analysis, however, shows that the total payments from GCZ are $9,225,880, resulting in an additional $30,000 reduction in Defendants' net disgorgement.

40.     The table below shows the reconciling items as described in paragraphs 19 through 39:

|  | Deposits | Payments | |
|---|---|---|---|
|  | GCZ | GCZ | GCZ Net |
| SEC Summary provided to Defendants | $21,675,716 | $ 5,883,862 | $15,791,854 |
| AP Summary | 21,862,985 | 9,255,880 | 12,607,105 |
| Variance | $   (187,269) | $ (3,372,018) | $  3,184,749 |
|  |  |  |  |
| **Explanation of Variance** |  |  |  |
| **SEC Summary** | **$21,675,716** | **$ 5,883,862** | **$15,791,854** |
| Individuals not deemed investors by SEC: |  |  |  |
|   Hiren Patel | 250,000 | 990,000 | (740,000) |
|   Emilio Hinojosa | 30,000 | 24,664 | 5,336 |
|   Heberto Hinojosa - Jonathan Adam Account | - | 20,000 | (20,000) |
|   Andrew Lake - GCZ Account | 125,000 | 588,515 | (463,515) |
|   Vanessa Tellez |  | 92,000 | (92,000) |
| Payments made to Heritage Residential for home construction that were attributed to Emilio Hinojosa and Heberto Hinojosa | - | 339,108 | (339,108) |
| Cash withdrawals being attributed to Violet Financial | - | 322,731 | (322,731) |
| Transfer within accounts SEC attributed as a deposit | (192,731) | - | (192,731) |
| Payments made to Grizzly Manufacturing and National Financial Services | - | 950,000 | (950,000) |
| Payment to Jose Delgado attributed to Joe Delgado | - | 5,000 | (5,000) |
| Payment to Joshua Sklut and Stephanie Berry | - | 10,000 | (10,000) |
| Wire return included as investor deposit | (25,000) | - | (25,000) |
| Data Entry error in AP Summary table | - | 30,000 | (30,000) |
| **Total Reconciling Items** | **187,269** | **3,372,018** | **(3,184,749)** |
|  |  |  |  |
| **Reconciliation to AP Summary** | **$21,862,985** | **$ 9,255,880** | **$12,607,105** |

41.    For accounts controlled by Triten and Tanner Adam, I calculated a net loss to investors of $16,227,534 and Defendants report a net loss of $12,942,306, resulting in a variance of $3,285,228.

42.    During the litigation, Defendants provided the Commission with an accounting of their use of investor funds. Included in the accounting was a list of payments that Defendants identified as finders fees.

13

43.     Some of the finders identified by Defendants also paid money to Defendants.  I calculated finders' fees by reducing the amounts Defendants paid to finders by the amount that the finders had invested with Defendants.  If a finder did not fully recoup his investment, I did not include any payments made to that individual as a finders fee.  Using this methodology, I calculated the total amount of finders fees to be $3,154,392.

44.     In my calculation of investor loss, I did not deduct the $3,154,392 Defendants paid as finders fees and Defendants did.  This also accounts for the variance in the SEC Summary and my Declaration referred to by the Defendants' expert and is presented below for clarification:

| | Deposits | Payments | |
|---|---|---|---|
| | Triten | Triten | Triten Net |
| SEC Summary provided to Defendants | $40,707,612 | $27,634,470 | $ 13,073,142 |
| Payments made by Triten bank accounts attributable to Finders Fees | - | (3,154,392) | 3,154,392 |
| Cannon Declaration | $40,707,612 | $24,480,078 | $ 16,227,534 |

45.     In my calculation of finders fees, I included $1,073,270 as finders fees paid to Carl Mehlman.  I did not see any investment by Mr. Mehlman.

46.     Defendants claim $1,281,170 in payments to Mr. Mehlman, including $75,000 in payments to Aquabella Organic Solutions LLC from Jonathan Adam, GCZ, and Triten as payments to Mr. Mehlman as well as additional payments totaling $132,900 to Mr. Mehlman from GCZ, Jonathan Adam, and Tanner Adam. If these payments are correctly attributable to Mr. Mehlman, they would not only

14

increase the amount of investor payments by $207,900, but also the amount of finders fees to be deducted by $207,900, resulting in a net neutral change to the overall variance, subject to potential investment as follows.

47.   Defendants also claim a deposit of $243,500 as coming from Mr. Mehlman.  My review of the bank records identified the $243,500 payment as being made by LTG Enterprises, LLC.  I researched LTG Enterprises, LLC and found no link to Mr. Mehlman.  I did include this as a deposit in my analysis but did not include this as an investment by Mr. Mehlman when performing my calculation of finders fees.  If this deposit is correctly attributable to Mr. Mehlman it would reduce my calculation of finders fees by $243,500, and when taken into account with the paragraph above, using our methodology of allowing recoupment of principal before finder fees, would have a net impact of reducing finders fees by $35,600.

48.   Defendants identified Peter and Kelly Strople and Rhianna Reed as finders.  We did not include payments to them as investor payments when we initially prepared our analysis as we were unaware of the relationship.  In the litigation when Defendants identified them as finders, we included their payments in our total finders fees but had not added them to investor payments.  Adding them to my analysis would increase investor payments by $47,788, but would not impact finders fees.

15

49.     Defendants also identified additional payments to three finders that were not included in the Commission's finders fees analysis.  If I added these transactions to my analysis, it would increase investor payments by $11,523 but also increase the amount of finders fees to be deducted by $11,523, resulting in no change to my net disgorgement calculation.

50.     Defendants included $11,810 in payments from Tanner Adam's account to finder Joe Malone, which we had not included in our listing of investor payments.  Because Mr. Malone did not receive anywhere close to his full principal back, I would not have included this additional amount in my calculation of finders fees but would add to total investor payments.

51.     Defendants included a payment of $48,093 made in May 2024 with a wire memo "To Chico" as a payment made to Remigio Ramos.  Mr. Ramos invested $60,000 via wire transfer and received $870,178 in payments from Triten via accounts identified by his name.  I have no basis to conclude that this payment constitutes an investor payment, so I did not include it in my analysis.

52.     Defendants included deposits for Allison Goodwin ($118,388), Aidan Herman ($1,000), and Davis Jaspers ($35,000) which I was unable to verify as investor deposits at the time of my analysis.  I understand that since the complaint was filed, counsel for the Commission has spoken directly with Ms. Goodwin and confirmed that she invested a total of $200,000.  If I accept that all three

16

transactions are investor deposits, it would increase my calculation of total deposits by $154,388 and would explain the full variance between the Commission's and Defendants' calculated deposit amounts.

53.    Finally, I included $41,890 in investor payments that were made through Triten's third-party payment processor, Zuntafi, in my analysis. Defendants did not.

54.    The table below shows the reconciling items as described in paragraphs 46 through 53.  The largest portion of the variance, as described in paragraph 44 relates to finders fees, leaving a net variance of $130,836 and is comprised of the following:

| | Deposits | Payments | Triten Finders included within Payments | Finders Fees SEC Calculated | Triten Net Excluding Finders Fees |
|---|---|---|---|---|---|
| | Triten | Triten | | | |
| SEC Summary provided to Defendants | $40,707,612 | $27,634,470 | $ 13,073,142 | $ 3,154,392 | $16,227,534 |
| AP Summary | 40,862,000 | 27,919,694 | 12,942,306 | 3,154,392 | 16,096,698 |
| Variance | $ (154,388) | $ (285,224) | $ 130,836 | | $ 130,836 |
| | | | | | |
| **Explanation of Variance** | | | | | |
| **SEC Summary** | **$40,707,612** | **$27,634,470** | **$ 13,073,142** | **$ 3,154,392** | **$16,227,534** |
| Payments to Carl Mehlman | - | 132,900 | (132,900) | 132,900 | (132,900) |
| Payment to Aquabella Organic Solutions LLC | - | 75,000 | (75,000) | 75,000 | (75,000) |
| Deposit from LTG Enterprises LLC | - | - | - | (243,500) | - |
| Finders Peter and Kelly Strople and Rhianna Reed | - | 47,788 | (47,788) | - | (47,788) |
| Additional fees for established finders, paid from non-Triten accounts | - | 11,523 | (11,523) | 11,523 | (11,523) |
| Payments to investor and finder Joe Malone from Tanner Adam | - | 11,810 | (11,810) | - | (11,810) |
| Wire transfer "To Chico" attributed to Remigio Ramos | - | 48,093 | (48,093) | - | (48,093) |
| Additional deposits for Allison Goodwin, Aidan Herman, and Davis Jaspers | 154,388 | - | 154,388 | - | 154,388 |
| Additional payments made to investors via Zuntafi | - | (41,890) | 41,890 | - | 41,890 |
| | | | | | |
| **Total Reconciling Items** | **154,388** | **285,224** | **(130,836)** | **(24,077)** | **(130,836)** |
| **Reconciliation to AP Summary** | **$40,862,000** | **$27,919,694** | **$ 12,942,306** | **$ 3,130,315** | **$16,096,698** |
| **Adjustment for finders fees** | | | | | **(24,077)** |
| **Revised reconciling amount adjusted for finders fees** | | | | | **$16,072,621** |

55.     If I were to revise my calculations based on the transactions in paragraphs 30, 35-37, 48-50, and 52, my calculation of disgorgement would be a net reduction of $232,731 in GCZ's disgorgement from $15,791,854 to $15,559,123 and a net increase in Triten's disgorgement of $94,790 from $16,227,534 to $16,322,324 and an $11,523 increase in finders fees from $3,154,392 to $3,165,915.  In total, disgorgement would decrease $137,941 from $32,019,388 to $31,881,447.

18

56. Revised disgorgement calculations, with adjusting items are shown below:

| | GCZ Net | Triten Net | Additional Finders Fees | Total Disgorgement |
|---|---|---|---|---|
| SEC Summary provided to Defendants | $ 15,791,854 | $ 16,227,534 | $ - | $ 32,019,388 |
| Transfer within accounts SEC attributed as a deposit | (192,731) | | | |
| Payment to Jose Delgado attributed to Joe Delgado | (5,000) | | | |
| Payment to Joshua Sklut and Stephanie Berry | (10,000) | | | |
| Wire return included as investor deposit | (25,000) | | | |
| Finders Peter and Kelly Strople and Rhianna Reed | - | (47,788) | - | - |
| Additional fees for established finders, paid from non-Triten accounts | - | (11,523) | 11,523 | |
| Payments to Joe Malone from Tanner Adam | - | (11,810) | - | - |
| Additional deposits for Allison Goodwin, Aidan Herman, and Davis Jaspers | - | 154,388 | - | - |
| Total Adjusted Items | (232,731) | 83,267 | 11,523 | (137,941) |
| | | | | |
| Revised SEC Amount | $ 15,559,123 | $ 16,310,801 | $ 11,523 | $ 31,881,447 |

57. The revised disgorgement amount of $31,881,447 is $1,368,672 higher than the Commission's requested disgorgement amount of $30,512,775.

58. Based on my review of the financial records, I can state that Defendants engaged in substantial commingling of assets.

59. For example, Triten paid virtually all finders fees for both GCZ and Triten, with Defendant's expert showing $123,200 of finder fees paid from GCZ and Jonathan Adam, while over $3 million are paid from Triten and Tanner Adam.

19

60.     Defendants' own analysis shows that a $50,000 payment on February 26, 2024 was made to Heberto Hinojosa from Jonathan Adam's personal account when it was actually made from GCZ accounts.

61.     On March 29, 2024, GCZ transferred $1,500,000 to Triten to allow Triten to send $3,502,452.39 to Zuntafi to in order to make Ponzi payments to investors.  Triten would not have had sufficient funds to make this transfer to Zuntafi to facilitate investor payments without receiving funds from GCZ.

62.     On July 21, 2023, Triten transferred $764,000 to GCZ so that GCZ could make a payment on behalf of a third party to a title company.

63.     On December 15, 2023, at a time when GCZ's bank account had less than $2,000 in total, Triten transferred $50,000 to GCZ, which was then sent to Jonathan's personal account.

64.     On January 29, 2024, when GCZ reflected a total balance of less than $6,000, Triten transferred $200,000 to GCZ, $150,000 of which was sent to Jonathan's personal account.

65.     Additionally, both Triten and GCZ contributed funds for the construction and purchase of homes for family members.  Triten paid $300,000 and $114,269 and GCZ paid $112,000 and $173,189 towards the homes of brother Garrett Adam and parents Robert and Carrie Adam, respectively.  Jonathan Adam also paid $38,324 from his account towards the purchase of his parents' home.

66.    In June of 2023, Triten sent $85,254 to Jonathan Adam's account which was then withdrawn in the form of a cashier's check and used to purchase a vehicle for brother Garrett Adam.

67.    In addition to the home and vehicle, funds were also sent to Garrett Adam from Jonathan Adam, Triten, and GCZ in the amounts of $23,434, $123,389, and $20,000, respectively.

68.    I was also asked to review Defendants' spreadsheet of purported business expenses.  I have sorted those transactions into the four categories identified by Defendants and created a summary reflecting the expenses that fall within each category.  A copy of that summary is attached as Exhibit A.

69.    During the investigation, we were notified that the law firm of Dechert had been hired to represent Tanner Adam and Triten in the investigation. After receiving this notification, we had no further contact with Dechert.

Dated:  April 2, 2026

*Krysta M. Cannon*
Krysta M. Cannon

# EXHIBIT A

| Schedule of Claimed Business Expenses | | |
|---|---|---|
| Exhibit A | | |
| | | |
| | | |
| **Expenses within Category** | | **Amount** |
| Legal, Compliance and Consulting | | |
| Dechert Law Firm - Defense | (100,000) | |
| Gray Reed McGraw - pre SEC Matter | (16,677) | |
| Health Insurance | (56,979) | |
| Michael Singleton - Unknown | (6,400) | |
| Mohiuddin Ahmed - Unknown | (96,250) | |
| Neovision FT Solutions LLC - Unknown | (50,000) | |
| Rent Payment - APF Tripalink Properties | (3,770) | |
| Rent Payment - JS Property Management | (14,947) | |
| Samahoma Media - Unknown | (20,000) | |
| Sarah Unverforth - IT Ops Consulting | (261,000) | |
| Simon Campbell - Unknown | (28,000) | |
| Swyft Filings | (2,223) | |
| Tom Rizol - Unknown | (15,000) | |
| Wyatt Parsons - Unknown | (9,760) | |
| | | (681,006) |
| Bank-Related Fees | | |
| Fees | (20,527) | |
| Zuntafi fees | (35,906) | |
| | | (56,433) |
| Software & Technology | | |
| Cloudron - Web Apps | (7,100) | |
| Digital Ocean - AI Cloud etc | (11,910) | |
| Google | (5,898) | |
| Iron Wifi | (2,153) | |
| Knack - AI App Builder | (12,005) | |
| Marketing Consultant | (3,000) | |
| Microsoft | (6,433) | |
| Vultr | (60,823) | |
| | | (109,323) |
| Administration & Office | | |
| Best Buy | (5,925) | |
| Car Financing | (9,519) | |
| Phone Bill - AT&T Jonathan Adam | (1,542) | |
| Phone Bill - AT&T Triten | (584) | |
| Phone Bill - T-Mobile Jonathan Adam | (4,340) | |
| Phone Bill - T-Mobile Tanner Adam | (74) | |
| Phone Bill - T-Mobile Triten | (549) | |
| Restaurant - Miami, FL | (11,893) | |
| Travel - Airport Expense | (58) | |
| Travel - American Airlines | (3,115) | |
| Travel - Expedia | (2,449) | |
| | | (40,048) |
| | | |
| **Total** | | **(886,809)** |