**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>TANNER S. ADAM, *et al.*,<br><br>Defendants, and<br><br>AVA A. ADAM, *et al.*,<br><br>Relief Defendants. | Civil Action No. 1:24-cv-03774-VMC |

**DEFENDANTS AND RELIEF DEFENDANTS' MOTION FOR**
**THE ISSUANCE OF LETTERS ROGATORY AND**
**MEMORANDUM OF LAW IN SUPPORT**

In response to this Court's April 27 Order directing the Defendants and Relief Defendants (collectively, the "Responding Parties") to re-file their Motions for Letters Rogatory, the Responding Parties respectfully file this Motion and Memorandum of Law in Support ("Motion") seeking an Order from this Court for the Issuance of Letters Rogatory and issue the Requests for International Judicial Assistance (the "Letters Rogatory") to the appropriate authority having jurisdiction

of civil causes in and for the countries of the Republic of Panama and the United Arab Emirates[1] attached hereto as **Exhibits A–D**, and state as follows:

## I.    INTRODUCTION

The Securities and Exchange Commission ("SEC") seeks multi-million-dollar remedies based in substantial part on assumptions about the ownership, control, and ultimate disposition of cryptocurrency and fiat assets routed through wallets associated with Grupo Gemini International Capital, S.A. ("GGP").    The Responding Parties contend that, rather than personally retaining those funds, they were themselves victimized when GGP and its processors absconded with assets held on the CoinPayments, Inc. ("CoinPayments") and Binance-branded platforms. The account, identity, access, and transaction records maintained by CoinPayments and Binance are, therefore, central to determining whether—and to what extent— any assets at issue can properly be attributed to the Responding Parties as "net profits" subject to disgorgement or traced into Relief Defendants' property.

This Motion seeks narrowly-tailored Letters Rogatory directed to those foreign custodians.  The requests are limited to specific, identified wallet addresses and related user accounts and seek only discrete ownership, "Know Your

---

[1] Neither the Republic of Panama, the United Arab Emirates, nor the Abu Dhabi Global Market are signatories to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.  Thus, this motion seeks Letters Rogatory to be used through official diplomatic channels.

Customer," and transaction data necessary to supplement the incomplete blockchain picture presently before the Court. As the record reflects, the Responding Parties already have pursued faster and less burdensome avenues: they voluntarily disclosed the GGP-controlled wallets to the SEC and asked the SEC to obtain information from Binance; they then served and re-served Rule 45 subpoenas on Binance.US and CoinPayments—only to learn that the relevant records are held abroad by separate, foreign entities. Having exhausted domestic and cooperative mechanisms, the Letters Rogatory are now the only realistic means of securing this critical evidence.

In its April 27, 2026 Order, the Court denied prior motions without prejudice and directed the Responding Parties to address, among other things: (1) the materiality of the requested records, (2) their diligence, (3) the risk of unreasonable delay, and (4) the comity and reciprocity considerations implicated by letters rogatory. This Motion squarely responds to those concerns. The Responding Parties show that the requested discovery is highly material to the pending Remedies Motion (and requested hearing related thereto), that they have acted diligently and in good faith, that any incremental delay is reasonable and manageable by the Court, and that the comity factors favor issuance of the letters. Far from being a tactic to stall the case, the requested letters rogatory are a necessary and proportionate step to ensure that any remedies the Court ultimately imposes rest on accurate, verifiable transaction data, rather than the SEC's offered inferences or speculation.

## II.    FACTUAL BACKGROUND AND PROCEDURAL POSTURE

### A.    The Case Commences and the Responding Parties advise the SEC of wallets held by GGP.

This case commenced and the Defendants entered into the Consent Judgment on August 26, 2024 and August 27, 2024. ECF 1–12. Despite entering into the Consent Judgment, Defendants were unaware of the amount in remedies (disgorgement, interest, and civil penalties) that the SEC would pursue because the Responding Parties' counsel and the SEC were in negotiations as to the appropriate remedy amount. Throughout this period, counsel for the Responding Parties advised SEC counsel of GGP's activity and relevant information. *See, e.g.*, ECF 58 ("Hearing Reply") at 12 (describing discussions between Defendants' counsel and the SEC). As reflected in communications with the SEC, the Responding Parties' counsel informed SEC staff that the cryptocurrency platform GGP maintained and controlled specific "payout" wallets that received investor funds and from which GGP paid a contractual daily return in Tether (USDT), and that Defendants "do not, and never had, control over these wallets." In a September 12, 2024 email to SEC Senior Trial Counsel, Kristin W. Murnahan, the Responding Parties' Counsel, Robert Rhatigan, identified two such GGP-controlled wallet addresses and explained that these wallets were "the payout wallets from which GGP paid the daily rate until the Defendants started the compound in late August 2023." A true and correct copy of that email thread is attached hereto as **Exhibit E** (Sept. 12, 2024

- 4 -

Rhatigan Email to Murnahan) at 2–3.  Mr. Rhatigan further stated that, based on those operations, "the defendants believed they accumulated a ledger balance at GGP of approximately $90 million, to be paid in Tether, which is the value that is owed to them by GGP." *Id*.  In a subsequent July 22, 2025 email to Ms. Murnahan, Mr. Rhatigan advised that one of these same GGP-controlled wallets "transferred the remaining $47,922 USDT a few months ago to the same Binance wallet that most of the other USDT was emptied into," and requested that the SEC seek information from Binance regarding the owner of that account.  A true and correct copy of that email thread is attached hereto as **Exhibit F** (July 22, 2025 Rhatigan Email to Murnahan) at 2.  The SEC never followed through on Mr. Rhatigan's request to obtain that information from Binance.

Following these conversations (and others), eight months after filing its initial Complaint, the SEC filed an Amended Complaint naming for the first time the Relief Defendants.  ECF 19 ("Am. Compl.").  Still again, the Responding Parties were without knowledge of the scope of remedies the SEC would pursue.  Nearly six months later, on October 1, 2025, the SEC filed its Motion for Remedies and Default Judgment (the "Remedies Motion") against the Responding Parties.  ECF 29.

On the same day the SEC filed its Remedies Motion, the Court entered an Administrative Stay Order due to a lapse in appropriations.  ECF 30.  Despite the stay, it entered final judgment on October 15, 2025.  ECF 31.  The Responding

Parties moved for relief from that judgment on October 20, 2025, which the Court granted on January 14, 2026, directing the parties to meet and confer on a form of final judgment and, absent agreement, requiring Relief Defendants to respond to the Remedies Motion by February 13, 2026.  ECF 34, 41.  On February 9, 2026, the Responding Parties obtained a 30-day extension of that deadline through March 16, 2026.  ECF 42–43.  On March 16, the Responding Parties filed their Opposition to the Remedies Motion and moved for a hearing on the Remedies Motion.

**B.**     **Prior Attempts at Obtaining the Requested Documents.**

Also on March 16, 2026, the Responding Parties issued two notices of subpoena: one to BAM Trading Services Inc. d/b/a Binance.US ("Binance.US") at its registered agent for service of process in California (ECF 48 at 3) and one to CoinPayments, Inc. d/b/a Centauri Pay LLC at an address in New Jersey (ECF 49 at 3).  For both entities, service attempts through subpoenas have been unsuccessful.

As to CoinPayments, the Responding Parties attempted service on March 17 but, on March 20, received notice that the New Jersey address publicly listed on CoinPayments' website was unsuccessful because CoinPayments was "unknown" at that address.  A true and accurate copy of the notice of attempt is attached hereto as **Exhibit G**.  After later discovering that CoinPayments' agent for service of process is located in Panama, the Responding Parties promptly filed their initial Request for International Judicial Assistance (Letters Rogatory) on March 31.  ECF 55.

As to Binance.US, the Responding Parties attempted service of the subpoena on March 17 on an address that initial diligence disclosed as being correct. A true and accurate copy of the Affidavit of Service on Binance.US is attached hereto as **Exhibit H**. On March 19, the Responding Parties received a Notice of Rejected Service of Process from CT Corporation indicating that it was not the registered agent for service of process for Binance.US. A true and accurate copy of the Notice of Rejected Service of Process is attached hereto as **Exhibit I**. After confirming the correct agent for service of process with the California Secretary of State's Office, the Responding Parties again filed a notice of subpoena with the Court on March 25 (ECF 51), and on March 30, served the subpoena upon Binance.US's correct registered agent. A true and accurate copy of the Affidavit of Service is attached hereto as **Exhibit J**. On March 31, counsel for Binance.US informed counsel for the Responding Parties that, after a review of its records did not identify any responsive records to the subpoena and had no information pertaining to the wallet addresses referenced therein, the Responding Parties should contact the legal department for Binance.com (a separate legal entity) to inquire about the wallets at issue. A true and accurate copy of the correspondence from Binance.US's counsel is attached hereto as **Exhibit K**. After numerous attempts at obtaining information from the email address provided, the Responding Parties discovered that Binance.com was, in fact, three separate entities (Nest Clearing and Custody

Limited, Nest Exchange Limited, and Nest Trading Limited) (collectively, "Binance") organized under the Abu Dhabi Global Market.  Upon discovery, the Responding Parties promptly filed three additional requests for international judicial assistance seeking documents from those entities on April 23.  ECF 59–61.

On April 27, the Court issued an Order denying the Responding Parties' prior attempts at seeking the Letters Rogatory.  The Responding Parties now file this motion seeking an Order from the Court to authorize the issuance of those Letters.

## III.    LEGAL STANDARD

In the Eleventh Circuit, the decision to issue letters rogatory lies within the sound discretion of the district court, and the standard for granting such a motion is generally permissive.  *See Benzion v. Vivint, Inc.*, No. 12-CV-61826, 2013 WL 12304563, at *6 (S.D. Fla. Sept. 20, 2013) ("[L]etters rogatory are generally freely granted by district courts in the United States.") (internal citation omitted).  This is because district courts "have both statutory and inherent authority to issue letters rogatory and the decision to issue letters rogatory lies within a court's sound discretion."  *Onemata Corp. v. Rahman*, No. 20-CV-62002, 2026 WL 500658, at *7 (S.D. Fla. Jan. 23, 2026), *report and recommendation approved*, No. 0:20-CV-62002-WPD, 2026 WL 497804 (S.D. Fla. Feb. 23, 2026) (citing *Hall v. Ins. Corp. of Brit. Columbia*, No. 20-CV-1992, 2022 WL 17581588, at *1 (M.D. Fla. Dec. 12, 2022)) (internal quotation marks omitted).  As such, "[c]ourts routinely issue letters

rogatory 'where the movant makes a reasonable showing that the evidence sought may be material or may lead to the discovery of material evidence.'" *Id. See also Netherby Ltd. v. Jones Apparel Grp., Inc.*, No. 04 CIV. 7028 (GEL), 2005 WL 1214345, at *1 (S.D.N.Y. May 18, 2005) (same).

Given this permissive nature, the burden for whether letters rogatory should be denied is with the party opposing the letters' issuance. That party "must show good reason for a court to deny the application." *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 218CV01479, 2019 WL 4687016, at *6 n.5 (N.D. Ala. June 6, 2019). "Whether such a showing has been made, and whether and in what form a letter rogatory should issue, comprise factual determinations turning upon the circumstances of the particular case." *Id*. (internal citations omitted).

## IV.    ARGUMENT

### A.    The Documents Requested Are Material to the Case.

The Court's April 27, 2026 Order noted that the prior Motions for Letters Rogatory failed to "explain how the requested documents and information are material and necessary for a potential evidentiary hearing regarding Plaintiff's Motion for Remedies and Default Judgment [(the "Remedies Motion")]." ECF 62 at 2. In furtherance of the Court's inquiry, the Responding Parties now respectfully submit that the materials sought are both material and necessary to this Court's

resolution of the SEC's Remedies Motion including at a hearing, should the Court grant the Responding Parties' motion for hearing.

In considering whether to issue letters rogatory, Courts routinely apply "the liberal discovery principles contained in Rule 26(b)." *DHA Corp. v. BRC Operating Co.*, No. 1:13-CV-3186, 2015 WL 13388248, at *1 (N.D. Ga. May 6, 2015); *see also Lantheus Medical Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 776 (S.D.N.Y. 2012) (collecting cases); *Asis Internet Servs. v. Optin Glob., Inc.*, No. C-05-05124, 2007 WL 1880369, at *3 (N.D. Cal. June 29, 2007); *DBMS Consultants Ltd. v. Comput. Assocs. Int'l, Inc.*, 131 F.R.D. 367, 369–70 (D. Mass. 1990) (holding request for letter rogatory was consistent with liberal discovery provisions of Rule 26). As such, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." *Sec. & Exch. Comm'n v. Leslie*, No. C 07-03444, 2009 WL 688836, at *3 (N.D. Cal. Mar. 16, 2009) (internal citation and quotation marks omitted). In this context, courts consider whether "the movant makes a reasonable showing that the evidence sought may be material or lead to the discovery of material evidence[.]" *Roche Diagnostics Corp.*, 2019 WL 4687016, at *4 (internal citation and quotation marks omitted).

As a threshold matter, the Consent Judgments entered in this action specifically authorize the parties to take "discovery from appropriate non-parties" in connection with the SEC's Remedies Motion. *See, e.g.*, ECF 9 (Consent J. as to J.

Adam) at 6.  The documents sought from CoinPayments and Binance fall squarely within that authorization.  Moreover, the documents sought directly bear on the core issues of the SEC's Complaint and Remedies Motion for several reasons.

*First*, GGP-related discovery is central to the proper measure of "net profits" under *Liu*.  The SEC's disgorgement theory effectively equates net investor (lender) losses with Defendants' "net profits," while entirely disregarding substantial assets held (or once held) by the ultimate bad actor, GGP.  *See* ECF 47 (Defs.' Opp'n to Pl.'s Mot. for Remedies and Default J. ("Remedies Opp.")) at 20–21.  In response, the Responding Parties' experts have shown that between December 23, 2020 through September 10, 2024, approximately $10 million in cryptocurrency was transferred from Triten Financial Group-controlled accounts to GGP, with only about $2.05 million returned, leaving roughly a $7.9 million shortfall.  *See* Remedies Opp. at 15; ECF 47-4 (White Decl., dated Mar. 16, 2026, at ¶ 12; Ex. D).  These figures go directly to whether those stranded amounts are Defendants' "net profits" (the only proper object of disgorgement under *Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 81–84 (2020)) or, instead, losses to a third-party counterparty.  The subpoenaed records from the CoinPayments and Binance exchanges (including transaction histories, balances, and onward transfers) will confirm how much went to GGP, how much was returned, and what was retained or diverted by others.  That information plainly "bears on" the central question of Defendants' alleged net profits and is,

therefore, discoverable under Rule 26.  *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978).

*Second*, the discovery is necessary to appropriately classify transactions and legitimate expenses.  As demonstrated in the briefing related to the SEC's Remedies Motion, the parties sharply dispute whether transfers involving GGP represent legitimate business activity and expenses (*e.g.*, liquidity provisioning, platform fees, technology costs) or ill-gotten gains and circular flows.  For their part, the Responding Parties have adduced evidence that GGP operated as a functioning platform routing funds through CoinPayments and Binance.  *See* Remedies Opp. at 13–14, 16 (citing Sutherland Decl., dated Mar. 16, 2026, at ¶ 16 (demonstrating fiat activity from Defendants to lenders); Strenski Decl., dated Mar. 16, 2026, at ¶ 15 & Ex. 1 (describing GGP-related blockchain analysis, including on Binance Smart Chain)).  The requested records are needed to investigate and confirm whether particular flows match legitimate trading activity, reflect fees or other ordinary-course costs, or, instead, support the SEC's allegations of misappropriation.  Because these characterizations directly affect what "legitimate expenses" may be deducted from gross receipts in calculating net profits, the requested records are squarely relevant and would unquestionably be helpful to the Court in determining the Remedies Motion.  *Liu*, 591 U.S. at 91–92 ("[C]ourts must deduct legitimate expenses before ordering disgorgement").

*Third*, the sought-after discovery bears on scienter and the appropriate tier of civil penalties, if any. The SEC nonchalantly portrays Defendants' business structure as a Ponzi scheme without any real external platform. Am. Compl. ¶¶ 10–11. But the Responding Parties contend—and have always contended in their interactions with the SEC—that GGP was an operating business and that Defendants themselves were victims with net losses when GGP stopped honoring withdrawals and disappeared. *See* Remedies Opp. at 7–8, 11–13; Hearing Reply at 9–11. The analysis conducted by the Responding Parties' experts at Nardello & Co. already shows that the majority of GGP's return flows went to other customers—not Defendants. Remedies Opp. at 17 (citing Strenski Decl., dated Mar. 16, 2026, Ex. 1 at 3–4, 8–9 (describing GGP platform operations in relation to CoinPayments and Binance)). Taken a step further, additional records from GGP's processors and exchanges at CoinPayments and Binance will clarify the nature and scale of GGP's operations and what Defendants reasonably could have understood about them during the relevant time period. That evidence is probative of scienter and, thus, directly pertinent to the appropriate civil-penalty tier and amount. Discovery bearing on scienter in an SEC enforcement action plainly satisfies Rule 26.

*Fourth*, the discovery could prove critical to tracing Relief Defendants' Assets. The SEC seeks constructive trusts over real properties held by Relief Defendants, which requires tracing specific ill-gotten gains to those assets. *Sec. &*

*Exch. Comm'n v. French*, No. 1:23-CV-01443, 2024 WL 6882685, at \*3 (N.D. Ga. Apr. 30, 2024) (ordering relinquishment of property rights only after SEC traced investor funds to purchase and improvement of real estate that relief defendants contributed no personal funds towards). Yet, Defendants' experts have shown that a substantial portion of the funds the SEC labels "ill-gotten" were sent to GGP and never returned. *See* Remedies Opp. at 21–22 (citing White Decl., dated Mar. 16, 2026, at ¶ 12 (calculating net deposits at GGP as $7.9 million); Strenski Decl., dated Mar. 16, 2026, at ¶ 12 (showing that GGP owes Defendants $7.7 million)). Records from CoinPayments and Binance are needed to determine which transfers to GGP led to funds that later re-entered accounts used to acquire or improve the targeted properties and which transfers to GGP were never returned and, thus, could not have funded the properties. Because this discovery goes directly to whether the SEC can satisfy its tracing burden, it is discoverable under Rule 26.

*Fifth*, and finally, the proportionality factors under Rule 26(b)(1) also favor authorizing this discovery. Discovery must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). As to import and the amount-in-controversy, this is a multi-million-

dollar SEC enforcement action involving significant public interests and requests for disgorgement, civil penalties, interest, and constructive trusts. As to access, the Responding Parties do not control GGP, CoinPayments, or Binance, and the SEC has refused to investigate GGP—much less subpoena or otherwise collect records related to the entity. Thus, CoinPayments and Binance are the only realistic sources of much of the necessary information. As to the discovery's importance, the requested records go to the heart of the net-profits calculation, expense characterization, scienter, and tracing—issues the Court must resolve (ideally at an evidentiary hearing) to set the appropriate amount of remedies sought by the SEC. *See* Remedies Opp. at 19–22; Hearing Reply at 12–13. Finally, the Letters Rogatory are narrowly focused on a limited set of wallets, counterparties, and time periods already identified by Defendants' experts. *See* ECF 50 ("Hearing Mot.") at 3–4 ¶¶ 5–6. For sophisticated financial intermediaries, the burden is modest compared to the substantial benefit of resolving multi-million-dollar discrepancies in the SEC's accounting.

As evidenced by the May 8, 2026 declaration of Kevin Strenski (attached hereto as Exhibit L), having access to these records would demonstrably prove the Responding Parties' positions in this case. Based on Mr. Strenski's experience with over 100 Know Your Customer ("KYC") disclosures produced by Binance, records obtained from Binance and CoinPayments would assist in determining several key

issues, including: (a) identities of individual(s) who controlled the Binance account used to process GGP-associated funds; (b) the scope of GGP's operations; (c) whether trading activity was conducted using those funds; and (d) the funds' ultimate destination after being received by GGP.  *See* **Exhibit L** at ¶¶ 4–11.

Given the breadth of relevance under Rule 26(b)(1), the express authorization in the Consent Judgments, and the centrality and proportionality of the requested information, the Letters Rogatory seek plainly discoverable material and should be authorized by the Court.

**B.    The Responding Parties Have Exercised Diligence in Seeking the Requested Documents from CoinPayments and Binance.**

The Court's Order notes that "it is unclear" why the Responding Parties could not have sought the documents requested by the Letters Rogatory (by way of subpoena) earlier.  ECF 62 at 3, n.1.  The record demonstrates not that the Responding Parties have been dilatory in seeking to obtain the requested documents but, rather, that the Responding Parties have pursued information concerning the GGP-controlled wallets with diligence and in a measured, escalating fashion, exhausting reasonable domestic avenues before seeking this Court's assistance through the Letters Rogatory.

*First*, the Responding Parties did not sit on their hands with respect to the foreign-held wallet information.  From the outset of this action, and while the parties were still negotiating remedies, Responding Parties' counsel voluntarily alerted the

SEC to GGP's activities and the specific GGP-controlled wallets at issue, and even requested that the SEC use its own investigative tools to obtain information from Binance. *See* Exs. E–F. That outreach pre-dated the SEC's Remedies Motion and reflects proactive cooperation—not reactive, last-minute discovery requests—despite the SEC's suggestion otherwise. ECF 57 at 7, n.2.

*Second*, once the scope of the SEC's requested remedies crystallized, the Responding Parties promptly turned to formal process. In granting the Responding Parties' Unopposed Motion for Relief from Final Judgment, the Court required the Parties to "meet and confer on an agreed form of final judgment" and should there be no agreement, instructed the Responding Parties to file a response to the SEC's Remedies Motion. ECF 41. Following the initial meet and confer, the Parties exchanged significant document productions and, in the midst of the conferral process, the Responding Parties filed an unopposed request for extension of their response to the Remedies Motion given that the Parties were productively negotiating towards a resolution and agreed-upon form of final judgment. ECF 42 at 3–4. However, once those negotiations broke down, the Responding Parties were required to file their Opposition to the Remedies Motion. ECF 47. On the ***same day*** they filed their Opposition to the Remedies Motion, the Responding Parties issued Rule 45 subpoenas to Binance.US and CoinPayments. ECF 48–49. When those efforts encountered technical and jurisdictional obstacles the Responding Parties

corrected course without delay: they identified the proper domestic agent for Binance.US and re-served; they investigated CoinPayments' true jurisdiction; and, once it became clear that key custodians of responsive records were foreign entities beyond the reach of ordinary Rule 45 subpoenas, they pivoted to requests for international judicial assistance. Exs. G–K; *see also* ECF 51, 55, 59–61.

*Third*, any gaps in the timeline are attributable to procedural events outside the Responding Parties' control, not to a lack of diligence. Throughout these developments the Responding Parties continued to press for wallet-related information—from the SEC, from U.S. affiliates (Binance.US), and now, once identified, from the appropriate foreign entities. *See supra* Section II. Where one avenue closed, the Responding Parties promptly pursued another.

In sum, the record shows continuous and escalating efforts over time: voluntary disclosure and cooperation with the SEC, targeted domestic subpoenas, corrective steps when service proved defective, and follow-up with U.S. affiliates. Then, only after those channels proved ineffective, the Responding Parties promptly pursued their requests for Letters Rogatory to be issued by this Court. This sequence of events shows diligence and underscores that the Responding Parties are not seeking foreign discovery as a first resort, but as a necessary last resort to obtain critical records concerning the GGP-controlled wallets.

**C.      By Utilizing the Letters Rogatory Process, the Responding Parties Do Not Seek Unreasonable Delay.**

The Court's April 27, 2026 Order states that "the issuance of letters rogatory could take several months at best, further delaying this case" and instructed the Responding Parties to explain "why the issuance of letters rogatory at the current posture of this case would not lead to an unreasonable delay." ECF 62 at 2–3. The Responding Parties submit that, at this juncture, Letters Rogatory are warranted in light of materially changed circumstances, rather than any effort to gain a procedural advantage.

In evaluating whether delay associated with letters rogatory is reasonable, courts look unfavorably on requests driven by gamesmanship but recognize, as here, the legitimacy of those prompted by new or evolving facts. *See Onemata Corp.*, 2026 WL 500658, at *6 (granting motion for letters rogatory over opposition claims of "bad faith conduct" and "delay" where sought after discovery was deemed "essential"); *Giraldo v. Drummond Co.*, No. 2:09-CV-1041, 2012 WL 1565829, at *2 (N.D. Ala. Apr. 26, 2012) (granting motion for letter rogatory filed over a year after the deadline, despite defendants' arguments that the motion was untimely and designed to prejudice them, as plaintiffs demonstrated voluntary depositions were no longer possible due to changed circumstances).

The Responding Parties' request for Letters Rogatory is the product of sustained, good-faith efforts to obtain the same information through faster and less

burdensome channels, not a tactic to stall these proceedings. From the outset, Responding Parties' counsel disclosed the GGP-controlled wallets and urged the SEC to obtain the Binance records. Exs. E–F. Once the SEC declined and Binance.US and CoinPayments either disclaimed having responsive records or proved unreachable through subpoenas, the Responding Parties turned to the letters-rogatory mechanism. *See supra* Section II(B).

Nor are the requested Letters Rogatory broad or open-ended. They are narrowly directed to specific foreign entities now known to be the likely custodians of records concerning the GGP-related wallets: CoinPayments' agent in Panama and the three Binance entities organized under the Abu Dhabi Global Market. The requests seek discrete wallet-ownership and transaction data that bear directly on whether, and to what extent, the funds at issue are properly attributable to the Responding Parties for purposes of disgorgement and other remedies. Allowing such targeted discovery promotes accuracy and fairness in the remedies determination and is likely to reduce—rather than increase—the overall duration of this litigation by minimizing the risk of later collateral attacks based on an incomplete factual record.

Finally, the Court retains full authority to structure any impact on the schedule. The Responding Parties do not ask the Court to halt all proceedings pending foreign responses; the Court may require periodic status reports, set or

- 20 -

maintain a hearing date on the Remedies Motion, or calibrate briefing as appropriate while the Letters Rogatory are processed.  Thus, utilizing the letters rogatory process now cannot fairly be characterized as seeking "unreasonable delay."

**D.      Principles of Comity Embody a Promise of Reciprocity Between this Court and the Foreign Courts.**

The Court's April 27, 2026 Order also instructed the Responding Parties to "explain why the Court must be willing to provide similar assistance to foreign judicial authorities or reimburse these foreign judicial authorities for costs incurred in executing potential letters rogatory."  ECF 62 at 3 (internal quotations omitted). The Responding Parties submit that this requirement derives from the twin aims of comity and reciprocity.  *See Roche Diagnostics Corp.*, 2019 WL 4687016, at \*5 ("Both the issuance and enforcement of letters rogatory by U.S. and foreign courts 'rest entirely upon the comity of courts toward each other, and customarily embody a promise of reciprocity.'") (citing 22 C.F.R. § 92.54); *see also In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) (noting "the twin aims" of 28 U.S.C. § 1782 to "'provid[e] efficient means of assistance to participants in international litigation in our federal courts and encourag[e] foreign countries by example to provide similar means of assistance to our courts . . .'").  Notably, the request for assistance from one court to another is made and "usually granted, by reason of the comity existing between nations in

ordinary peaceful times." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 105 F.R.D. 435, 438 n.3 (S.D.N.Y. 1984) (internal citation omitted).

When considering traditional notions of comity, the court is responsible to base its comity analysis on five factors when considering a discovery request abroad. *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 543–44 (1987). The five factors are as follows: (1) the importance to the litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance would undermine important interests of the United States, or compliance would undermine important interests of the state where the information is located. *Id.* at nn.27–28.

*First*, as explained above, these documents are critical to this litigation as they show the ownership and control of funds by GGP that the SEC alleges were improperly and illegally withheld by the Defendants (and subsequently used to pay for the Relief Defendants). By being able to procure the requested documents, the Responding Parties will be able to supplement the cryptocurrency tracing already conducted by its experts to refute the SEC's admittedly incomplete analysis. *See* ECF 57 (SEC's Opp. to Defs.' Mot. for Hearing) at 6 ("The Commission could not

perform a similar analysis [of the crypto exchanges] because Defendants have never provided any transparency into their crypto transactions.").

*Second*, the Letters Rogatory are narrowly tailored. They are directed only to identified custodians—CoinPayments and the three Binance entities in the Abu Dhabi Global Market—and seek discrete categories of records tied to specific wallet addresses already disclosed to the SEC (including the GGP payout wallets and the referenced Binance deposit address). The requests do not seek broad discovery, but focused ownership and transaction records necessary to trace the GGP-related funds.

*Third*, the records at issue are maintained by foreign entities (CoinPayments in Panama and the Binance entities organized under the Abu Dhabi Global Market) regarding activity on their platforms. In practical terms, these records originated in, and are controlled by, those foreign jurisdictions. This factor supports the targeted use of the Letters Rogatory—the very mechanism designed to respect foreign sovereignty when such records are needed in U.S. proceedings.

*Fourth*, alternative means have been tried and exhausted. The Responding Parties first asked the SEC itself to obtain information from Binance regarding the GGP wallets, *see* Exs. E–F, to no avail. They then served Rule 45 subpoenas on Binance.US and CoinPayments, corrected defective service, and obtained formal confirmation from Binance.US that it had no responsive records and that any relevant information would be held by Binance.com. Exs. G–K; ECF 48–51. Only

- 23 -

after learning that the proper custodians were foreign entities beyond the reach of the ordinary Rule 45 process did the Responding Parties resort to these Letters Rogatory. There is no realistic domestic or voluntary alternative left. However, even if it were available by alternative means, for the sake of argument, "the mere fact [of] an alternative method for obtaining the documents is not proof that it is necessarily an effective, or efficient, method for doing so in this case." *Roche Diagnostics Corp.*, 2019 WL 4687016, at \*7 (internal citation omitted).

*Fifth*, and finally, the United States has a strong interest in accurate and fair enforcement of the federal securities laws, including ensuring that disgorgement and other remedies reflect actual ill-gotten gains rather than funds held or retained by third parties abroad. Granting the Letters Rogatory advances that interest by promoting a remedies determination grounded in verifiable transaction data. On the other side of the balance, there is no indication that Panama or the Abu Dhabi Global Market would view limited judicial assistance for basic account and transaction records as contrary to their fundamental public policies. On the contrary, the use of formal letters rogatory is itself a comity-enhancing mechanism. *See In re Clerici*, 481 F.3d 1324, 1332 (11th Cir. 2007) (affirming district court's authority to grant request by Panamanian court for judicial assistance in obtaining information regarding resident of judicial district). On balance, the United States' interests in

- 24 -

accurate securities enforcement, pursued through a respectful international process, outweigh any speculative foreign sovereignty concerns.

## V.    CONCLUSION

For the foregoing reasons, the Responding Parties respectfully request that the Court sign the Proposed Order, filed concurrently herewith, granting their Motion and issue the Letters Rogatory, attached hereto as **Exhibits A–D**, as follows:

1.      This Court would sign two originals of the Letters Rogatory;

2.      This Court would then direct the Clerk of this Court to: (i) enter the Letters Rogatory on the electronic docket, (ii) place the Court's official seal upon each signed Letter Rogatory, and (iii) permit the Responding Parties' counsel to pick up the two signed and sealed Letters Rogatory;

3.      Counsel for the Responding Parties would then transmit the signed and sealed Letters Rogatory to the appropriate foreign authority through the proper diplomatic channels;

4.      The foreign authority would then obtain the requested evidence and return it to this Court; and

5.      This Court would then provide the evidence and executed Letters Rogatory to counsel by entering it on the electronic docket or in any other manner the Court finds appropriate.

Respectfully submitted, this May 11, 2026.

**TROUTMAN PEPPER LOCKE LLP**

*/s/ Mary M. Weeks*
Mary M. Weeks
Georgia Bar No. 559181
Derek Centola
Georgia Bar No. 749911
Hannah L. Baskind
Georgia Bar No. 276384
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
T: 404-885-3000
F: 404-885-3900
mary.weeks@troutman.com
derek.centola@troutman.com
hannah.baskind@troutman.com

Patrick Clendenen (admitted *pro hac vice*)
**PRACTUS, LLP**
555 Long Wharf Drive
New Haven, CT 06511
T: 203-212-9046
patrick.clendenen@practus.com

*Counsel for Defendants Tanner S. Adam, Jonathan L. Adam, Triten Financial Group, LLC and GCZ Global LLC and Relief Defendants Ava A. Adam, Garrett L.W. Adam, Robert S. Adam, Carrie L. Adam, Emilio F. Hinojosa, and Virginia I. Hinojosa*

- 26 -

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Northern District of Georgia Civil Local Rule 7.1.D, I certify that the foregoing document was prepared in Times New Roman 14-point font, in compliance with Local Rule 5.1.C.

*/s/ Mary M. Weeks*
Mary M. Weeks
mary.weeks@troutman.com
Georgia Bar No. 559181

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which automatically serves notification of such filing to all counsel of record.

This 11th day of May, 2026.

/s/ Mary M. Weeks
Mary M. Weeks
mary.weeks@troutman.com
Georgia Bar No. 559181